UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUY NGUYEN,<br><br>          Plaintiff,<br><br>    v.<br><br>WELLS FARGO BANK, NATIONAL ASSOCIATION,<br><br>          Defendant. | Case No.  15-cv-05239-JCS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 28 |

## I.    INTRODUCTION

In this putative class action Plaintiff Huy Nguyen, a Home Mortgage Consultant employed by Defendant Wells Fargo Bank National Association ("Wells Fargo"), challenges various policies and procedures that were applied to him and to other loan officers under Wells Fargo's Home Mortgage Incentive Compensation Plan.  The action was removed to federal court under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C §§ 1332(d)(2) and 1453.  Presently before the Court is Wells Fargo's Motion for Summary Judgment, which came on for hearing on September 23, 2016.  For the reasons stated below, the Motion is GRANTED in part and DENIED in part.[1]

## II.    BACKGROUND

### A.    The Complaint

The operative complaint in this action is the First Amended Complaint ("FAC"), which was filed in San Francisco Superior Court on September 28, 2015.  In the FAC, Plaintiff alleges that during the Class Period, defined as commencing four years before the filing of the FAC and

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

United States District Court<br>Northern District of California

United States District Court
Northern District of California

ending on the date when the class is certified, he was employed by Wells Fargo as a Home Mortgage Consultant in the state of California. FAC ¶¶ 2, 5.  He alleges that he was covered by Wells Fargo's Home Mortgage Incentive Compensation Plan ("Incentive Plan"), and that the Incentive Plan applied to all Home Mortgage Consultants, Home Mortgage Consultants Jr., and Private Mortgage Bankers ("HMCs" or "Loan Officers"). *Id.* ¶¶ 1, 9.[2]

According to Plaintiff,  the "Incentive Plan provides that Loan Officers' compensation is comprised of hourly pay, commissions, bonuses, incentives, and premium pay for overtime hours worked." *Id.* ¶ 11.   Plaintiff alleges that the Incentive Plan "provides that Loan Officers receive Paid Time Off  ('PTO') pay for standard work hours, i.e., non-overtime hours" but that "PTO pay is treated as an 'advance'  against future commissions" and therefore, that Wells Fargo  "deducts any PTO pay from Loan Officers'  future commissions after the PTO time is earned and paid." *Id.* Consequently, Plaintiff alleges, "Loan Officers who take time away from work and receive PTO pay are subject to an unlawful forfeiture by having their PTO pay deducted from their commissions." *Id.*

Plaintiff further alleges that "commission payments are not paid in a timely manner following the conclusion of the period in which they are earned" because under the Incentive Plan, "commission payments are paid on a monthly basis and in the last pay period of the month following the actual funding of mortgage loans generated by the Class Member during the previous month." *Id.* ¶ 12.

Plaintiff alleges that he and all Loan Officers were subject to "deductions from their compensation by Defendant for fees for marketing programs that were reasonably and necessarily incurred by Loan Officers in direct consequence of the discharge of their duties for Defendant's benefit." *Id.* ¶ 13.  In particular, Plaintiff alleges that Wells Fargo makes various marketing

---

[2] In the Stipulated Facts of the Parties for Use in Defendant's Motion for Summary Judgment or Partial Summary Judgment ("Stipulated Facts"), Docket No. 29, the parties have agreed that "employees working in the position of Home Mortgage Consultant, Private Mortgage Banker, Home Mortgage Consultant Jr., and Private Mortgage Banker, Jr. are all treated equivalently" by Wells Fargo and therefore, that "employees in any of these positions shall be referred to as an 'HMC.'"  Therefore, the Court uses the terms "Loan Officer" (the term used in the Complaint) and "HMC" (the term used in the Motion papers) interchangeably.

United States District Court
Northern District of California

outlets available to the Loan Officers, such as "HMC Websites," "FASTMail," "My Mortgage Gift," "Marketing Agreements," and "Facebook," which Loan Officers are trained and encouraged to use.  *Id*.   Further, Wells Fargo allegedly "controls, designs, manages, edits and otherwise has final approval on all content and design of the various marketing programs it allows Loan Officers to use" and Wells Fargo's "trade name and other identifying information are featured in all of these marketing materials."  *Id*.  While Wells Fargo "realizes revenue from any sales generated as a result of the marketing programs," the Loan Officers are charged a fee for each marketing program Loan Officers utilize, which is deducted "as a set-off against future commissions" and called an "adjustment" to wages.  *Id*.

Similarly, Plaintiff alleges that Loan Officers are charged for regular business expenses that are incurred in connection with marketing of Wells Fargo's mortgage products to clients and potential clients throughout Wells Fargo's business areas.  *Id*. ¶ 14.

Plaintiff alleges that he and other formerly employed Loan Officers were not timely and properly paid all of their wages at time of termination.  *Id*. ¶ 15.   He further alleges that he and all Loan Officers "have been harmed by Defendant's unlawful business policies and/or practices in that they have had their wages subject to unlawful deductions, as alleged above, thereby diminishing their agreed-upon compensation."  *Id*. ¶ 16.

Plaintiffs asserts the following claims:  1) Forfeiture of paid time off in violation of California  Labor Code sections 201, 202, 203, 221, 223,  and 227.3 based on the theory that Wells Fargo improperly deducted from HMCs' commission payments the amount of PTO pay that had already been earned and paid (Claim One); 2) Failure to pay wages timely in violation of California Labor Code sections 204 and 226 based on the theory that Wells Fargo is required to pay commissions on a semi-monthly basis and in the pay period in which they were earned rather than on a monthly basis the month *after* the commissions are earned (Claim Two); 3) Unlawful wage deductions in violation of California Labor Code sections 221, 223, 400-410, and Cal. Code Reg. Tit. 8, § 11040(8) based on Wells Fargo's deductions from HMC compensation in connection with their use of marketing programs offered by Wells Fargo  (Claim Three); 4) Failure to reimburse business expenses in violation of California Labor Code section 2802 based

1   on failure to reimburse HMCs for costs associated with use of marketing programs and other

2   business expenses (Claim Four); 5) Failure to pay wages at termination in violation of California

3   Labor Code sections 201-203 (Claim Five); 6) Unlawful wage statements in violation of

4   California Labor Code sections 226, 1174, and 1174.5 (Claim Six); 7) Unfair competition in

5   violation of California Business & Professions Code sections 17200 *et seq.* (Claim Seven); and 8)

6   Labor Code Private Attorneys General Act of 2004, Labor Code sections 2699 *et seq*. (Claim

7   Eight).

8       **B.**    **Factual Background[3]**

9           **1.  Plaintiff's Employment with Wells Fargo**

10        Between approximately October 1, 2011 and August 17, 2015, Plaintiff Huy Nguyen

11  worked for Wells Fargo in California in different HMC positions, including Home Mortgage

12  Consultant and Private Mortgage Banker.  Stipulated Fact Nos. 1, 3.  As an HMC, Plaintiff

13  originated mortgage loans, which involved receiving applications from potential borrowers,

14  assembling and submitting the loan files to underwriting, obtaining approval, and closing and

15  funding the loan. Defendant Wells Fargo Bank, N.A.'s Appendix of Evidence in Support of its

16  Motion for Summary Judgment ("Appendix of Evidence"), Ex. F (Nguyen Dep.) at 169-70.

17  While Nguyen's job titles changed during the relevant time period, the parties agree that these

18  changes did not alter his compensation arrangement materially.[4]  Stipulated Fact No. 2.

19        When Nguyen began a new HMC position, he received an offer letter that set forth certain

20  terms and conditions of his employment.  Stipulated Fact No. 4 & Ex. A (Sample Offer Letter,

21

22  [3] The facts set forth below are undisputed unless otherwise noted.  The Court notes that the parties have expressly stipulated to many of the facts at issue in this case, including the challenged

23  compensation policies.  *See* Stipulated Facts, Docket No. 29.  The Court cites to the stipulated facts contained therein as "Stipulated Fact No. __ ."  Where applicable, the Court uses the original

24  pages numbers of the documents attached as exhibits rather than the page numbers stamped on the documents by the parties (bottom right-hand corner of documents) or the pages assigned to the

25  documents by the Court's electronic filing system (ECF).  It appears that Plaintiff has cited to the ECF page numbers in citing to documents attached to the Stipulated Facts.

26  [4] Although the Stipulated Facts list only two positions that were held by Plaintiff – Home Mortgage Consultant and Private Mortgage Banker – it appears to be undisputed that he also held

27  the position of Home Mortgage Consultant Junior at some point.  *See* Stipulated Fact No. 1; Motion at 3 (stating that Plaintiff held all three positions).

28

United States District Court
Northern District of California

dated January 27, 2014 ("2014 Offer Letter")).  These offer letters ("Offer Letters") referenced a Compensation Plan for Home Mortgage Consultants ("HMC Comp Plan"), which was updated approximately once a year.  Stipulated Fact Nos. 5-6.  The updated compensation plan superseded the previous plan as to mortgage loans funded after a certain date.  Stipulated Fact No. 6;  *see also* Stipulated Facts, Exs. B, C and D (HMC Comp Plans for 2013-2015) (hereinafter, "the HMC Comp Plans" or "the Plans").  At all times relevant to the Motion, Plaintiff's employment was governed by the terms and conditions outlined in the HMC Comp Plans.  *See* Stipulated Facts Nos. 7-9.

In addition, the Offer Letters that Nguyen received specified the number of days of paid time off (PTO) for which he was eligible every year.  Stipulated Facts Nos. 4, 10.  For example, in 2014, Nguyen was eligible to accrue up to 18 days of PTO.  Stipulated Fact No. 10 & Ex. A (2014 Offer Letter).  When Nguyen took a day off for vacation, eight hours would be deducted from his PTO bank and he would be paid $96 in earned vacation wages, calculated based on his regular hourly rate of $12/hour.  Stipulated Fact No. 11;  *see also* Stipulated Facts, Ex. B at 11, Ex. C. at 10, Ex. D at 10 (providing that PTO is paid at the HMC's regular rate of pay for normal hours worked).

### 2.  Wells Fargo's Compensation Plans

Under the HMC Comp Plans, compensation is "comprised solely of (a) hourly pay (Advances on Commissions), (b) commissions, bonuses and other incentives received, if any, . . . in excess of advances, and (c) overtime premiums for overtime hours worked in accordance with applicable law."  Stipulated Facts, Ex. B at 2, Ex. C at 2, Ex. D at 2.   Although the hourly pay is considered to be an "advance" that is "taken into account in calculating net commissions/ incentives," the Plans provide that Wells Fargo does not have "the right to recover any hourly pay back from any employee" and that "[h]ourly pay is fully vested when received and is not subject to recapture by [Wells Fargo] under any circumstances."  Stipulated Facts, Ex. B at 9, Ex. C at 8, Ex. D at 8.   Similarly, compensation for PTO is advanced against commissions, *see id*., but vests in the pay period in which it is accrued and is not subject to recapture by Wells Fargo.  Thus, to the extent HMCs do not use all of their accrued vacation pay allotment during their employment,

United States District Court
Northern District of California

1    such amount is paid out with the final paycheck at their last hourly rate.  Stipulated Fact No. 12.

2        Under the Plans, hourly pay and any PTO paid out for a given month is subtracted from

3    commissions.  Stipulated Facts, Ex. B at 7-8, Ex. C at 6-7, Ex. D at 6-7 (sample calculation

4    illustrating calculation of compensation and "how monthly commissions are handled").   The

5    primary credit in an HMC's incentive compensation is "commission credit" arising from monthly

6    loan originations.  See Stipulated Facts, Ex. B at 2-6, Ex. C at 2-6, Ex. D at 2-6.  Certain loans

7    have a specific commission rate assigned to them, such as a flat rate where the HMC refinances an

8    existing Wells Fargo loan.  Stipulated Facts, Ex. B at 3, Ex. C at 3, Ex. D at 3.  The commission

9    rate on most types of loans is based on a commission schedule that derives the commission rate

10   from total monthly loan activity.  Stipulated Facts, Ex. B at 2, Ex. C at 2, Ex. D at 2;  *see also*

11   Appendix of Evidence, Ex. F (Nguyen Dep.) at 93 (agreeing that for loans covered by the

12   commission schedules in the HMC Compensation Plans, "you look at the monthly units funded

13   and the monthly dollar volume to figure out what the commission is going to be for those loans").

14   In general, as an HMC originates more loans during a calendar month, the commission rate

15   applicable to all the loans increases on a tiered basis under the commission schedules.  *See id.*

16       As discussed above, the amount of an HMC's commission is reduced by the amount of any

17   "advances" already paid for the HMC's regular hours, including PTO pay.   In addition, Wells

18   Fargo deducts from commissions charges related to the HMC's enrollment in certain

19   marketing programs.  *See* Stipulated Facts, Ex. B at 5 ("Employee's commission credit shall be

20   adjusted in association with the use of any voluntary marketing programs"), Ex. C at 4

21   ("Employee's commission credit shall be adjusted downward by the charge for any voluntary

22   marketing programs used by the Employee" including "HMC Websites, FASTMail,

23   MyMortgageGift, Marketing Agreements and Facebook"), Ex. D at 4 (same).  In this case,

24   Plaintiff testified that he used two of these marketing programs, FASTMail and the HMC website.

25   Appendix of Evidence, Ex. F (Nguyen Dep.) at 114-115.

26       According to Wells Fargo Senior Vice President of Business Services Jennifer Clark, the

27   HMC websites were offered in response to the desire of some HMCs to set up individual websites

28   to "supplement the central Wells Fargo Home Mortgage website and the branch level websites."

Clark Decl. ¶ 3.  She states:

> To deal with concerns about individual HMCs posting noncompliant websites, Wells Fargo created a program that would allow HMCs to have an individual website that would be mostly standardized content that Wells Fargo would ensure remained current with the governing regulations. The HMCs could customize a portion of the website and the website would include their contact information and include functionality that would allow the customer to submit some information that would be fed into an actual mortgage application. HMCs could not take applications through the website itself though.

*Id*. ¶ 3.  Clark further states that "prior to January 2016, Wells Fargo charged a $95 set up fee for the website (which included the first month's monthly fee) and then $40 per month for each month the HMC kept the website active," which it "used . . . to pay for hosting the websites and keeping them current with regulations."  *Id*. ¶ 4.  These fees were included as a debit in each month's commission calculation, reducing the final incentive pay calculation by the amount of the fee.

The FASTMail program, according to Clark, is a "contact management program" that was developed by Wells Fargo that "allows HMCs to stay in contact with people in their 'book of business,' which includes both former customers and potential new customers."  *Id*. ¶ 7.  Clark explains:

> [s]imilar to the websites, there is extensive regulation over mailing communications with potential customers. Accordingly, while HMCs can set up their own mailers to their book of business, they need to be evaluated by Wells Fargo to ensure they comply with regulations, and their book of business needs to be "scrubbed" to eliminate anyone from the mailing on a "do not call list." To simplify things for HMCs, they can subscribe to FASTMail, which will cause a number of . . . customized mailing[s] to be sent to their book of business. The mailings have their name on them (in addition to Wells Fargo's), which allows the direct recipients to contact the HMC specifically.

*Id*.  She states further that "HMCs pay a monthly fee at a tiered level depending on the number of pieces of mail[] they have sent out, which usually relate[s] to how many people they have in their book of business."  *Id*. ¶ 8.  According to Clark, "[s]ince 2013, the monthly rate has ranged from approximately $45 to $340 (exclusive of postage)."  *Id*.

As of January 1, 2016, Wells Fargo began offering HMCs an individual website free of charge.  Clark Decl. ¶ 6.  In addition, at that time Wells Fargo began offering a "loyalty program" whereby HMCs with adequate loyalty ratings received a subsidy on their FASTMail charges.

7

1    Wynn Decl., Ex. 3 (Clark Dep.) at 17-18.

2          A copy of the Wells Fargo Expense Reimbursement Policy from January 2009 describes

3    FASTMail and HMC websites as "optional marketing and advertising services" and further states

4    that "[a]lthough [these] services . . . are not mandatory or necessary, some HMCs might consider

5    them helpful in promoting their business."  Wynn Decl., Ex. 11.  A Wells Fargo webpage entitled

6    "HMC Online Advertising Toolkit" describes the individual HMC websites as "a vital tool for

7    your business."  Wynn Decl., Ex. 4 (Toolkit).  The Toolkit further states that the HMC individual

8    website is a "valuable business tool" that "provides greater business efficiency."  *Id*.

9          Regarding FASTMail, a survey conducted by Wells Fargo in 2010 and described in a

10   training Powerpoint presentation entitled "FASTMail Works, FASTMail Works for You,"

11   revealed that "[a]lmost 90% of those surveyed rated FASTMail as a valuable/very

12   valuable/extremely valuable program."  Wynn Decl., Ex. 8 at 3.  Another survey was conducted in

13   2013;  comments about FASTMail included:  "all my refinances have come from my FASTMail,"

14   "I always get calls after the mailer goes out," and "I regularly get calls from former customers

15   solely due to FASTMail."  Wynn Decl., Ex. 9.  Many HMCs also commented that they were

16   pressured to use FASTMail or told they had to use it:  "Management sells this product to HMC

17   with implications that our book of business will be given to other HMCs to market [to] if we

18   don[']t sign up and pay Wells Fargo for postage and mailers," "was told I had to subscribe no

19   choice in the matter," "we are forced to participate in Fast Mail or we were told we would lose our

20   branch assignments," "It is hard to be called a voluntary program and then be told you will [lose]

21   your branch if you withdraw."  *Id*.

22         The undisputed evidence shows that a substantial percentage of HMCs use these marketing

23   programs.  In particular, Stephanie Clark testified in her deposition that currently 85% of HMCs

24   have HMC websites and that even before Wells Fargo began offering the websites for free, in

25   January 2016, 66% of HMCs used them.  Wynn Decl., Ex. 3 (Clark Dep.) at 10, 21, 41. She also

26   testified that 54% of HMCs use FASTMail.  *Id*. at 10.

27         Wells Fargo issues paychecks to HMCs every two weeks and the HMCs' hourly pay is

28   included in this bi-weekly paycheck.  Stipulated Fact Nos. 13-4.  15.  Incentive pay based on

United States District Court
Northern District of California

8

1   monthly loan fundings is paid on the last pay day of the month following the month in which the

2   loans funded.  Stipulated Fact No. 15.  In particular, under Section 5(A) of the Comp Agreements,

3   "[s]ubject to the commission reconciliation process set forth above, net commissions (gross

4   commissions less hourly pay advances) shall be paid on the last pay period of each month based

5   on the actual funding of mortgage loans originated by Employee during the previous month."

6   Stipulated Facts, Ex. B at 9, Ex. C at 8, Ex. D at 8.  The Comp Plans provide that "[p]rovided

7   Employee satisfies all conditions and minimum requirements as set forth in the Plan, and subject

8   to all Plan terms, commission credit will be granted on the last day [of] the month in which the

9   loan actually funds."  Stipulated Facts, Ex. B at 2, Ex. C at 2, Ex. C at 2.

10          Section 5(C) of the HMC Comp Plans contains further requirements relating to when

11   commissions are "credited" or "earned."[5]   *See* Stipulated Facts, Ex. B at 9, Ex. C at 8, Ex. D at 8.

12   The text of these sections varies slightly in the HMC Comp Plans but there do not appear to be any

13   significant differences between them other than the use of the word "credited" in the title of the

14   2013 and 2014 versions and "earned" in the title of the 2015 version.  The Court quotes only one

15   version of this provision, found in the 2013 HMC Comp Plan:

16          **When Incentive Payments are credited.**   To earn commissions,
            bonuses, or other incentives under this Plan, the Employee must be
17          actively Employed by Wells Fargo through the date commission
            credit is granted and through the end of the applicable performance
18          period, unless otherwise expressly provided in this Plan or required
            by applicable law.   This is an express condition of earning
19          incentives under this Plan, it being one purpose of this Plan to
            provide an incentive to the Employee to remain in employment with
20          Employer.  This condition also recognizes the Employee's ongoing
            responsibilities with respect to the closing of loans on which the
21          Employee may be eligible to receive commissions/incentives.  As
            provided in this Plan, some commissions and other incentives are
22          estimates when paid, or are subject to adjustments after they are
            paid.  When paid, those commissions, bonuses, or other incentives
23          are advances of anticipated wages and are not wages that the
            Employee has earned.  Those advances are not earned until after all
24          adjustments provided for in this plan have been calculated and
            implemented, and the other terms and conditions of the Plan have
25          been satisfied.

26   _____

27   [5] In the 2013 and 2014 HMC Comp Plans, this provision is entitled "When Incentive Payments are
    Credited."  In the 2015 HMC Comp Plan, the provision is entitled "When Incentive Payments are
28   Earned."  *See* Stipulated Facts, Ex. B at 9, Ex. C at 8, Ex. D at 8.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Stipulated Facts, Ex. B (2013 HMC Comp Plan) at 9.

2     Wells Fargo's 30(b)(6) witness, Mark Faktor, testified in his deposition about the time it

3  takes to calculate and verify the amounts of the commission payments.  Appendix of Evidence,

4  Ex. G at 38-41, 43-44, 55.  The process begins when the information about the previous months'

5  loan fundings become available; other types of information, including the HMC's previous

6  month's hours, are also submitted and calculations are then performed and verified.  *Id.*

7  According to Faktor, this calculation and verification process takes approximately 15 days.  *Id.* at

8  37- 38.  He agreed that Wells Fargo already has some of the necessary data once a loan is funded

9  but that "the system is just set up [so] that it doesn't retrieve the data until eight to twelve business

10  days after month-end." *Id.* at 41.   Faktor also testified that he believes that commissions are not

11  earned until the calculation and verification process is complete, which occurs approximately two

12  days before commissions are paid, at the end of the month that follows the loan fundings.  Wynn

13  Decl., Ex. 2 (Faktor Dep.) at 51-53.

14     **C.    The Motion**

15     In the Motion, Wells Fargo asserts that all of Plaintiff's claims fail as a matter of law.

16  With respect to Claim One (unlawful forfeiture of vacation pay in violation of California Labor

17  Code Section 227.3), Wells Fargo contends Plaintiff does not allege any forfeiture of vacation pay.

18  Motion at 1, 11-13.  In particular, Wells Fargo asserts that PTO is "accrued and paid in strict

19  compliance with Labor Code Section 227.3" and there is "nothing unlawful about Wells Fargo

20  paying Plaintiff incentive pay only to the extent the commission credit exceeded wages already

21  paid in hourly pay and paid time off." *Id.* at 11.  This is because "an employee's right to incentive

22  pay depends on the terms of the employee's compensation agreement with the employer,"

23  according to Wells Fargo, "and the employee earns incentive pay only to the extent he satisfies

24  contractual terms for such pay." *Id.* at 11-12 (citing *Koehl v. Verio, Inc.*, 142 Cal. App. 4th 1313

25  (2006); *Prachasaisoradej v. Ralphs Grocery Co., Inc.*, 42 Cal. 4th 217, 239 (2007); *Deleon v.*

26  *Verizon Wireless, LLC*, 207 Cal. App. 4th 800, 808-09 (2012); *Steinhebel v. Los Angeles Times*

27  *Communications, LLC*, 126 Cal. App. 4th 696, 705 (2005); *Prudential Ins. Co. v. Fromberg*,

28  240 Cal. App. 2d 185, 189-193 (1966); *Kemp v. IBM*, 2010 U.S. Dist. LEXIS 118801, *12-14

10

1    (N.D. Cal. Nov. 4, 2010)).

2           Wells Fargo challenges the sufficiency of the pleadings as to Claim Two on three grounds.

3    Motion at 1-2, 13-18.  First, Wells Fargo argues that California Labor Code Section 204 requires

4    only that employers establish paydays at least bimonthly and Wells Fargo has met that

5    requirement by paying regular wages and PTO on a biweekly basis.  *Id*. at 1, 14 (citing *Ephraim v.*

6    *Jamestown Judicial District Court*, 120 Cal. App. 2d 741 (1953); *In re Moffett*, 19 Cal. App. 2d 7,

7    13 (1937);  *De la Torre v. American Red Cross*, 2013 U.S. Dist. LEXIS 146462, *12-14 (C.D.

8    Cal. Oct. 9, 2013);  *Hadjavi v. CVS Pharmacy, Inc*., 2010 U.S. Dist. LEXIS 143726, * 5-7

9    (C.D. Cal. Sep. 22, 2010); *See's Candy Shops. Inc. v. Superior Court*, 210 Cal. App.

10   4th 889 (2012)).

11          Second, with respect to the payment of commissions at the end of the month that follows

12   the loan fundings, Wells Fargo argues this practice complies with section 204 because it pays the

13   commissions promptly once the commissions are calculated.  *Id*. at 15.  According to Wells Fargo,

14   "California has long recognized that the requirements to pay wages under Labor Code Section 204

15   do not apply to incentive pay in the same manner as they apply to hourly pay."  *Id*. at 15.  In

16   particular, it points to an exception to section 204 set forth in Section 5.24 the Division of Labor

17   Standards Enforcement Manual, which provides:

18                    Base salary must be paid pursuant to the provisions of Labor Code §
                      204; however, certain exceptions are provided in the statute for
19                    specified extraordinary wages. For instance, if a bonus . . . is
                      calculated on a quarterly basis, the bonus need not be paid until the
20                    regular payday following the date upon which the bonus is
                      calculated.
21

22   DLSE Enforcement Manual, pp. 5-1 to 5-2 (citing opinion letter 1986.12.23).  Similarly, Wells

23   Fargo contends, the evidence is undisputed that determination of the commission amounts requires

24   certain data that is not available until the end of the month of the loan funding; moreover, the

25   undisputed evidence shows that even after this data is available, it takes another 15 days to

26   complete and verify the calculations.  *Id*. at 16.  Nor is there any surprise for the HMCs related to

27   these payments, Wells Fargo asserts, as they are made on the same day each month and the Comp

28   Plans make clear that the commission payments are not earned until the calculations are complete.

United States District Court
Northern District of California

11

1    *Id*.

2         Finally, Wells Fargo argues that California Labor Code section 204 does not create a

3    direct private right of action.  *Id*. at 17-18 (citing *Slay v. CVS Caremark Corp*., 2015 U.S. Dist.

4    LEXIS 58261 (E.D. Cal. May 4, 2015)).

5         Wells Fargo argues that Claim Three (unlawful deductions from wages) fails because

6    California Labor Code section 221 prohibits only deductions from wages that have already been

7    earned;  the deductions here are from commissions, however.  *Id*. at 18.  Under section 221, Wells

8    Fargo asserts, the reductions in an HMC's commission based on marketing expenditures are not

9    "deductions" because the commissions are not "earned" until all the conditions in the Comp Plans

10   are satisfied, including the completion of the final calculation of the amount.  *Id*. at 18-19 (citing

11   *Steinhebel*, 126 Cal. App. 4th at 707;  *Deleon*, 207 Cal. App. 4th at 808;  *Koehl*, 142 Cal. App. 4th

12   at 1330; *Ralphs Grocery Co*., 42 Cal. 4th at 236).  Wells Fargo contends that its compensation

13   plan, like the one in *Ralph's Grocery*, is consistent with section 221 because it does "'not create an

14   expectation of or entitlement to a specified wage, then take deductions or contributions from that

15   wage to reimburse [the company] for its business costs.'"  *Id*. at 19 (quoting *Ralph's Grocery*, 42

16   Cal. 4th at 223-24.  "Instead, 'ordinary business expenses . . .  were figured in . . .to determine  . . .

17   profit, upon which . . . compensation payments were calculated'."  *Id*. (quoting *Ralph's Grocery*,

18   42 Cal. 4th at 223-24).

19        Wells Fargo also argues that the marketing programs at issue here are fundamentally

20   different from the types of expenses for which deductions are prohibited under section 221, such

21   as cash shortages, breakage and loss of equipment.  *Id*. at 19 (citing IWC Wage Order 4-2001 § 8;

22   *Hudgins v. Neiman Marcus Group, Inc*., 34 Cal. App. 4th 1109, 1123-24 (1995)).  In contrast to

23   the latter sorts of expenses, the marketing programs used by HMCs are for the direct benefit of the

24   HMCs themselves, Wells Fargo contends, and therefore are not within the "spirit" of section 221.

25   *Id*.

26        Wells Fargo argues that Claim Four, asserted under California Labor Code section 2802,

27   also fails as a matter of law.  *Id*. at 20-22.  Section 2802 requires that an employer must

28   "indemnify his or her employee for all necessary expenditures or losses incurred by the employee

1  in direct consequence of the discharge of his or her duties."  *Id.* at 20.  To the extent that Plaintiffs

2  contend they are entitled to reimbursement for the subscription fees for the marketing programs

3  discussed above, Wells Fargo argues, they are incorrect because these programs are optional and

4  therefore are not "necessary expenditures."  *Id.*  According to Wells Fargo, the case law

5  establishes that optional expenses are not "necessary expenditures."  *Id.* at 20-21 (citing *Morgan v.*

6  *Wet Seal*, 210 Cal. App. 4th 1341 (2012); *Buchanan v. HomeServices Lending, LLC*, 2013 U.S.

7  Dist. LEXIS 60156, *15-16 (C.D. Cal. Apr. 25, 2013); *Novak v. The Boeing Company*, 2011 U.S.

8  Dist. LEXIS 83031 (C.D. Cal. Jul. 20, 2011);  *Aguilar v. Zep, Inc.*, 2014 U.S. Dist. LEXIS 120315

9  (N.D. Cal. Aug. 27, 2014)).

10        Finally, Wells Fargo argues that all of Plaintiff's remaining claims fail because they are

11  derivative of Claims One through Four.  *Id.* at 22.  Therefore, it contends, these claims fail for the

12  same reasons those claims fail.  *Id.*

### III.    ANALYSIS

####    A.    Legal Standard Under Rule 56

15        Summary judgment on a claim or defense is appropriate "if the movant shows that there is

16  no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

17  law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

18  the absence of a genuine issue of material fact with respect to an essential element of the non-

19  moving party's claim, or to a defense on which the non-moving party will bear the burden of

20  persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has

21  made this showing, the burden then shifts to the party opposing summary judgment to designate

22  "specific facts showing there is a genuine issue for trial."  *Id.*  On summary judgment, the court

23  draws all reasonable factual inferences in favor of the non-movant.  *Scott v. Harris*, 550 U.S. 372,

24  378 (2007).

####    B.    Failure to Reimburse for Marketing Expenses Under California Labor Code
         Section 2802 (Claim Four)

        Section 2802 provides, in relevant part, that "[a]n employer shall indemnify his or her

employee for all necessary expenditures or losses incurred by the employee in direct consequence

1   of the discharge of his or her duties." Cal. Lab. Code § 2802(a). Wells Fargo seeks summary

2   judgment on Plaintiff's claim under Labor Code section 2802 on the basis that enrollment in the

3   marketing programs at issue in this case is optional and therefore these expenses are not

4   "necessary" for the purposes of section 2802.  The Court concludes that there are material disputes

5   of fact as to whether the marketing costs are "necessary expenditures" and therefore denies Wells

6   Fargo's request for summary judgment on this claim.

7            Section 2802(c) provides that "[f]or purposes of this section, the term 'necessary

8   expenditures or losses' shall include all reasonable costs, including, but not limited to, attorney's

9   fees incurred by the employee enforcing the rights granted by this section."  California courts have

10  found that "[n]ecessity is by nature a question of fact" and that "the reasonableness of any given

11  expenditure must turn on its own facts."  *Grissom v. Vons Companies, Inc.*, 1 Cal. App. 4th 52, 58

12  (1991).  Consequently, summary judgment on the question of whether an expenditure is necessary

13  for the purposes of section 2802 is only appropriate where the facts are undisputed and no

14  conflicting inferences are possible. *Takacs v. A.G. Edwards & Sons, Inc.*, 444 F. Supp. 2d 1100,

15  1124–25 (S.D. Cal. 2006).  That is not the case here.

16           While participation in Wells Fargo's marketing programs is officially "optional," there is

17  evidence in the record that support an inference that HMCs are strongly encouraged to use some of

18  these programs in their work and that a high proportion of HMCs use them. Indeed, Wells Fargo

19  itself describes the individual HMC websites as "vital." Wynn Decl., Ex. 4 (Toolkit).  The

20  conflicting evidence as to whether the subscription fees paid by Plaintiff for the use of an

21  individual HMC website and FASTMail were a "reasonable cost" precludes summary judgment

22  on this claim. *See, e.g.,  Takacs v. A.G. Edwards & Sons, Inc.*, 444 F. Supp. 2d 1100, 1104 (S.D.

23  Cal. 2006).  *Takacs* illustrates this point.  In that case, the plaintiffs were former financial

24  consultants who sought to recover certain business expenses under Section 2802, including

25  advertising costs.  *Id*. at 1124.  The defendant argued that "it provided Plaintiffs with the necessary

26  tools, such as support staff, office equipment, phone and other costs, but the 'financial consultants

27  had the option to purchase, at their own expense, other business items over and above those

28  necessary to doing business and for their own entrepreneurial initiatives.'" *Id.*  Because these

United States District Court
Northern District of California

14

United States District Court
Northern District of California

1    expenses were optional, the defendant argued, it was entitled to summary judgment that these

2    expenses were not "necessary" under Section 2802.  *Id*.  The court rejected this argument,

3    however, finding instead that there were fact questions that precluded summary judgment on the

4    question of whether the expenses were "necessary," even though there was no express policy

5    requiring employees to incur these expenses.  The same is true here.

6            Further, Wells Fargo argument that there is a bright-line rule that only expenses that are

7    officially required can be considered "necessary" does not square with the case law.  Wells Fargo

8    relies heavily on two cases that involve class certification, *Morgan v. Wet Seal*, 210 Cal. App. 4th

9    1341 (2012) and *Buchanan v. HomeServices Lending, LLC*, 2013 WL 1788579 (C.D. Cal. Apr.

10   25, 2013).   As Wells Fargo correctly notes, in both cases the holding was "based on the court's

11   determination that individualized issues existed as to whether expenses were necessary." Reply at

12   12.  These cases stand for the unremarkable proposition that where there is a company policy

13   requiring that employees incur certain expenses, the resolution of the question of whether

14   expenses are "necessary" under section 2802 is easily handled on a classwide basis whereas, in the

15   absence of such a policy, the question of whether an expense was "necessary" will be require an

16   inquiry concerning the specific facts of each class member's circumstances.  *See  Buchanan v.*

17   *Homeservices Lending LLC*.,  2013 WL 1788579, at *5 ("without a stated company policy

18   requiring HMCs to enroll in the marketing programs as a condition of employment, the Court

19   finds no common method to prove liability on a class-wide basis");  *Morgan v. Wet Seal, Inc*., 210

20   Cal. App. 4th at 1362 ("there is no class-wide method of proof with regard to the fundamental

21   liability questions at the heart of both sets of plaintiffs' claims [because] Wet Seal's written

22   polices do not require employees to (1) purchase and wear Wet Seal clothing as a condition of

23   employment; and/or (2) use their own vehicles to travel on work business without

24   reimbursement.").  These cases do *not* hold that an expense is "necessary" only if it is required

25   under an official employer policy.  Instead, the courts in *Morgan* and *Buchanan* recognize that

26   expenses may be "necessary" based on other circumstances.[6]

27   _____

28   [6] The Court notes that in both of these cases the plaintiffs' claims under California Labor Code

15

The Court also rejects Wells Fargo's reliance on *Novak v. The Boeing Company* and *Aguilar v. Zep, Inc*. Wells Fargo contends the courts in these cases expressly held that "optional expenses are not necessary." Reply at 14. First, even assuming this is an accurate characterization of the holding of these cases, the record in this case contains conflicting facts about whether the expenses at issue were truly optional, as discussed above. The fact that Wells Fargo's *formal* policy is to treat these costs as optional is not dispositive of this question. Second, the facts of both cases are distinguishable from those in this case.

In *Novak*, the court held that the expenses associated with working out of a home office were not "necessary" expenses where participation in the work-at-home required approval and where the employer "ma[de] physical workspaces with computers, phones, and other necessary equipment available at its offices to employees so that they [did] not have to work remotely." *Novak v. Boeing Co.*, No. SACV 09-01011-CJC, 2011 WL 9160940, at *3 (C.D. Cal. July 20, 2011). Under these circumstances, the court held, as a matter of law, that the expenses were not "necessary" under section 2802, even though it acknowledged that typically this question is one of fact; it therefore granted summary judgment in favor of the employer on the section 2802 claim. *Id*. The facts here do not involve expenses for services that the employer already provides, however, and therefore *Novak* does not support the conclusion that the necessity of the expenses at issue in this case should be decided on summary judgment.

Nor does *Aguilar* support Wells Fargo's request for summary judgment on the section 2802 claim. In *Aguilar*, the employer deducted a variety of expenses from the commissions it paid to outside sales representatives it hired to sell its cleaning and janitorial products. *Aguilar v. Zep Inc.*, No. 13-CV-00563-WHO, 2014 WL 4245988, at *1 (N.D. Cal. Aug. 27, 2014). As to many of these expenses, namely, credit card fees, phone order fees, and costs deducted for repairs not caused by the fault of the plaintiffs, the court granted summary judgment in favor of the plaintiffs, finding that the employer was impermissibly passing on the cost of doing business to its employees. *Id*. As to certain other expenses (free products, free freight, minimum order fees,

section 2802 survived the pleading stage of the case.

16

collections, novelties and literature, and costs of returned items), the court found that there were material issues of fact as to whether "there was an implied-in-fact agreement that would allow [the employer] to deduct other items." *Id*. Finally, the court granted summary judgment in favor of the employer as to the expenses associated with gifts, meals, and entertainment. *Id*. As to this last category of expenses (the ones upon which Wells Fargo relies in support of its request for summary judgment in this case), the court's holding was based not only on the fact that the expenses were optional but also on the fact that the employer did not know about them, which is a requirement for reimbursement under section 2802. *Id*. at *18. Because the expenses at issue here are ones of which Wells Fargo has knowledge, *Aguilar* is not on point.

Accordingly, the Court finds that there are material issues of fact that preclude summary judgment as to Claim Four.

### C. Failure to Pay Commissions on a Bi-Monthly Basis under California Labor Code Section 204 (Claims Two, Seven and Eight)

Plaintiff concedes that California Labor Code section 204 does not create a private right of action, as this Court held in *Villalpando v. Exel Direct Inc.*, No. 12-CV-04137 JCS, 2014 WL 1338297, at *17 (N.D. Cal. Mar. 28, 2014), and therefore, that Claim Two should be dismissed. Opposition at 15. He contends, however, that the violations of section 204 that he alleges can be asserted by way of his PAGA and UCL claims (Claims Seven and Eight). *Id*. Wells Fargo does not dispute that a violation of section 204 can form the basis for a claim under the UCL or for PAGA penalties but argues that the undisputed facts establish that there is no violation in the first instance. The Court disagrees.

Section 204(a) provides that "[a]ll wages . . . earned by any person in any employment are due and payable twice during each calendar month. . . ." Wages include "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." Cal. Labor Code § 200(a). "In other words, all earned wages, including commissions, must be paid no less frequently than semimonthly." *Peabody v. Time Warner Cable, Inc.*, 59 Cal. 4th 662, 668 (2014). Nonetheless, the California Supreme Court has recognized that "(1) commissions are not *earned*

United States District Court
Northern District of California

17

1  or owed until agreed-upon conditions have been satisfied, and (2) such satisfaction often may

2  occur on a monthly or less frequent basis." *Id.* (emphasis added).

3        While the legal conditions precedent that determine when a commission is earned are "a

4  matter of contract between the employer and employee," they are "subject to various limitations

5  imposed by common law or statute."  *Koehl v. Verio, Inc.*, 142 Cal. App. 4th 1313, 1335 (2006)

6  (quoting DLSE Opinion Letter No. 1999.01.09, p. 2).  Thus, the DLSE Opinion letter cited in

7  *Koehl* states that "California courts will not enforce unlawful or unconscionable terms and will

8  construe any ambiguities against the person who wrote the contract (usually the employer) to

9  avoid a forfeiture."  DLSE Opinion Letter No. 1999.01.09, p. 2.

10       Here, Wells Fargo takes the position that commissions are not "earned" until the

11  calculation and verification process is complete, citing the testimony of Mark Faktor and Section 5

12  of the Comp Plans.  Reply at 7-8.  Faktor, however, was unable to point to any basis for his

13  opinion in the Comp Plans or any other writing that might reflect an agreement between Wells

14  Fargo and the HMCs that commissions are not earned until all calculations and verifications are

15  completed.  Wynn Decl., Ex. 2 at 52-53.  Moreover, the language in the Comp Plans is not clear

16  on this question.  While Wells Fargo represents that Section 5(A) "expressly provide[s] . . .that no

17  incentive pay is *earned* until the 'reconciliation process' of calculating all adjustments is

18  completed," that section only specifies when "net commissions will be *paid*" and makes that

19  timing contingent on the "commission reconciliation process."  *See* Stipulated Facts, Ex. B at 9,

20  Ex. C at 8, Ex. D at 8 (emphasis added).

21       Nor is it clear that the completion of the calculation and verification process is a condition

22  precedent for earning commissions under Section 5(C).  That section *does* state clearly that "the

23  Employee must be actively employed by Wells Fargo through the date commission credit is

24  granted and through the end of the applicable performance period" and that "this is an express

25  condition of earning incentives under this plan."  *Id*.  Wells Fargo's failure to also include similar

26  language as to the completion of the calculation and verification process could be reasonably

27  interpreted to mean that that is *not* a condition precedent under the plan.  In addition, the Plan

28  expressly states that commission credits are "granted on the last day [of] the month in which the

loan actually funds." Stipulated Facts, Ex. B at 2, Ex. C at 2, Ex. D at 2. This language, along with the fact that Wells Fargo entitled Section 5(C) – which addresses when commission credits are granted – "When Incentive Payments are Earned" in the 2015 HMC Comp Plan, suggests that the Plans could reasonably be read as providing that commissions are "earned" when "commission credit" is granted. *See* Opposition at 18 n. 102

Nor is the Court persuaded by Wells Fargo's reliance on the second half of Section 5(C) to argue that commission payments are not earned until after the calculation and verification process is complete. In particular, Wells Fargo points to the language stating that "some commissions and other incentives are estimates when paid." While it is true that the commissions referred to in this part of Section 5(C) are not considered to be "earned" until "after all adjustments provided for in this Plan have been calculated and implemented," it is also apparent that this language refers to specific exceptions that are expressly identified elsewhere in the Plans. For example, the Plans contain special provisions relating to the commissions that are earned on Home Equity Lines of Credit, which are considered "tentative" until the final determination is made based on the balance on the line of credit at the end of the billing cycle of the third month of the loan. Stipulated Facts, Ex. B at 4, Ex. C at 3, Ex. D at 3. Read in context, this language in Section 5(C) does not support the conclusion that *all* commissions are tentative pending the calculation and verification process or that they are not "earned" before this process is complete.

Wells Fargo's reliance on the exemption from section 204's requirements for bonus payments is also misplaced. Wells Fargo quotes section 5.2.4 of the DLSE Manual, which states that there are certain exceptions to section 204 for "specified extraordinary wages" and offers as an example a bonus that is calculated "on a quarterly basis," which "need not be paid until the regular payday following the date upon which the bonus is calculated." DLSE Manual § 5.2.4. This provision expressly references the definition of a bonus, however, which is found in section 2.5.5. That section, in turn, explicitly distinguishes bonuses from commissions, which are defined in section 2.5.4. *See* DLSE Manual, §§ 2.5.4 -2.5.5. Section 2.5.4 states, in relevant part, as follows:

Labor Code § 204.1 defines commissions as: "Compensation paid to

> any person for services rendered in the sale of such employer's property or services and based proportionately upon the amount or value thereof." *Keyes Motors v. DLSE* (1987) 197 Cal.App.3d 557. If the compensation is based on a percentage of a sale, the compensation plan is a commission. . . .

*Id.* § 2.5.4. In contrast, a bonus is "money promised to an employee *in addition* to the monthly salary, hourly wage, *commission* or piece rate usually due as compensation." *Id.* § 2.5.5 (emphasis added). Bonuses "are predicated on performance over and above that which is paid for . . . sales completed," *ie.*, commissions, and are paid "for extraordinary work performance." *Id.* § 2.5.5.2. The DLSE Manual addresses the timing of commission payments (as opposed to the payment of bonuses) in § 5.2.5, stating that they are "due and payable when they are reasonably calculable." Because the payments at issue in this case are commissions and not bonuses, the DLSE section quoted by Wells Fargo is not relevant to whether Wells Fargo's policy with respect to the payment of commissions violates section 204.

The Court concludes that based on the current record there is sufficient ambiguity as to when commissions are "earned" to preclude summary judgment in favor of Wells Fargo. In particular, while there is evidence that commissions are "earned" for most loans at the end of the month in which a loan is funded (when "credit" is awarded), the parties have not sufficiently briefed: (1) the meaning of the "credit" term (Section 5(C)) and consequently whether commissions for some loans are earned at the end of the month in which they fund; (2) what is "earned" at the time a credit is awarded; and (3) to which loans the end of the month credit applies, and to which loans it does not apply. If the Court later determines that commissions for certain loans are earned at the end of the month in which they are funded, then the DLSE manual requires that they be paid when "reasonably calculable." Based on the record before the court on this motion, there appear to be material issues of disputed fact on this latter question. *See, e.g.,* Appendix of Evidence, Ex. G (Faktor Dep.) at 37-41 (testimony by Wells Fargo's 30(b)(6) witness that the calculation and verification process takes approximately 15 days after loans fund at the end of the previous month but that Wells Fargo already has some of the necessary data once a loan is funded and that "the system is just set up [so] that it doesn't retrieve the data until eight to twelve business days after month-end.").

United States District Court
Northern District of California

20

The Court also rejects Wells Fargo's assertion that it has met its obligations under section 204 simply by establishing bi-weekly pay periods, regardless of when it pays the HMCs commissions.  The cases Wells Fargo relies upon do not support that broad assertion.  In *Ephraim v. Jamestown Judicial Dist. Court,* 120 Cal. App. 2d 741 (1953), the court addressed whether the criminal prosecution of an employer for violation of California Labor Code section 204 was barred under section 1387 of the California Penal Code by an earlier prosecution under the same provision that was dismissed with prejudice.  The court compared the section 204 count in the earlier complaint with the one in the later complaint to determine if they were the same claim and found that they were.  *Id*. at 743-44.   The first complaint charged that "petitioner on the 26th day of August, 1949, wilfully and unlawfully continued to employ the said John F. Graham, Sr., without maintaining semimonthly paydays for said employee as required by section 204 of the Labor Code of the State of California."  *Id*. at 743.  The second complaint "charged that petitioner wilfully and unlawfully failed to pay John Graham, Jr., C. F. Porter, Jr., and Jerry P. Graham semimonthly."  *Id*. at 744.   The court reasoned that in both complaints "the essence of the crime charged was in no way connected with a failure to pay a particular employee but was a failure to maintain a semimonthly pay roll.  Hence the violation charged in count two of the second complaint was identical with the crime charged in the first complaint which was dismissed."  *Id.* Consequently, the court found that the later prosecution under section 204 was barred by the earlier one.  *Id*.

The court in *Ephraim* did not address the question of whether the mere establishment of a bimonthly payday would satisfy an employer's obligations under section 204 if it established a *different* schedule for paying certain types of wages, such as commissions.  To the extent that *Ephraim* might be read to stand for such a proposition, it is purely dicta.  Moreover, such a reading would be inconsistent with the California Supreme Court's discussion of  an employer's obligations under section 204 with respect to commission payments in *Peabody v. Time Warner Cable, Inc*., 59 Cal. 4th 662, 664 (2014).  In that case, the court addressed the application of section 204 to commission payments where the employee also receives a bimonthly paycheck for hourly wages, explaining:

1

2

3

4

5

6

7

8

9

> [T]he Division of Labor Standards Enforcement (DLSE) has observed that "[c]ommission programs which *calculate* the amount owed once a month (or less often) are common." (DLSE Opn. Letter No. 2002.12.09–2 (2002) p. 2, italics added.) This statement, however, does not connote approval of *monthly pay periods*. It merely acknowledges that (1) commissions are not earned or owed until agreed-upon conditions have been satisfied, and (2) such satisfaction often may occur on a monthly or less frequent basis. For example, as in this case, an employment agreement may require receipt of a client's payment before any commissions on sold advertising are earned. If a client routinely pays its bills on the 15th of each month, commissions will be earned and owed once a month. Yet this does not create *a monthly pay period* in contravention of section 204(a). To summarize, section 204 establishes semimonthly pay periods, but there is no obligation to pay *unearned* commission wages in any pay period. Commissions are owed only when they have been earned, even if it is on a monthly, quarterly, or less frequent basis.

10   59 Cal. 4th at 668 (emphasis in original).  In other words, under section 204 commission payments

11   may be made less frequently than biweekly if they are not *earned* in each biweekly pay period.

12   This is a far cry from holding that the mere maintenance of biweekly pay periods excuses an

13   employer from complying with section 204 altogether when it comes to commission payments.

14        Wells Fargo's reliance on *In re Moffett*, while creative, is also misplaced.  In *Moffett*, the

15   court stated that "the sole purpose of section two of the act in question is to require an employer of

16   labor who comes within its terms to maintain two regular pay days each month, within the dates

17   required in that section."  19 Cal. App. 2d 7, 13 (1937).  Wells Fargo would have the Court read

18   this language as a holding that an employer's *only* obligation under section 204 is to establish

19   bimonthly pay periods; apparently (under this theory) an employer could pay any portion of an

20   employee's wages, no matter how small, on a bimonthly basis and pay the remainder of the

21   employee's wages on whatever schedule it chose without running afoul of section 204.  The

22   context of the court's statement in *Moffett* makes clear, however, that the quoted language has

23   nothing to do with the timing of commission payments.

24        The court in this Depression-era case was addressing the question of whether the

25   bimonthly pay period established under section 204 was constitutional.  In particular, it was

26   distinguishing section 204 from other wage and hour laws that the Supreme Court had struck

27   down on the basis that they interfered with the right to contract.  *Id.* at 13-14 (distinguishing its

28   holding from *Adkins v. Children's Hospital*, 261 U. S. 525, 539 (1923) (striking down District of

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Columbia  law establishing minimum wage for women and children on the basis that it violated

2  Fourteenth Amendment due process clause), overruled in part in W. *Coast Hotel Co. v. Parrish*,

3  300 U.S. 379, 391 (1937);  *Morehead v. People of the State of New York*, 298  U. S. 587 (striking

4  down New York law establishing minimum wage for women and children on the basis that it

5  violated Fourteenth Amendment), overruled in part by *Olsen v. State of Nebraska ex rel. Western*

6  *Reference & Bond Ass'n*,  313 U.S. 236 (1941);  *Ex parte Kubach*, 85 Cal. 274, 274 (1890)

7  (striking down Los Angeles ordinance that established an eight-hour limit with respect to labor

8  contracts), disapproved by *Lelande v. Lowery*, 26 Cal. 2d 224, 228 (1945)).   The language in

9  *Moffett* that Wells Fargo quotes was simply intended to establish that section 204 was about the

10  *timing* of paychecks and that it "does not attempt to fix a maximum or minimum wage to be paid"

11  or to "limit the hours or conditions of labor nor interfere with the freedom of contracts on these

12  subjects" such that the constitutional rights associated with the freedom to contract (as understood

13  in the late 1930s) were not implicated.   In short, Wells Fargo has taken phrases from another era

14  that have absolutely no relevance to the issue at hand to support a proposition that was never

15  considered by the court in *Moffett*.[7]

16          Therefore, the Court rejects Wells Fargo's assertion that it has established, as a matter of

17  law, that its policy of paying commissions at the end of the month that follows the funding of the

18  loan does not violate section 204.  Plaintiff may proceed, subject to any further motion after

19  discovery has closed, on his claims under PAGA and the UCL to the extent these claims are based

20  on Wells Fargo's alleged violation of that section.

21

22  [7] The two cases cited by Wells Fargo that relied on *Moffett* to dismiss claims under section 204
     also are not on point.  In *De La Torre v. Am. Red Cross*, No. CV 13-04302 DDP JEMX, 2013 WL
23  5573101, at *5 (C.D. Cal. Oct. 9, 2013), the plaintiff alleged that she was terminated on the basis
     of her ethnicity and that her employer failed to pay a promised bonus.  There were no allegations
24  relating to the timing of bonus payments or that the employer failed to maintain bi-weekly pay
     periods.  Similarly, the plaintiffs in *Hadjavi v. CVS Pharmacy, Inc.*, No. CV 10-04886 SJO RCX,
25  2010 WL 7695383, at *2 (C.D. Cal. Sept. 22, 2010) asserted a claim under section 204 based on
     the failure of their employer, who had allegedly terminated them in retaliation for complying with
26  the law, to pay them wages to which they were entitled.  The court concluded that the essence of
     the claim was one for unpaid wages and did not turn on the *timing* of the employer's paychecks.
27  As the claims in this case *do* challenge the timing of commission payments, both *De La Torre*  and
     *Hadjavi* are distinguishable.

28

1

**D.    Unlawful Deductions for Marketing Expenses Under California Labor Code Section 221  (Claim Three)**

2

California Labor Code section 221 provides that "[i]t shall be unlawful for any employer to

3

collect or receive from an employee any part of wages theretofore paid by said employer to said

4

employee." Cal. Lab. Code § 221.  "Wages" are defined broadly to include "all amounts for labor

5

performed by employees of every description, whether the amount is fixed or ascertained by the

6

standard of time, task, piece, commission basis, or other method of calculation."  Cal. Lab. Code §

7

200.  "Section 221 was enacted in order to prevent employers from utilizing secret deductions or

8

kickbacks to pay employees less than their stated wages." *Finnegan v. Schrader*, 91 Cal. App. 4th

9

572, 584 (2001).   In cases involving commissions, a key issue for determining whether there has

10

been an unlawful deduction under section 221 is when the commission is "earned."  As discussed

11

below, California courts may permit employers to deduct certain costs from employee

12

commissions, or charge them back to the employee, when the commission is considered an

13

advance pending the fulfillment of some condition.  On the other hand, deductions that have been

14

taken after the commission has already been earned are typically unlawful under section 221.

15

The right of an employee to a commission is governed by the terms of the compensation

16

agreement. *Steinhebel v. Los Angeles Times Commc'ns*, 126 Cal. App. 4th 696, 705 (2005).

17

Where it is clear under the compensation agreement that a commission is earned only once certain

18

conditions are satisfied, a commission payment made before those conditions are satisfied is

19

considered to be an advance, which "by definition is not a *wage* because all conditions for

20

performance have not been satisfied." *Id*.  Consequently, a deduction or charge-back against that

21

advance typically will not violate section 221.  For example, in *Steinhebel*, the plaintiffs were

22

newspaper telesales employees who earned commissions based on the number of subscriptions

23

they sold.  126 Cal. App. 4th at 353.  The plaintiffs read and signed a Telesales Agreement that

24

explained that they would receive commissions only on a "commissionable order," which was

25

defined as "a sale that is input into the L.A. Times home delivery computer . . . where the

26

customer keeps the paper for a minimum of 28 days without giving a specific stop date." *Id*.  Each

27

sale was verified by another employee, called a "verifier," who would call the customer to be sure

28

the customer really wanted the subscription and would determine if there had been collection

problems in connection with the customer.  *Id*. at 355.  If the sale did not survive that process, no subscription would be delivered and no commission was paid;  on the other hand, if the sale was verified, the employee would be paid a commission on that sale.  *Id*.  If a customer cancelled before the 28 days was up, however, the commission would be charged back to the employee.  *Id*.

The court in *Steinhebel* found that the commission arrangement in that case did not violate section 221 because employees "were aware that a sale did not qualify as a 'commissionable order' until the customer kept the subscription for 28 days without a stop date" and that "they would receive advances before [the employer] could ascertain whether the sales would actually ripen into "commissionable order."  *Id*. at 357-358.  The court reasoned that because "the 28-day requirement was a condition precedent to [the employees'] entitlement to a commission" the employer "could charge back any unearned advances from [employees'] future advances on commissions."  *Id*. at 358.

In *Koehl v. Verio*, the court reached a similar conclusion, following *Steinhebel*.  142 Cal. App. 4th 1313 (2006).  In that case, sales associates who worked for an Internet service provider were paid an "advance commission" when a sale of Internet services was "booked," which occurred before any verification of the sale occurred.  *Id*. at 1318.   After the sale was booked, the sales associate had ongoing responsibilities relating to the installation of equipment and hardware in connection with the sales, including "contact with customers to ensure their system was up and running, playing a key role in customer happiness, which made them more likely to pay."  *Id*. at 1319.  Under the employer's commission plan, "when an installation order cancelled before the customer paid for the first three months, [the employer] recovered its previous commission payment on that transaction by reducing the advance commission payments in a subsequent month."  *Id*. at 1326.  The court in *Koehl* entered judgment in favor of the employer following a bench trial, finding that California Labor Code section 221 was not violated because the employees understood and agreed that the commissions were not earned until the customer paid. *Id*. at 1335.

In contrast, in *Harris v. Investor's Business Daily*, the court found that there were triable issues of fact as to whether an employer's chargebacks against commissions violated section 221.

138 Cal. App. 4th 28 (2006).  As in *Steinhebel*, the employees in Harris were telemarketing

employees who sold newspaper subscriptions and received commissions on their sales through a

point system whereby employees received points for "selling longer subscriptions, winning daily

contests, and meeting weekly sales goals."  *Id*. at 31.  If a customer cancelled a subscription

within 16 weeks, the employer would deduct the points earned on that sale, amounting to a

chargeback on the sale.  *Id*.  During the relevant period, the commission policy stated:

> Any subscription which is canceled within 16 calendar weeks from
> the start, or restart, date of the subscription will be charged back to
> the week sold. The unit amount earned, as well as the associated
> dollar value of the unit amount earned, will be deducted in full. . . .
> If the department is unable to prevent cancellation, the unit value
> will be charged back in full.

*Id*. at 40.[8]  The court recognized that the arrangement in *Harris* was very similar to the one that

had been found lawful in *Steinhebel*, but found that there was a "critical difference" between the

two cases, namely, that the employment agreement in *Steinhebel* "clearly identified the

commission as an advance" while the one in *Harris* did not.  *Id*.  Even though the employees in

*Harris* knew about the policy, they had not agreed to it in writing.  *Id*.

In *Prachasaisoradej v. Ralphs Grocery Co*., the California Supreme Court addressed the

legality of an incentive compensation plan of the Ralph's supermarket chain "whereby certain

employees of each store were eligible to receive, over and above their regular wages,

supplementary sums based upon how the store's actual Plan-defined profits, if any, for specified

periods compared with preset profitability targets." 42 Cal. 4th 217, 222 (2007).  In establishing

the profitability target and determining whether it was met, Ralphs subtracted store operating

expenses from store revenues.  *Id*.  The plaintiffs argued that this arrangement impermissibly

shifted from the employer to employees certain business expenses in violation of California Labor

Code section 221.  *Id*.  The court disagreed.  The court explained that the Plan was "collective in

nature" and was not measured according to the individual efforts of any employee but instead by

---

[8] After litigation was commenced, the employer revised the policy to describe the commission
payments as advances.  *Id*.

United States District Court
Northern District of California

the profitability of the store as a whole. *Id.* Therefore, "[b]y the Plan's terms, it was *only after* the store had completed the relevant period of operation, and that the resulting profit or loss figure was then derived, that it was possible to determine, by a further comparison to the present targets, whether Plan participants were entitled to a supplementary incentive compensation payment, and if so, how much. *Id.* at 229. The Court further held that "[t]his final figure, and this figure only, once calculated, was the amount offered or promised as compensation for labor performed by eligible employees, and it thus represented their supplemental 'wages' or 'earnings.'" *Id.*

In this case, Wells Fargo relies heavily upon the Supreme Court's decision in *Prachasaisoradej v. Ralphs Grocery Co.,* arguing that the undisputed facts establish that the commissions here, like the incentive payments in *Ralphs*, are not earned until the final calculations have been performed. The Court concludes that the facts of *Ralphs* are not on point however. In that case, the incentive was created to reward storewide profit, which could *only* be determined by subtracting out of revenues the store's costs. That is not the case here, however, where commissions are calculated on an individual basis depending on how many loans an HMC funds. Nor is there anything inherent in Wells Fargo's compensation scheme that requires that the marketing expenses at issue in this case must be factored in to determine whether the conduct Wells Fargo seeks to reward has been achieved.

Nonetheless, the Court concludes that in this case, as in *Steinhebel* and *Koehl*, it is clear from the Comp Plans that whenever the commissions are earned, the *amount* of those commissions will be determined under a formula that makes adjustments for certain expenditures, along with the hourly wages and PTO already paid to the HMCs for the previous month. Thus, even assuming that the commission is earned when loans fund, the amount that is earned under the terms of the agreement with Wells Fargo and the HMCs excludes marketing expenses. This does not mean these deductions are lawful under California Labor Code section 2802. It does, however, entitle Wells Fargo to summary judgment as to Plaintiff's claim under section 221. Therefore, the Court grants the Motion as to Claim Three.

**E.    Unlawful Forfeiture Of Paid Time Off Under California Labor Code section 227.3 (Claim One)**

Section 227.3 prohibits forfeiture of vacation pay, providing in relevant part as follows:

> Unless otherwise provided by a collective-bargaining agreement, whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate in accordance with such contract of employment or employer policy respecting eligibility or time served; provided, however, that an employment contract or employer policy shall not provide for forfeiture of vested vacation time upon termination. . . .

Cal. Lab. Code § 227.3.    This section does not appear to fit the allegations in Plaintiff's complaint.  Rather than alleging that Wells Fargo failed to compensate him for PTO that he had not used at the time of termination, Plaintiff alleges that PTO pay for the time off that he *did* use was factored into the calculation of his commissions.  As discussed above, even if commissions were "earned" at the end of the month when loans fund, the agreement between the HMCs and Wells Fargo makes clear that the amount of the commission factors in the PTO pay already advanced to the HMC.  The Court finds no authority suggesting that such a practice constitutes a "forfeiture" within the meaning of section 227.3.  Therefore, Wells Fargo is entitled to summary judgment on this claim.

**F.    Claim Five through Eight**

Wells Fargo requests dismissal of these claims on the basis that they are derivative of Claims One through Four.  Because the Court has found that there are fact questions as to the alleged violations of California Labor Code sections 204 and 2802, the Court denies summary judgment on Claims Five through Eight.

**IV.    CONCLUSION**

The Motions is GRANTED as to Claims One, Two and Three, which are dismissed with prejudice.  The Court dismisses Claim Two, under California Labor Code section 204, only on the ground that there is no private right of action under that section.  Plaintiff may, however, assert his derivative claims based on an alleged violation of section 204, as discussed above.  The Motion is

1    DENIED as to Claims Five through Eight.

2        **IT IS SO ORDERED.**

3    Dated:  September 26, 2016

4

5    _____

6    JOSEPH C. SPERO
     Chief Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California