SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
THOMAS R. KAUFMAN, Cal. Bar No. 177936
tkaufman@sheppardmullin.com
PAUL BERKOWITZ, Cal. Bar No. 251077
pberkowitz@sheppardmullin.com
JASON P. BROWN, Cal. Bar. No. 296688
jpbrown@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:  310.228.3700
Facsimile:   310.228.3701

Attorneys for Defendant
WELLS FARGO BANK, N.A.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUY NGUYEN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, NATIONAL ASSOCIATION and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 3:15-cv-5239<br><br>Assigned to Hon. Joseph Spero<br><br>**CLASS ACTION**<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DENY CLASS CERTIFICATION; POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Appendix of Evidence; Stipulated Facts; and [Proposed] Order Filed Under Separate Covers]<br><br>DATE:       June 23, 2017<br>TIME:        9:30 a.m.<br>CRTRM:     G<br><br>Complaint Filed August 25. 2015 |

1

## NOTICE OF MOTION AND MOTION

2

## TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3      **PLEASE TAKE NOTICE** that, on June 23, 2017 at 9:30 a.m., or as soon

4  thereafter as this matter can be heard, in Courtroom G in the United States

5  Courthouse for the Northern District of California, Defendant Wells Fargo Bank,

6  N.A. ("Wells Fargo"), will and hereby does bring this Motion for an order denying

7  class certification pursuant to Federal Rule of Civil Procedure 23.

8      The grounds for this Motion are that the law allows either party to move the

9  court at an early practicable time for an order determining whether the action can

10  proceed as a class action.  Here, the evidence shows that individualized issues

11  necessarily predominate as to Plaintiff's purported class claims for failure to

12  reimburse for business expenses and failure to pay incentive pay in a timely

13  manner, thereby making it impossible for Plaintiff to meet either the requirements

14  of Rule 23(a) or Rule 23(b)(3) necessary to support certification.

15      This Motion is based on this Notice of Motion and Motion, the

16  Memorandum of Points and Authorities, the concurrently filed Appendix of

17  Evidence and the previously-filed Stipulated Facts (Dkt. No. 46-5), all pleadings

18  and papers on file in this action, and other such matters and arguments as may be

19  presented to the Court in connection with this Motion.

20  Dated:  May 5, 2017

21                          SHEPPARD, MULLIN, RICHTER & HAMPTON

22

23                  By      _____/s/ Thomas R. Kaufman_____

24                                  Thomas R. Kaufman
                                   Attorneys for Defendant
25                              WELLS FARGO BANK, N.A.

26

27

28

-- 1 --

# TABLE OF CONTENTS

Page

I.     INTRODUCTION AND SUMMARY OF MOTION ....................................... 1

II.    SUMMARY OF RELEVANT FACTS ............................................................. 3

    A.    Wells Fargo's Business and the Nature of the HMC Job ...................... 3

    B.    Facts Relevant to Certification of Expense Reimbursement
        Claim ..................................................................................................... 4

        1.    Wells Fargo Offers HMCs the Option to Participate in
            Certain Optional Marketing Programs ......................................... 4

        2.    Different HMCs Report Very Different Individual
            Experiences As it Relates to Websites and Marketing
            Expenses ..................................................................................... 6

    C.    Facts Relevant to Certification of Untimely Incentive Pay
        Claim ..................................................................................................... 8

        1.    The Primary Element of Incentive Compensation is
            Commission Credit Generated from Monthly Loan
            Volume ....................................................................................... 8

        2.    Steps Wells Fargo Goes Through Each Month in
            Calculating Incentive Pay ............................................................ 9

        3.    Timing of Paychecks to HMCs .................................................. 11

        4.    Changes to Compensation Plan That Went Into Effect
            January 1, 2017 .......................................................................... 11

III.   LEGAL ARGUMENT ................................................................................. 12

    A.    Procedural Standard for Class Certification ......................................... 12

    B.    Class Certification Requires Sufficient Commonality to Allow
        Claims to be Proven Through Collective Proof.................................... 12

    C.    Plaintiff's Expense Reimbursement Claim Is Not Suitable for
        Class Treatment Because Individualized Issues Predominate.............. 14

-i-

DEFENDANT'S MOTION TO DENY CLASS
CERTIFICATION Case No. 3:15-cv-5239

1
2
           1.    Whether The Expenses Were Necessary to Any Given
HMC Raises a Predominant Individualized Issue ..................... 15

3
           2.    Whether Employees Incurred a Loss From The Programs
Raises Another Individualized Issue ........................................... 20
4

5
    D.    Certification is Also Inappropriate on Plaintiff's Claim for
Alleged Late Payment of Incentive Pay ................................. 22
6

7
           1.    Whether Any Given Incentive Payment Was Timely Will
Turn on Individualized Issues as to When Payment Was
8
Reasonably Calculable That Month For That HMC .................. 22

9
           2.    As a Result of Substantial Revision to The Compensation
Plan, No Class Can Be Certified After December 31,
10
2016 ............................................................................................ 23
11

IV.    CONCLUSION ............................................................................ 24
12

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-ii-

DEFENDANT'S MOTION TO DENY CLASS
CERTIFICATION Case No. 3:15-cv-5239

# TABLE OF AUTHORITIES

Page(s)

Cases

*Aburto v. Verizon California, Inc.*
    2012 WL 10381 (C.D. Cal. Jan. 3, 2012) ........................................................ 13

*Buchanan v. Home Services Lending LLC*
    2013 WL 1788579 (S.D. Cal. April 25, 2013) ..................................... 15, 17, 18

*Cassady v. Morgan, Lewis & Bockius*
    145 Cal. App. 4th 220 (2006) ........................................................................... 14

*Ellis v. Costco Wholesale Corp.*
    657 F.3d 970 (9th Cir. 2011) ............................................................................ 13

*Gattuso v. Harte-Hanks Shoppers, Inc.*
    42 Cal. App. 4th 554 (2007) ............................................................................. 14

*Grissom v. Vons Companies, Inc.*
    1 Cal. App. 4th 52 (1991) ................................................................................. 15

*Howard v. Gap, Inc.*
    2009 WL 3571984 (N.D. Cal. Oct. 29, 2009) ............................................. 17, 21

*Hughes v. Winco Foods*
    2012 WL 34483 (C.D. Cal. Jan. 4, 2012) .................................................... 13, 14

*In re Hydrogen Peroxide Antitrust Litig.*
    552 F.3d 305 (3rd Cir. 2009) ............................................................................ 14

*Marlo v. United Parcel Service*
    639 F.3d. 942 (9th Cir. 2011) ........................................................................... 14

*Morgan v. Wet Seal, Inc.*
    210 Cal. App. 4th 1341 (2012) .................................................................. 17, 18, 20

*Novak v. The Boeing Company*
    2011 WL 9160940 (C.D. Cal. Jul. 20, 2011) ................................................... 15

*Nguyen v. Wells Fargo Bank, N.A.*
    2016 WL 5390245 (N.D. Cal. Sept. 26, 2016) ................................................. 22

-iii-

*In re Taco Bell Wage & Hour Actions*
    2011 WL 4479730 (E.D. Cal. Sep. 26, 2011) ......................................... 13

*Takacs v. A.G. Edwards & Sons*
    444 F. Supp. 2d 1100 (S.D. Cal. 2006) ................................................ 15

*Vinole v. Countrywide Home Loans, Inc.*
    571 F. 3d 935 (9th Cir. 2009) ............................................................ 12

*Wal-Mart Stores, Inc. v. Dukes*
    131 S. Ct. 2541 (2011) .................................................................... 13

*Washington v. Joe's Crab Shack*
    271 F.R.D. 629 (N.D. Cal. 2010) .................................................. 17, 18

*Walsh v. IKON Office Solutions, Inc.*
    148 Cal. App. 4th 1440 (2007) .......................................................... 22

*Weigele v. Fedex Ground*
    267 F.R.D. 614 (S.D. Cal. 2010) ....................................................... 20

*Zalkind v. Ceradyne, Inc.*
    194 Cal. App. 4th 1010 (2011) .......................................................... 20

<u>State Statutes</u>

Labor Code § 204(a) ........................................................................... 22

Labor Code § 2802 ............................................................................. 14

<u>Federal Statutes</u>

F.R.C.P. Rule 23 ............................................................................... 12

F.R.C.P. Rule 23(c)(1)(A) .................................................................. 12

F.R.C.P. Rule 23(b)(3) ....................................................................... 14

SMRH:482700072.2

DEFENDANT'S MOTION TO DENY CLASS
CERTIFICATION Case No. 3:15-cv-5239

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION AND SUMMARY OF MOTION**

Wells Fargo moves for an order from this Court denying class certification. There are now two claims that Plaintiff seeks to pursue on a class basis, including that Wells Fargo must: (1) reimburse California-based Home Mortgage Consultants ("HMCs")[1] for subscription fees HMCs incurred for the FASTMail marketing program or for an individual HMC website (the "reimbursement claim"); and (2) pay a civil penalty for each pay period in which HMCs received incentive pay outside of the time frames allegedly required by Labor Code Section 204 (the "late pay claim"). Neither of these claims can properly proceed on a class basis because individualized liability issues predominate as to each claim.

Specifically, the reimbursement claim cannot be certified because the predominant individualized liability issue will be whether it was "necessary" for Wells Fargo to provide free FASTMail or a free individual website to an HMC. Generally speaking, in the absence of a company-wide directive to incur an expense, what qualifies as a "necessary" expense turns on the individual circumstances of the given HMC. Where an employer makes clear that an expense is optional and the employee's job, in fact, can reasonably be performed without incurring the expense, the expense is not "necessary." By contrast, where an HMC receives a communication from management that reasonably leads the HMC to conclude that he must incur an expense, that expense may qualify as necessary. Given that all of Wells Fargo's policies expressly state that enrolling in FASTMail or having an HMC website is optional and not required, individual liability for reimbursement will turn on individual communications HMCs had with

---

[1]    The proposed class also includes other loan originating jobs such as Private Mortgage Bankers and Jr. Home Mortgage Consultants. For purpose of this briefing all such loan originators fall within the definition of "HMCs."

1  management about those programs and whether any particular HMC reasonably

2  believed in his or her individual case that the programs were necessary.  Indeed,

3  Wells Fargo presents 15 declarations from HMCs who all testified that enrolling in

4  FASTMail and signing up for an individual website were not expenses they needed

5  to incur to perform their job.  Notably, the United States District Court for the

6  Southern District of California already considered this very issue in *Buchanan v.*

7  *HomeServices Lending*, and refused to certify a smaller class of loan originators

8  who were seeking reimbursement of the very same FASTMail and HMC website

9  expenses that Plaintiff seeks here.

10      Separate from the issue of whether the expenses were necessary in any

11  particular case, there is a separate individualized issue as to whether any particular

12  HMC suffered any loss as a result of subscribing to FASTMail or having an

13  individual website.  If, as Plaintiff testified was true in his case, participating in

14  these programs led to increased commissions that exceeded the subscription fee the

15  HMC paid, such HMCs have no basis to sue under Section 2802, because they

16  experienced no loss from their paid participation.  Evaluating when any HMC

17  suffered such a loss will raise another individualized issue that will require a case

18  by case evaluation of the return different HMCs received on their investments in

19  these voluntary marketing programs.

20      Lastly, class certification is also inappropriate on the late pay claim.

21  According to this Court's order, the deadline to pay incentive pay in any given case

22  depends on when that incentive payment reasonably could be calculated for a

23  month's loan activity.  This can vary from month to month and HMC to HMC

24  based on when Wells Fargo received all the information needed to calculate the

25  incentive pay, or reasonably could have obtained it—a question that cannot be

26  answered on a classwide basis.  In addition, Wells Fargo significantly revised its

27  compensation plan on January 1, 2017 to better document that no incentive pay can

28

-- 2 --

1  be earned before the 16th day of the following month.  Because Plaintiff never

2  worked for Wells Fargo in 2017, he cannot represent a class for the period

3  governed by this substantially revised compensation plan.

4         For these reasons, Wells Fargo respectfully requests that the Court deny

5  class certification as to both the reimbursement and late pay claims.

6  **II.     SUMMARY OF RELEVANT FACTS**[2]

7         **A.     Wells Fargo's Business and the Nature of the HMC Job**

8         Wells Fargo employs different types of mortgage loan originators, including

9  Home Mortgage Consultants, Private Mortgage Bankers, and "Junior" versions of

10  each of those two jobs.  The parties have agreed that, for purposes of class

11  certification, these positions can all be treated as "HMCs."[3]  Plaintiff Huy Nguyen

12  worked for Wells Fargo as an HMC from October 1, 2011 to August 17, 2015.[4]

13         A central job duty of HMCs is to originate mortgage loans, which involves

14  receiving applications from potential borrowers, assembling and submitting the

15  loan files to underwriting, obtaining approval, and closing and funding the loan.[5]

16  At all times relevant to this motion, HMCs' employment was governed by terms

17  and conditions outlined in written Compensation Plans ("Comp Plans") that were

18  typically revised annually.[6]  Under these Comp Plans, HMCs qualified for certain

19  monthly incentive payments that were based on monthly loan funding activity.[7]

20

---

21    [2]    All Exhibits and Declarations cited herein are contained within the
22  concurrently filed Appendix of Evidence, except where it is expressly indicated
    that they are Exhibits to the Stipulated Facts that Plaintiff filed on April 28, 2017.

23    [3]    Stipulated Fact (Stip. Fact) No. 2.

24    [4]    Stip. Fact Nos. 1, 5.
      [5]    Deposition of Huy Nguyen ("Pltf. Dep.") 169:2-170:9; Stip. Fact No.
25  3.

      [6]    Stip. Fact Nos. 7-11, Exs. B, C, and D to Stipulated Facts (2013-15
26  Comp Plans), filed with the Court of April 28, 2017 (Docket No. 46-5, pp. 6-44).

27    [7]    Stip Fact Nos. 3-4.

28
SMRH:482700072.2                          DEFENDANT'S MOTION TO DENY CLASS
                                          CERTIFICATION Case No. 3:15-cv-5239

**B.    Facts Relevant to Certification of Expense Reimbursement Claim**

**1.    Wells Fargo Offers HMCs the Option to Participate in Certain Optional Marketing Programs**

Wells Fargo offers certain free marketing support to its HMCs.  Free marketing services that Wells Fargo provides to HMCs include various printable brochures and flyers that HMCs can customize and tailor towards their clients or potential clients.[8]  As relevant to this motion, HMCs have also been able to participate in FASTMail and the individual HMC website program by paying a subscription fee in exchange for receiving certain services from Wells Fargo.[9]

For the individual website, Wells Fargo offered HMCs the option to have an individual, regulatory-compliant HMC website that would identify the HMC individually, in addition to Wells Fargo.[10]  If HMCs elected to set up such a website, the monthly subscription fee would be $40 per month after an initial $95 set up fee (which included the first month's monthly fee).[11]  Wells Fargo informed HMCs who elected to have an individual website that the HMC would be responsible for a corresponding monthly charge.[12]  To the extent leads came in through an HMC's individual website, they would always be routed to the HMC, while leads that came through the main Wells Fargo Home Mortgage website would be assigned to an HMC selected at Wells Fargo's discretion.[13]

---

[8]    Declaration of Jennifer Clark ("Clark Dec.") ¶ 15; Pltf. Dep. 129:21-130:9 (explaining that Wells Fargo provided him some free marketing materials).

[9]    Clark Dec. ¶¶ 3, 4, 7 and 8.  The payment is actually the result of a debit in the incentive compensation formula that this Court has already held not to violate the anti-deduction provisions of California law.  (MSJ Order, pp. 23-27).  For purposes of class certification, the only relevant aspect is that the HMC bears a cost to cover the subscription fees for these two programs.

[10]    Clark Dec. ¶ 3.

[11]    Pltf. Dep. 124:16-25; Clark Dec. ¶ 4.

[12]    Pltf. Dep. 136:10-16, 144:1-22; Clark Dec. ¶¶ 4, 8, Ex. H.

[13]    Pltf. Dep. 123:2-124:2; Clark Dec. ¶ 5.

-- 4 --

HMCs could cancel the individual HMC website any time after they initially elected to have it set up, in which case they would not pay any further website fees for the months following the month of cancellation.[14] Not all HMCs elected to have individual websites. In fact, when Wells Fargo introduced a new employee benefit in 2016 that included a free personalized website, about 1,000 HMCs (15%) still elected *not* to have one.[15] At all relevant times, the fee for the monthly website was included as a debit in each month's commission calculation, effectively reducing the final incentive pay calculation by the amount of the fee.[16]

Similarly, Wells Fargo offers a customer contact program called FASTMail, that enables HMCs the option to have Wells Fargo send customers in a HMC's "book of business" certain marketing mailings that comply with the rules and regulations governing the mortgage industry. These mailings identify the particular HMC as the Wells Fargo loan originator to contact.[17] Wells Fargo informed HMCs who elected to participate in FASTMail that the HMC would be responsible for certain monthly fees which varied based on the number of pieces of mailing the HMC elected to have sent through the FASTMail program. The monthly rate could range from approximately $45 to $340, depending on the number of contacts the HMCs elected to send FASTMail mailings.[18] Based on multiple surveys Wells Fargo conducted, many but not all HMCs' found FASTMail a worthwhile investment because the additional customer contact tended to increase their number of loan originations (and resulting incentive pay)

---

[14]   Clark Dec. ¶ 6.
[15]   Clark Dec. ¶ 6 (even after individual websites became free in 2016, roughly 15% of HMCs elected not to have one).
[16]   Pltf. Dep. 118:2-6; Clark Dec. ¶ 13.
[17]   Pltf. Dep. 121:16-122:5; Clark Dec. ¶ 7.
[18]   Pltf. Dep. 125:1-14, 126:10-13, 147:3-22; Clark Dec. ¶ 8, Ex. I.

1  by more than the cost of the subscription fees.[19]  Plaintiff admitted that, in his case,

2  FASTMail generated more incentive pay than it cost him in subscription fees:

> Q.   Do you think you got enough deals that -- that the
>       increased commissions fully offset the cost you
>       paid for FASTMail?
>
> A:    Yes.[20]

7  As with the websites, HMCs could cancel their FASTMail subscription any

8  time after they initially elected to enroll.[21]  For example, between 2013 and 2015,

9  only about half the HMCs were enrolled in FASTMail at any given time, and at

10 present, only half of eligible HMCs are enrolled in FASTMail.[22]

### 2. Different HMCs Report Very Different Individual Experiences As it Relates to Websites and Marketing Expenses

13 In the Appendix of Evidence, Wells Fargo submits a sampling of 15 HMC

14 declarations describing their experiences with FASTMail and individual websites.

15 The declarations reflect material *individual* differences among HMCs with regard

16 to their experiences.  These include variations as to when they participated in any

17 marketing program, what they were told about the programs, why they elected to

18 participate (or not), and what value they derived from them.  For example, Charles

19 Kryski, Jr. testified that he had previously enrolled in FASTMail and a website a

20 few years ago, but decided to cancel the subscription because he did not feel the

21 expenses were necessary as he can successfully originate loans without the

22 programs and did not find it worth the ongoing cost.[23]  Another HMC, James

---

[19]  Clark Dec. ¶ 9.

[20]  Pltf. Dep. 131:17-22 (attorney objection omitted).

[21]  Clark Dec. ¶ 10.

[22]  Clark Dec. ¶ 10 (participation has ranged from about 49% to 54%).

[23]  Declaration of Charles Kryski, Jr. ("Kryski Dec.") ¶¶ 3-4

1  Perrinne, testified that he has never signed up for FASTMail because he does not

2  have a need as "[a] lot of [his] business is referred to [him] by bankers, realtors,

3  and friends and family of past customers."[24]  Perrinne has not even signed up for

4  an individual website even after this service became free because he does not

5  believe it is necessary to originate loans.[25]

6       By contrast, Yogesh Rane has always chosen to enroll in FASTMail and

7  maintain a website because he believes that these programs are a "cheap form of

8  marketing," that they pay for themselves, and his book of business is too large for

9  him to "individually contact [his] clients on [his] own because it would be too time

10  consuming."[26]  Rane is aware of a HMCs who, unlike him, decided not to enroll in

11  FASTMail because her book of business was too small for the program to be

12  valuable to her.[27]

13       Furthermore, the communications from HMCs' managers regarding these

14  marketing programs varied.  Plaintiff testified that his manager told him he had to

15  enroll in the programs.[28]  But declarant Ken Sotelo testified that his manager told

16  him that the programs were voluntary and that "they were simply resources

17  available to him" if he chose to use them.[29]  By contrast, Chad Smart's manager

18  recommended that he enroll in these programs because "they are good ways to

19  keep in contact with clients and potential clients, and they also bring in business in

20  amount that covers the cost of the fees."[30]  Anna Lisa Truong Lopez testified that

21  her manager sent a "very clear message" that enrolling in FASTMail and having a

---

22  [24]  Declaration of James Perrinne ("Perrinne Dec.") ¶ 3.

23  [25]  Perrinne Dec. ¶ 3.

24  [26]  Declaration of Yogesh Rane ("Rane Dec.") ¶ 4.

    [27]  Rane Dec. ¶ 4.

25  [28]  Pltf. Dep. 119:17-120:9.

26  [29]  Declaration of Ken Sotelo ¶ 4.

27  [30]  Declaration of Chad Smart. ¶ 4.

28

1   website were voluntary and that she did not have to participate in these programs if

2   she did not want to do so.[31]

3         As the above sampling of declarations reflects, HMCs had differing

4   experiences with respect to marketing programs that could materially impact

5   liability.  Accordingly, a trial in this case would necessarily require investigation of

6   each and every HMC's specific facts—essentially thousands of mini trials.  Such

7   an exercise is flatly inconsistent with class litigation.

8         **C.**    **Facts Relevant to Certification of Untimely Incentive Pay Claim**

9             **1.**    **The Primary Element of Incentive Compensation is**
                **Commission Credit Generated from Monthly Loan Volume**

10

11         Typically, the primary credit in a HMC's incentive compensation formula is

12   "commission credit" arising from monthly loan originations.  Certain loans have a

13   specific commission rates assigned to them, such as a flat rate where the HMC

14   refinances an existing Wells Fargo loan.[32]  The commission rate on most types of

15   loans, however, is based on a set "commission schedule" that derives the

16   commission rate from total *monthly* loan activity.[33]  Essentially, as an HMC

17   originates more loans during a calendar month, the commission rate applicable to

18   all the loans can increase on a tiered basis.  For example, in 2015, an HMC who

19   originated 1-3 loans in a month would receive commission credit of .45% on the

20   dollar loan volume of those 1-3 loans, but if the HMC originated a fourth loan that

21   month, the commission rate on all the loans would increase to .65%.[34]

22   _____

23       [31]     Declaration of Anna Lisa Truong Lopez ¶ 4.

24       [32]     Declaration of Mark Faktor ("Faktor Dec.") ¶ 3; Stip. Fact Nos. 9-11
Ex. B, p. 3 (.43% on WFHM to WFHM refinance), Ex. C, p. 3 (.35% on WFHM to

25   WFHM refinance), Ex. D, p. 3 (.40% rate on enterprise refinance loans); Pltf. Dep.
92:19-93:14, 107:22-108:2.

26       [33]     Pltf. Dep. 93:10-22.

27       [34]     Stip. Fact No. 11; Ex. D, p. 2 (commission schedule shown); Pltf.
Dep. 93:15-94:24.

28

-- 8 --

1    In addition, the commission credit from any particular loan was subject to

2    certain minimums and maximums, such as minimum commission credit regardless

3    of the size of the loan originated.  Accordingly, a small loan of only $120,000

4    would generate a minimum commission of $1,200 even though that translates into

5    a higher rate (1%) than the highest rate listed on the commission schedule.[35]

6    ## 2.    Steps Wells Fargo Goes Through Each Month in Calculating Incentive Pay

7    Although the incentive pay HMCs receive is based on the loan activity in a

8    given calendar month, Wells Fargo does not have the information available to

9    calculate the incentive pay instantaneously on the last day of the month.  Before it

10   can calculate any HMC's commission, Wells Fargo must undertake a complex

11   process to verify the accuracy of the monthly loan data, and it must also pull

12   various data items from separate company databases to determine the proper

13   commission rate to be paid on different individual loans.[36]

14   A key step in this process involves the input of each HMC.  Wells Fargo

15   generates a commission report listing the loans its records reflect that the employee

16   closed and the commission rate Wells Fargo assigned to each loan, and HMCs

17   review this list to verify it and identify any errors.[37]  HMCs routinely identify what

18   they believe to be errors, which must then be investigated.   For example, a loan

19   may be listed as a referral loan with a lower commission rate than the standard

20   schedule, and the HMC might be able to show that this designation was improper.

21   Or it may be that the HMC had negotiated a special arrangement for a period of

22   time to receive a higher commission rate than the schedule which was not reflected

23

---

24   [35]   Faktor Dec. ¶ 3; Stip. Fact Nos. 9-11; Ex. B, p. 3 (describing minimum commission), Ex. C, p. 3 (same), Ex. D, p. 3 (same); Pltf. Dep. 95:13-

25   96:1 (in California minimum commission was $1,200, even though national minimum reflected in Comp Plan was $700).

26   [36]   Faktor Dec. ¶ 4.

27   [37]   Faktor Dec. ¶ 5; Pltf. Dep. 150:8-17, Ex. F-35.

28

on the commission report.[38]  The time required to validate any particular HMCs' commissions in any month can vary based on individual circumstances.[39]  For example, James Perrinne testified that he has noticed errors on his commission report and has contacted Wells Fargo's Bonus Commission Accounting Department to resolve the issue through the reconciliation process.[40]  Michael Viktiuk testified that the "verification process can take a long time because there are occasions when [he] need[ed] to have a dialogue with [his] manager regarding the attribution of correct commission rates for certain loans."[41]

In addition, because a debit item in the monthly incentive pay formula is the straight time hourly pay the employee received in the calendar month, Wells Fargo cannot calculate the incentive pay for an HMC until the HMC has input into the timekeeping system the number of hours the HMC worked during the calendar month.  HMCs must input and close their time only weekly, so it may be several days after the end of the calendar month before Wells Fargo even possesses the hourly time data that would allow it to calculate the value of the straight time hourly pay debit within the monthly incentive pay formula.[42]

Separate from items that require the HMCs' input to calculate, to code certain loans for the proper commission rate requires Wells Fargo to pull data from other databases that it receives only at set intervals.  For example, only once per month, Wells Fargo receives data from other databases that enables it to determine which loans from the previous month resulted from partner referrals or were

---

[38]   Faktor Dec. ¶ 5.
[39]   Faktor Dec. ¶ 5.
[40]   Perrinne Dec. ¶ 8.
[41]   Declaration of Michael Viktiuk ("Viktiuk Dec.") ¶ 9.
[42]   Faktor Dec. ¶ 6.

-- 10 --

1  refinances of existing Wells Fargo loans, both of which can impact the commission

2  rate attributable to those loans under the terms of the governing Comp Plan.[43]

3       Wells Fargo has at all relevant times allotted itself 15 days after the close of

4  a month to complete verifications and calculations, which is typically sufficient to

5  allow it to determine each HMCs' incentive pay for the previous month.[44]

6  ### 3.    Timing of Paychecks to HMCs

7       HMCs receive a paycheck every 14 days, which means there are either 2 or

8  3 pay periods in any month.  Each paycheck contains all of the hourly pay the

9  HMC generated during a two-week period.[45]  In addition, incentive pay generated

10  during a particular month (over and above hourly pay already advanced) is paid out

11  in the last pay day of the following month.  The last pay date can fall anytime

12  between the 16th and 31st of a particular month, depending which day of the

13  month is the first pay period and how many days in the month (28-31).

14  Accordingly, incentive pay for February loan funding is paid to HMCs sometime

15  between March 18 and 31, depending when the March pay dates occur that year.[46]

16  ### 4.    Changes to Compensation Plan That Went Into Effect
        January 1, 2017

17

18       In response to issues raised in this Court's September 2016 denial of Wells

19  Fargo's motion for summary judgment concerning alleged ambiguities in Wells

20  Fargo's HMC Compensation Plan, the 2017 HMC Compensation plan was

21  significantly revised to clarify that no incentive pay is earned until after a

22  calculation period for the incentive pay, that runs through and including the 15th

23  day of the following month.  The new provisions include the following:

24

25  [43]    Faktor Dec. ¶ 6.

    [44]    Faktor Dec. ¶ 7.

26  [45]    Stip. Fact No. 13; Faktor Dec. ¶ 8.

27  [46]    Stip. Fact No. 14; Faktor Dec. ¶ 8.

28

-- 11 --

- In the "Definitions" section on page 2, a definition is set forth for "commission credit" that make clear that commission credit is just a running calculation and not an actual earned wage.

- Also in the "Definitions" section, a new definition is set for "earn, earned or earning." It states that, unlike HMCs' hourly pay, which is earned when they actually work the hours, monthly incentive pay is not earned until "Wells Fargo completes its processes to calculate the value of the incentive pay and verify the accuracy of its calculations" which "requires until the 16th of the following month."

- Section 5 C: Payment Schedule states that monthly incentive pay generally is earned only after the completion of the calculation and verification period (no sooner than the 16th date of the month following the month of loan funding at issue).[47]

## III.   LEGAL ARGUMENT

### A.   Procedural Standard for Class Certification

"At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." FRCP 23(c)(1)(A).  However, the defendant need not wait for the plaintiffs to act.  A defendant may file a pre-emptive motion to deny certification or to strike the class allegations from the complaint even if the plaintiffs have not moved to certify the class.  *Vinole v. Countrywide Home Loans, Inc.*, 571 F. 3d 935, 939 (9th Cir. 2009).  As explained below, the record here is sufficiently developed to allow this Court to conclude that class certification should be denied.

### B.   Class Certification Requires Sufficient Commonality to Allow Claims to be Proven Through Collective Proof

Certification is governed by Rule 23 of the Federal Rules of Civil Procedure. "Under Rule 23(a), the party seeking certification must demonstrate, first, that: (1) the class is so numerous that joinder of all members is impracticable, (2) there

---

[47]     Faktor Dec. ¶ 9, Ex. G, pp. 2 and 9.

SMRH:482700072.2                                           DEFENDANT'S MOTION TO DENY CLASS
                                                           CERTIFICATION Case No. 3:15-cv-5239

1    are questions of law or fact common to the class, (3) the claims or defenses of the

2    representative parties are typical of the claims or defenses of the class, and (4) the

3    representative parties will fairly and adequately protect the interests of the class"

4    *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2548 (2011).

5        *Dukes* clarified that the "commonality" standard in Rule 23(a)(2) is not met

6    merely by identifying some issues that are common among the class.  Rather,

7    commonality requires a plaintiff to demonstrate that class members claims "depend

8    upon a common contention" that is "of such a nature that it is capable of classwide

9    resolution — which means that determination of its truth or falsity will resolve an

10    issue that is central to the validity of each one of the claims in one stroke." *Id.* at

11    2551.  As the Supreme Court further explained:

12
13          What matters to class certification . . . is not the raising of
14          common 'questions' – even in droves – but, rather the
15          capacity of a class-wide proceeding to generate ***common***
16          ***answers*** apt to drive the resolution of the litigation.
                 Dissimilarities within the proposed class . . . have the
                 potential to impede the generation of common answers.

17    *Wal-Mart,* 131 S. Ct. at 2551. (emphasis added); *see also See Ellis v. Costco*

18    *Wholesale Corp.*, 657 F. 3d 970, 981 (9th Cir. 2011) ("it is insufficient to merely

19    allege any common question"); *In re Taco Bell Wage & Hour Actions*, 2011 WL

20    4479730, at * 14 (E.D. Cal. Sep. 26, 2011) (applying *Dukes* to deny certification to

21    wage and hour claims for lack of Rule 23(a) commonality); *Aburto v. Verizon*

22    *California, Inc.*, 2012 WL 10381, at *4-6 (C.D. Cal. Jan. 3, 2012) (relying on

23    *Dukes* to deny certification in exemption case stating, "the question of whether

24    [class members] were improperly classified as exempt will depend on answers

25    unique to each potential plaintiff"); *Hughes v. Winco Foods*, 2012 WL 34483, at

26
27
28

-- 13 --

         DEFENDANT'S MOTION TO DENY CLASS
                                       CERTIFICATION Case No. 3:15-cv-5239

1  *5 (C.D. Cal. January 4, 2012) (relying on *Dukes* to deny certification in wage-

2  and-hour case stating that commonality "is satisfied only by common question 'of

3  such a nature that it is capable of classwide resolution").

4      Second, the proposed class must satisfy at least one of the three requirements

5  listed in Rule 23(b). *Id.* In this case, Plaintiff is seeking certification only under

6  Rule 23(b)(3), which applies when "the court finds that the questions of law or fact

7  common to class members predominate over any questions affecting only

8  individual members, and that a class action is superior to other available methods

9  for fairly and efficiently adjudicating the controversy." FRCP Rule 23(b)(3).

10 When the plaintiff lacks collective proof that can resolve the liability issue on a

11 classwide basis, courts will deny certification under Rule 23(b)(3). *See Marlo v.*

12 *United Parcel Service*, 639 F.3d. 942, 948-49 (9th Cir. 2011) (affirming

13 decertification for lack of Rule 23(b)(3) predominance); *see also In re Hydrogen*

14 *Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3rd Cir. 2009) (liability must be

15 "capable of proof at trial through evidence that is common to the class rather than

16 individual to its members."). Plaintiff here lacks proper grounds for certification.

17     **C.   Plaintiff's Expense Reimbursement Claim Is Not Suitable for Class Treatment Because Individualized Issues Predominate**

18

19     Labor Code Section 2802(a) states that an employer "shall indemnify his or

20 her employee for all necessary expenditures or losses incurred by the employee in

21 direct consequence of the discharge of his or her duties. . . ." Section 2802 is

22 designed to require employers to absorb the loss an employee incurs by paying for

23 a "necessary" expense, and what is necessary must take into account whether the

24 expense was reasonably necessary under the totality of circumstances. *Gattuso v.*

25 *Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 568 (2007).

26     The elements of a Section 2802 cause of action are: (1) the employee made

27 expenditures or incurred losses; (2) the expenditures or losses were incurred in

28 direct consequence of the employee's discharge of his or her duties; and (3) the

-- 14 --

DEFENDANT'S MOTION TO DENY CLASS
                          CERTIFICATION Case No. 3:15-cv-5239

1  expenditures or losses were ***necessary***. *Cassady v. Morgan, Lewis & Bockius*, 145

2  Cal. App. 4th 220, 230 (2006) (emphasis added). "[A]scertaining what was a

3  necessary expenditure will require an inquiry into what was reasonable under the

4  circumstances." *Buchanan v. HomeServices Lending LLC*, 2013 WL 1788579, at

5  *7 (S.D. Cal. April 25, 2013) (citing *Grissom v. Vons Companies, Inc.*, 1 Cal. App.

6  4th 52, 58 (1991)). Where an employee's expenditure is voluntary and optional

7  and not reasonably deemed necessary to perform the employee's job duties, the

8  employer is not required to reimburse the expense. *See Novak v. Boeing Co.*, 2011

9  WL 9160940, at *4 (C.D. Cal. July 20, 2011) (finding that failure to reimburse

10  work-from-home employees for phone line and internet costs did not violate

11  § 2802 because the work-from-home program was optional and not required by the

12  employer); *see also Takacs v. A.G. Edwards & Sons*, 444 F. Supp. 2d 1100, 1124-

13  25 (S.D. Cal. 2006) (factual disputes as to whether "advertisement costs and

14  bonuses to support staff" were "necessary" precluded summary judgment).

15      **1.    Whether The Expenses Were Necessary to Any Given HMC**
            **Raises a Predominant Individualized Issue**

16
        The first predominant individualized issue the Court will need to resolve to

17  decide liability in this action is whether any particular HMC's expenditure on

18  FASTMail or an individualized website was necessary under Section 2802.

19  Multiple analogous cases explain why that issue cannot be decided on a class basis.

20
        *Buchanan* is a closely analogous decision in that it addresses whether

21  certification was proper for a Section 2802 class seeking reimbursement of the

22  very same FASTMail and HMC website programs at issue Plaintiff seeks to have

23  reimbursed here.[48] The *Buchanan* plaintiffs produced evidence that one of the

24

25      [48]    Although the defendant in that action was a Wells Fargo joint venture,
    Home Services Lending ("HSL"), HSL used the same compensation plans as
26  Wells Fargo and allowed its employees to participate in Wells Fargo's FASTMail
    and HMC website programs. *See* Declaration of Thomas R. Kaufman ("Kaufman
27  Dec.") ¶ 5.

28                                   -- 15 --

three area managers in California had sent e-mails to the HMCs he oversaw

exhorting them to participate in FASTMail and have an individualized website,

including one stating that his goal was to have "100% enrollment." The plaintiffs

argued that, although the written materials describing FASTMail and the websites

indicated that the programs were optional and that employees who enrolled were

free to cancel at any time, communications from management rendered the

expenditures "necessary" within the context of Section 2802.   By contrast, the

defendant submitted approximately ten declarations from HMCs describing their

experiences, stating that they never received any instruction to enroll in the

marketing programs, and always understood them to be optional.  Furthermore, the

evidence reflected that a significant portion of the HMC population either did not

participate in FASTMail, did not have an individual website, or both.[49]

On this record, the United States District Court for the Southern District of

California denied the Plaintiffs' motion for class certification and granted HSL's

motion to deny class certification.  The court, citing two other court decisions that

had denied certification of expense reimbursement claims, noted that where the

company policy at issue does not indicate that the purchase at issue was

mandatory, and the plaintiff instead relied on communications from managers that

were heard by some but not other members of the proposed class, individualized

issues will necessarily predominate.  Since that was exactly the record that the

court faced, it denied class certification for lack of commonality:

> Defendants' liability will rest on individualized inquiries
> into matters such as what each manager instructed, how
> each employee interpreted the instruction, and whether
> the employee then relied on the instructions and enrolled
> in the programs. Therefore, the commonality prong is not

---

[49]   Kaufman Dec. ¶ 5 (discussing record provided to the district court in *Buchanan*).

SMRH:482700072.2

DEFENDANT'S MOTION TO DENY CLASS
CERTIFICATION Case No. 3:15-cv-5239

1      met because Plaintiffs fail to allege common claims
2      capable of class-wide resolution.

3  *Buchanan,* 2013 WL 1788579, at *5 (internal citations omitted); *Howard v. Gap,*
4  *Inc.,* 2009 WL 3571984, at * 4-6 (N.D. Cal. Oct. 29, 2009) (cited by *Buchanan*
5  court in support); *Morgan v. Wet Seal, Inc.*, 210 Cal. App. 4th 1341,1353, 1356-57
6  (2012) (same); *see also Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 642-43
7  (N.D. Cal. 2010) (denying certification for lack of collective proof in a case where
8  employees allegedly subject to a common practice forcing them to buy T-shirts
9  contrary to company written policy).

10      Similarly, the California Court of Appeal in *Morgan* denied certification of a
11  claim seeking reimbursement for purchases retail store employees had made of
12  company clothing to comply with the company's alleged dress code policy.
13  Because the dress code policy did not, on its face, indicate that any retail employee
14  had to purchase clothing, the plaintiffs argued that the policy as construed by their
15  managers required them to purchase Wet Seal or other stylish clothing to comply
16  with the store's requirement that they meet the dress code for the job and that any
17  variations in what clothing they bought was simply a damages question.  The trial
18  court rejected that argument and the court of appeal affirmed, explaining that
19  numerous individualized inquiries would be needed to resolve to determine if any
20  purchase was "necessary" within the meaning of Section 2802:

21          Answering the "central" liability question whether Wet
22          Seal employees were required to wear Wet Seal clothing
            as a condition of employment or otherwise compelled to
23          purchase Wet Seal merchandize would require several
24          individualized inquiries including (1) what, if anything,
            the employee was told by his or her store manager
25          regarding purchasing Wet Seal clothing or wearing Wet
26          Seal clothing to work; (2) if such a discussion occurred,
27          when and with whom the employee had that discussion;

28
                                    -- 17 --

> (3) how the employee interpreted that discussion;
> (4) whether the employee's interpretation was
> reasonable; and (5) whether the employee then purchased
> Wet Seal clothing to wear to work pursuant to that
> discussion.

*Id.* at 1356.

The same reasons the courts in *Buchanan* and *Morgan* denied class certification apply to this action as well.  Examining the record here, all of the following evidence in the record suggests that, at least in many individual cases, participation in FASTMail or the HMC website program was not necessary.  The evidence to support that conclusion includes:

- The competent Declaration of Jennifer Clark explaining that there has never been a company policy requiring HMCs to have a website or participate in any marketing program and there is no record of any HMC ever having been disciplined for refusing to participate.[50]

- The 2014-15 Compensation Plans and the expense reimbursement policy all describe FASTMail and HMC websites as optional and not required.[51]

- Declarations from a sampling of fifteen (15) HMCs attesting that they always understood the websites and FASTMail to be optional, including three (3) employees who worked without a website without experiencing any adverse consequence and two (2) HMCs either never participated in FASTMail or did so for only a portion of their employment.[52]

- The actual usage patterns of these two programs has not been universal over the years.  Participation in FASTMail has never been significantly higher than 50% of the HMCs, participation in the HMC website program was never higher than 75%, and even once Wells Fargo made having a website free in 2016, 1,000 HMCs declined to set one up.[53]

---

[50]  Clark Dec. ¶¶ 1-17.

[51]  Stip. Facts, Ex. C, p. 4 and Ex. D, p. 4; Clark Dec. ¶ 17, Ex. K, p. 2.

[52]  Kryski Dec. ¶ 3; Perrinne Dec. ¶ 3; Viktiuk Dec. ¶ 4.

[53]  Clark Dec. ¶¶ 6, 10.

-- 18 --

- Copies of the instructions HMCs received when they enrolled for a website or marketing programs, which provide that the HMCs can cancel their participation at no cost—a concept inconsistent with participation being mandatory.[54]

- Plaintiff's testimony that his belief these programs were mandatory was based on alleged statements he heard from his manager coercing him to enroll.[55]

This evidence reveals that there is no common answer as to whether any particular HMC was coerced to participate (or reasonably felt he or she had to participate), but rather the answer will vary.  Consider a number of situations where the answer to the "necessary" question would be completely different:

- One HMC works as part of a team supporting a high producing HMC, and has very few contacts of his own.  That HMC chooses not to participate in FASTMail because the big producer is already doing so, and that is his source of the HMC's loan production.

- An HMC opted to participate in FASTMail for six months, found it did not generate additional loans, and then discontinued it.  Could the program be deemed necessary if he incurred no benefit when he used it?

- Another HMC has had his own client contact program in place for many years and did not want to terminate it to instead use Wells Fargo's FASTMail program.  How can FASTMail be necessary for him?

- An HMC has been participating at the lowest level of FASTMail for a year, but would increase to a higher level of mailings if he did not need to pay the cost of doing so.  Which level of FASTMail subscription is the "necessary" level for this HMC?

The possible variations are endless, and in each case where an employee contends it was necessary for him to use FASTMail or an HMC Website, Wells

---

[54]  Clark Dec. ¶ 8, Exs. H and I.
[55]  Pltf. Dep. 119:17-120:9.

1  Fargo will be entitled to cross-examine the HMC on the alleged grounds for this
2  belief and to present evidence of its own that it was not necessary in that case.
3  Given that there are literally thousands of HMCs in the putative class, resolving all
4  those claims will prove to be truly unmanageable.  *See Morgan*, 210 Cal. App. 4th
5  at 1368 (affirming denial of certification because "individual factual inquiries
6  would pose overwhelming case management difficulties"); *Weigele v. Fedex*
7  *Ground,* 267 F.R.D. 614, 622 (S.D. Cal. 2010) (decertifying case when it became
8  evidence that proving classwide liability would require the unmanageable calling
9  of 227 witnesses at trial).  Accordingly, the Court should grant Wells Fargo's
10 motion as class certification is not warranted on Plaintiff's reimbursement claim.

11          **2.      Whether Employees Incurred a Loss From The Programs**
                      **Raises Another Individualized Issue**
12
13          Labor Code Section 2802 speaks of "indemnifying" employees, which
14 Webster's dictionary defines as "to make compensation to for incurred hurt, loss,
15 or damage."[56]  Implicit in this concept of indemnification is that the employee has
16 suffered some sort of ***economic loss*** or injury that the indemnifying party restores.
17 *See Zalkind v. Ceradyne, Inc.*, 194 Cal. App. 4th 1010, 1023-24 (2011) (explaining
18 that "indemnify" entails "reimbursement for losses").

19          Unlike a routine business expense case where an employee must incur a loss,
20 such as an employee who drives his car for work, which depreciates the car and
21 requires expenditures for gas, through the marketing programs at issue, Wells
22 Fargo provides the HMC ***a service in return for the payment*** that may actually
23 generate additional money for the employee.  In other words, investing $100 in
24 FASTMail may generate additional commissions for the HMC worth more than the
25 $100 fee, causing the employee to earn a return on investment rather than a loss.

26 _____
27 [56]     http://www.merriam-webster.com/dictionary/indemnify

28                                    -- 20 --

1    The value of the service obtained through a marketing program can vary
2  widely from one employee to another.  For example, Plaintiff testified that, in his
3  case, FASTMail generated enough additional business that the additional
4  commissions he received fully offset the cost of the subscription.[57]  By contrast,
5  HMC Lillia Sanchez attested in her declaration that she canceled FASTMail after
6  having enrolled in it for a year because she "did not think it was helping [her]
7  business as much as it should."[58]  To determine whether any HMC experienced a
8  loss would require a close analysis of the HMCs record of generating business, and
9  the impact to that level of business after the employee either obtained an individual
10  website or enrolled in FASTMail.  There is no feasible way to answer this question
11  classwide without studying each HMC's particular case.

12    As the court in *Howard* discussed the individualized nature of this inquiry
13  when discussing the value different employees obtained from purchasing
14  discounted Gap clothing (assuming the purchases were mandatory):

15  As to damages, whether there is a policy or not,
16  plaintiff's claims would still require an inquiry into the
   variety of reasons each employee may have purchased
17  Gap clothing. It could have been to wear it during non-
18  working hours, as gifts for their family, and a host of
19  other possibilities. Such purchases would not fall under
   the claims at issue and thus would not support damages.
20  ***It would be very difficult, if not impossible to***
21  ***determine, on class-wide proof, whether all employees***
22  ***were harmed by some Gap managers' instructions***.

23  *Howard*, 2009 WL 3571984, at \*6 n. 2 (emphasis added).

24    In sum, because many employees received greater value in return than they
25  expended on websites or FASTMail, and because there is no ready way to

---

26  [57]    Pltf. Dep. 131:17-22.
27  [58]    Declaration of Lilia Sanchez ¶ 4.

28

SMRH:482700072.2                          DEFENDANT'S MOTION TO DENY CLASS
                                          CERTIFICATION Case No. 3:15-cv-5239

1  determine which employees obtained such benefits from the greater putative class

2  without a detailed individualized analysis, individualized issues necessarily

3  predominate and preclude class certification on the reimbursement claim.

**D.   Certification is Also Inappropriate on Plaintiff's Claim for Alleged Late Payment of Incentive Pay**

**1.   Whether Any Given Incentive Payment Was Timely Will Turn on Individualized Issues as to When Payment Was Reasonably Calculable That Month For That HMC**

The parties concur as to the process Wells Fargo follows to calculate and pay incentive pay. Wells Fargo generally pays incentive pay for loan activity in one month on the last pay day of the month in the subsequent month. However, despite the common system, the question of whether that system is lawful or unlawful in any given case varies from HMC and HMC and month to month. *See Walsh v. IKON Office Solutions, Inc.*, 148 Cal. App. 4th 1440, 1461 (2007) (common exempt classification for putative class members did not support certification where record showed exempt status was lawful in some cases and not others based on individual factors).

In its order denying Wells Fargo summary judgment on the late pay claim, the Court explained that, in its judgment, the law required Wells Fargo to pay the incentive pay when "reasonably calculable." *See Nguyen v. Wells Fargo Bank, N.A.*, 2016 WL 5390245, at * 12 (N.D. Cal. Sept. 26, 2016). But many individualized factors impact when Wells Fargo reasonably can calculate incentive pay an HMC was owed and whether they pay day for that particular month satisfied Labor Code Section 204's timing requirement.

As a preliminary matter, Labor Code Section 204 states that wages earned between the 1st and 15th of the month, must be paid by the 26th of the month, while wages earned between the 16th and 31st of the month may be paid as late as the 10th date of the following month. Lab. Code § 204(a). Wells Fargo's incentive pay dates for a month can range from anywhere between the 16th and

-- 22 --

31st of the following month because they occur every two weeks, and Wells Fargo pays on the last one to occur in a month. So, if wages in a particular case were first calculable between the 1st and the 15th of the month following the loan activity at issue, then Wells Fargo complied with Labor Code Section 204 if the payday for the month fell on or before the 26th. In addition, if the wages in a particular case were not earned until the 16th of the month, Wells Fargo was entitled to pay as late as the last day of the month (or even to wait until the 10th of the month after that).

But numerous individualized factors could lead to a delay in when pay was calculable. These include:

- Whether the employee identified any errors in the commission report that Bonus Commission Accounting had to investigate and correct, and the reasonable amount of time that was required to complete the investigation into the alleged errors.

- How long the employee waited after the end of the month to input his work hours for the latter part of the month, as necessary for Wells Fargo to calculate the debit in the payment formula for hourly straight time pay.

- Whether the employee generated loans in a month that required Wells Fargo to access information from other databases to calculate the commission rate and, if so, when Wells Fargo reasonably could have obtained that information in that month to make the calculation.

Given that the thousands of putative class members had varying loan activity each month in a class period covering several years, answering the above questions will require extensive individualized inquiries and will prove unmanageable on a class basis. Accordingly, class certification of the late pay claim should be denied.

### 2. As a Result of Substantial Revision to The Compensation Plan, No Class Can Be Certified After December 31, 2016

At the very minimum, no late pay class can be certified beyond December 31, 2016. Plaintiff, who is the sole proposed class representative, last worked for Wells Fargo in 2015. Effective January 2017, however, Wells Fargo thoroughly

-- 23 --

DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION Case No. 3:15-cv-5239

1  revamped its HMC compensation plan to better clarify that no incentive pay is
2  earned until the 16th day of the month following the month of loan activity.  While
3  Plaintiff's counsel might argue that the new plan is still non-compliant with
4  Section 204, the fact that Plaintiff never worked under that Plan and the Plan is so
5  different from the ones under which he did work, should preclude him from
6  representing a class challenging the 2017 Comp Plan.  Accordingly, if the Court is
7  inclined to certify any sort of late pay class, the cut-off date for that class should be
8  no later than December 31, 2016.

9  **IV.    CONCLUSION**

10        For the foregoing reasons, Wells Fargo respectfully requests that the Court
11  grant this instant motion and deny class certification as to all claims.

13  DATED:  May 5, 2017

15                              SHEPPARD MULLIN RICHTER & HAMPTON LLP

17                              By      /s/ Thomas R. Kaufman
18                                      Thomas R. Kaufman
                                        Attorneys for Defendant
19                                      WELLS FARGO BANK, N.A.

SMRH:482700072.2                      DEFENDANT'S MOTION TO DENY CLASS
                                      CERTIFICATION Case No. 3:15-cv-5239