1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   THOMAS R. KAUFMAN, Cal. Bar No. 177936
2  tkaufman@sheppardmullin.com
   PAUL BERKOWITZ, Cal. Bar No. 251077
3  pberkowitz@sheppardmullin.com
   JASON P. BROWN, Cal. Bar. No. 296688
4  jpbrown@sheppardmullin.com
   1901 Avenue of the Stars, Suite 1600
5  Los Angeles, California 90067-6055
   Telephone:  310.228.3700
6  Facsimile:  310.228.3701

7  Attorneys for Defendant
   WELLS FARGO BANK, N.A.
8
                  UNITED STATES DISTRICT COURT
9
                 NORTHERN DISTRICT OF CALIFORNIA
10

11  HUY NGUYEN, individually and on         Case No. 3:15-cv-5239
    behalf of all others similarly situated,
12                                          Assigned to Hon. Joseph C. Spero
                    Plaintiff,
13                                          **CLASS ACTION**
         v.
14                                          **DEFENDANT'S MEMORANDUM
    WELLS FARGO BANK, NATIONAL              ON POINTS AND AUTHORITIES
15  ASSOCIATION and DOES 1 through          IN OPPOSITION TO PLAINTIFF'S
    10, inclusive,                          MOTION FOR CLASS
16                                          CERTIFICATION**
                    Defendants.
17                                          [Supplemental Appendix Submitted
                                            Under Separate Covers]
18
                                            DATE:    August 25, 2017
19                                          TIME:    9:30 a.m.
                                            CRTRM:   G
20
                                            Complaint Filed August 25, 2015
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND SUMMARY OF OPPOSITION ......................... - 1 -

II.   SUMMARY OF RELEVANT FACTS ......................................... - 3 -

    A.    Wells Fargo's Business and the Nature of the HMC Job ................. - 3 -

    B.    Facts Relevant to Certification of Expense Reimbursement
        Claim ....................................................................... - 3 -

        1.    Wells Fargo Offers HMCs the Option to Participate in
            Certain Optional Marketing Programs ..................... - 3 -

        2.    Different HMCs Report Different Individual Experiences
            As it Relates to Websites and Marketing Expenses ............... - 6 -

        3.    Plaintiff's Two Former Manager Declarants Only Raise
            Additional Individualized Issues ............................... - 7 -

    C.    Facts Relevant to Certification of Late Pay Claim ........................... - 9 -

        1.    The Primary Element of Incentive Compensation is
            Commission Credit Generated from Monthly Loan
            Volume .................................................. - 9 -

        1.    Steps Wells Fargo Takes Each Month to Calculate Pay ......... - 9 -

        2.    Timing of Paychecks to HMCs ............................. - 11 -

        3.    Changes to Compensation Plan That Went Into Effect
            January 1, 2017 ................................... - 12 -

III.  LEGAL ARGUMENT ............................................... - 12 -

    A.    Class Certification Requires Sufficient Commonality to Allow
        Claims to be Proven Through Collective Proof............................. - 12 -

    B.    Plaintiff's Expense Reimbursement Claim Is Not Suitable for
        Class Treatment Because Individualized Issues Predominate......... - 14 -

        1.    Whether The Marketing Expenses Were Necessary to
            Any Given HMC Raises a Predominant Individualized

-i-

Issue ...................................................................................... - 15 -

       2.     Whether Employees Incurred a Loss From The Programs
            Raises Another Individualized Issue .................................... - 20 -

  C.   Certification is Also Inappropriate on Plaintiff's Claim for
      Alleged Late Payment of Incentive Pay .......................................... - 22 -

       1.     Whether Any Given Incentive Payment Was Timely Will
            Turn on Individualized Issues as to When Payment Was
            Reasonably Calculable That Month For That HMC ............. - 22 -

       2.     As a Result of Substantial Revision to The Compensation
            Plan, No Class Can Be Certified After December 31,
            2016 ...................................................................................... - 24 -

IV.  THE MOTION SHOULD ALSO BE DENIED FOR PLAINTIFF'S
     FAILURE TO PRESENT A TRIAL PLAN ............................................. - 24 -

V.    CONCLUSION ..................................................................................... - 25 -

-ii-

# TABLE OF AUTHORITIES

Page(s)

Cases

*Aburto v. Verizon California, Inc.*
2012 WL 10381 (C.D. Cal. Jan. 3, 2012) ............................................................ 13

*Buchanan v. HomeServices Lending LLC*
2013 WL 1788579 (S.D. Cal. April 25, 2013)....................... 1, 14, 15, 16, 17, 20

*Cassady v. Morgan, Lewis & Bockius*
145 Cal. App. 4th 220 (2006)........................................................ 14, 16, 17, 19

*Cervantez v. Celestica Corp.*
253 F.R.D 562 (C.D. Cal. 2008) ........................................................................ 24

*Duran v. U.S. Bank Nat'l Ass'n*
59 Cal. 4th 1 (2014)............................................................................................ 24

*Ellis v. Costco Wholesale Corp.*
657 F. 3d 970 (9th Cir. 2011)............................................................................. 13

*Gattuso v. Harte-Hanks Shoppers, Inc.*
42 Cal. 4th 554 (2007)........................................................................................ 14

*Howard v. Gap, Inc.*
2009 WL 3571984 (N.D. Cal. Oct. 29, 2009)........................................ 16, 21, 22

*Hughes v. Winco Foods*
2012 WL 34483 (C.D. Cal. Jan. 4, 2012) ........................................................... 13

*In re Hydrogen Peroxide Antitrust Litig.*
552 F.3d 305 (3rd Cir. 2009)............................................................................. 13

*Marlo v. United Parcel Service*
639 F.3d. 942 (9th Cir. 2011)............................................................................. 13

*Morgan v. Wet Seal, Inc.*
210 Cal. App. 4th 1341,1353 (2012)............................................................ 16, 17

*Nguyen v. Wells Fargo Bank, N.A.*
2016 WL 5390245 (N.D. Cal. Sept. 26, 2016) ................................................... 22

-iii-

*Novak v. Boeing Co.*
  2011 WL 9160940 (C.D. Cal. July 20, 2011) ...................................................... 14

*Takacs v. A.G. Edwards & Sons*
  444 F. Supp. 2d 1100 (S.D. Cal. 2006) .............................................................. 15

*Wal-Mart Stores, Inc. v. Dukes*
  131 S. Ct. 2541 (2011) ............................................................................... 12, 13

*Walsh v. IKON Office Solutions, Inc.*
  148 Cal. App. 4th 1440 (2007)............................................................................ 22

*Washington v. Joe's Crab Shack*
  271 F.R.D. 629 (N.D. Cal. 2010) ........................................................................ 16

*Weigele v. Fedex Ground*
  267 F.R.D. 614 (S.D. Cal. 2010)......................................................................... 19

*Zalkind v. Ceradyne, Inc.*
  194 Cal. App. 4th 1010 (2011)............................................................................ 20

Statutes

Labor Code § 204 ..............................................................................2, 23, 24

Labor Code § 2802 ....................................................................1, 2, 14, 15, 17, 20

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION AND SUMMARY OF OPPOSITION

Wells Fargo opposes Plaintiff's motion for class certification as to his claims for failure to reimburse expenses ("the reimbursement claim") and delayed payment of incentive pay ("the late pay claim"). As explained below, individualized issues predominate as to both claims for several reasons.

First, for the reimbursement claim, the parties agree that an essential element for liability is that the expenditure for FASTMail and HMC Websites must be *necessary*. Plaintiff does not deny that all the policy documents describe the programs as completely voluntary and optional and not generally reimbursable as business expenses. Plaintiff also concedes that many employees perform their job duties effectively without using the programs. The mere fact that Wells Fargo may believe these are useful programs and may encourage HMCs to enroll at their own expense is not a common question suitable to support classwide liability.

Rather, the question of whether the expense qualifies as "necessary" for any given HMC is a highly individualized issue that turns on the particular needs of each HMC. This is reflected in Wells Fargo's declarations that show how different HMCs value FASTMail and HMC Websites based on their particular book of business and marketing preferences. Furthermore, to the extent Plaintiff contends that certain managers made coercive threats to get certain HMCs to sign up (which Wells Fargo disputes), that would simply raise a new set of individualized disputes as to what different HMCs heard and understood. In fact, another district court rejected this same argument in denying class certification in a virtually identical case, *Buchanan v. HomeServices Lending*, involving a Wells Fargo joint venture.

Furthermore, there is an individualized issue as to whether different HMCs experienced any loss, as necessary to state a claim under Labor Code section 2802. FASTMail and HMC Websites are, in effect, investments where HMCs receive

-- 1 --

1 value in exchange for their money. Enrolling in these programs can sometimes
2 generate additional commissions that fully "pay for" the subscription fees, which
3 means that the employee who enrolls may suffer no "loss" to "indemnify" through
4 Section 2802. Whether any HMC suffered a "loss" in his or her individual case is
5 a separate predominant individualized issue that prevents class certification.

6      Individualized issues also predominate on the late pay claim. Plaintiff's sole
7 argument for certifying the claim for late payment of incentive pay is that there is a
8 common compensation plan and system for payment of incentive pay. But the fact
9 that there is a common pay system does not mean that *liability* for a Labor Code
10 section 204 lay payment claim can be decided collectively. The reality is that,
11 assuming that liability turns on the length of time between when a particular
12 month's incentive payment was reasonably calculable and when it was paid, the
13 answer to that question will turn on a variety of individualized factors including
14 when the employee turned in his work hours, when the employee confirmed the
15 commissions report was accurate, how much time investigation into any
16 discrepancies took, and when the data needed to determine the rate on the loan
17 closings in a particular month were reasonably available to Wells Fargo. Plaintiff
18 has proposed no method to manage those individualized issues.

19      Moreover, to the extent any class can be certified at all, the certification
20 must cut off as of the date when Wells Fargo made substantial revisions to the
21 relevant compensation programs in 2017 after Plaintiff last worked for Wells
22 Fargo. Accordingly, at a minimum, he cannot represent a "late pay" subclass from
23 January 2017 forward.

24      Lastly, Plaintiff has not presented any trial plan explaining how he will
25 actually try this case as a class action. That is a separate defect that independently
26 should lead the court not to certify the class.

27      For all these reasons, Wells Fargo respectfully requests that the Court deny

28

-- 2 --

1 Plaintiff's motion for class certification in its entirety.

2 **II.   SUMMARY OF RELEVANT FACTS[1]**

3    A.   **Wells Fargo's Business and the Nature of the HMC Job**

4    Wells Fargo employs different types of mortgage loan originators, including

5 Home Mortgage Consultants, Private Mortgage Bankers, and "Junior" versions of

6 each of those two jobs, all of which are treated as "HMCs" for purposes of this

7 motion.[2]  Plaintiff worked as an HMC from October 1, 2011 to August 17, 2015.[3]

8    A central job duty of HMCs is to originate mortgage loans, which involves

9 receiving applications from potential borrowers, assembling and submitting the

10 loan files to underwriting, obtaining approval, and closing and funding the loan.[4]

11 At all times relevant to this motion, HMCs' employment was governed by terms

12 and conditions outlined in written Compensation Plans ("Comp Plans") that were

13 typically revised annually.[5]  Under these Comp Plans, HMCs qualified for certain

14 monthly incentive payments that were based on monthly loan funding activity.[6]

15    B.   **Facts Relevant to Certification of Expense Reimbursement Claim**

16       1.   **Wells Fargo Offers HMCs the Option to Participate in Certain Optional Marketing Programs**

17

18    Wells Fargo offers certain free marketing support to its HMCs.  These free

19 marketing services include printable brochures and flyers that HMCs can

20

21

22   [1]   All Exhibits and Declarations cited herein are contained within the concurrently filed Appendix of Evidence, except where it is expressly indicated
23 that they are Exhibits to the Stipulated Facts that Plaintiff filed on April 28, 2017.

24   [2]   Stipulated Fact (Stip. Fact) No. 2.

   [3]   Stip. Fact Nos. 1, 5.

25   [4]   Depo. of Huy Nguyen ("Pltf. Dep.") 169:2-170:9; Stip. Fact No. 3.

   [5]   Stip. Fact Nos. 7-11, Exs. B, C, and D to Stipulated Facts (2013-15
26 Comp Plans), filed with the Court of April 28, 2017 (Docket No. 46-5, pp. 6-44).

27   [6]   Stip Fact Nos. 3-4.

28

customize and tailor towards clients or potential clients.[7] As relevant to this motion, HMCs have also been able to participate in FASTMail and the individual HMC website program by paying a monthly subscription fee.[8]

For the individual website, Wells Fargo offered HMCs the option to have an individual, regulatory-compliant HMC website that would identify the HMC individually, in addition to Wells Fargo.[9] If HMCs elected to set up such a website, the monthly subscription fee would be $40 per month after an initial $95 set up fee (which included the first month's monthly fee).[10] Wells Fargo informed HMCs who elected to have an individual website that the HMC would be responsible for a corresponding monthly charge.[11] To the extent leads came in through an HMC's individual website, they would always be routed to the HMC, while leads that came through the main Wells Fargo Home Mortgage website would be assigned to an HMC selected at Wells Fargo's discretion.[12]

HMCs could cancel their website any time, in which case they would not pay any further fees for the months following the cancellation.[13] Not all HMCs elected to have individual websites. In fact, when Wells Fargo introduced a new employee benefit in 2016 that included a free website, about 1,000 HMCs (15%)

---

[7]     Declaration of Jennifer Clark ("Clark Dec.") ¶ 15; Pltf. Dep. 129:21-130:9 (explaining that Wells Fargo provided him some free marketing materials).

[8]     Clark Dec. ¶¶ 3, 4, 7 and 8. The payment is actually the result of a debit in the incentive compensation formula that this Court has already held not to violate the anti-deduction provisions of California law. (MSJ Order, pp. 23-27). For purposes of class certification, the only relevant aspect is that the HMC bears a cost to cover the subscription fees for these two programs.

[9]     Clark Dec. ¶ 3.

[10]    Pltf. Dep. 124:16-25; Clark Dec. ¶ 4.

[11]    Pltf. Dep. 136:10-16, 144:1-22; Clark Dec. ¶¶ 4, 8, Ex. H.

[12]    Pltf. Dep. 123:2-124:2; Clark Dec. ¶ 5.

[13]    Clark Dec. ¶ 6.

-- 4 --

1 still elected *not* to have one.[14] At all relevant times, the fee for the website was
2 included as a debit in each month's commission calculation, effectively reducing
3 the final incentive pay calculation by the amount of the fee.[15]

4      Similarly, Wells Fargo offers a customer contact program called FASTMail,
5 that enables HMCs the option to have Wells Fargo send customers in a HMC's
6 "book of business" certain marketing mailings that identify the HMC by name and
7 comply with the rules and regulations governing the mortgage industry.[16] Wells
8 Fargo informed HMCs who elected to participate in FASTMail that the HMC
9 would be responsible for certain monthly fees which varied based on the number of
10 pieces of mailing the HMC elected to have sent through the FASTMail program.
11 The monthly rate could range from approximately $45 to $340, depending on the
12 number of contacts the HMCs elected to send FASTMail mailings.[17] Many but
13 not all HMCs have found FASTMail a worthwhile investment because the
14 additional customer contact tended to increase their number of loan originations
15 (and resulting incentive pay) by more than the subscription fees.[18] Plaintiff
16 admitted that FASTMail generated more incentive pay for him than it cost him:

17      Q.    Do you think you got enough deals that -- that the
18             increased commissions fully offset the cost you
19             paid for FASTMail?

20      A:    Yes.[19]

21      HMCs could also cancel their FASTMail subscription at any time.[20]

---

[14]    Clark Dec. ¶ 6 (even after individual websites became free in 2016,
roughly 15% of HMCs elected not to have one).

[15]    Pltf. Dep. 118:2-6; Clark Dec. ¶ 13.

[16]    Pltf. Dep. 121:16-122:5; Clark Dec. ¶ 7.

[17]    Pltf. Dep. 125:1-14, 126:10-13, 147:3-22; Clark Dec. ¶ 8, Ex. I.

[18]    Clark Dec. ¶ 9.

[19]    Pltf. Dep. 131:17-22 (attorney objection omitted).

1 | Between 2013-15, only half the HMCs were enrolled in FASTMail.  At present,
2 | only a bit more than half of eligible HMCs are enrolled in FASTMail.[21]

**2. Different HMCs Report Different Individual Experiences As it Relates to Websites and Marketing Expenses**

Wells Fargo has submitted 15 declarations from HMCs describing their varying experiences with FASTMail and individual websites. The declarations reflect material ***individual*** differences among HMCs.  These include variations as to when they participated in any marketing program, what they were told about the programs, why they elected to participate (or not), and what value they derived from them.  For example, Charles Kryski, Jr. testified that he had previously enrolled in FASTMail and a website a few years ago, but decided to cancel the subscription because he did not feel the expenses were necessary as he can successfully originate loans without the programs and did not find it worth the ongoing cost.[22]  Another HMC, James Perrinne, testified that he has never signed up for FASTMail because he does not have a need as "[a] lot of [his] business is referred to [him] by bankers, realtors, and friends and family of past customers."[23]  Perrinne has not even signed up for an individual website even after this service became free because he does not believe it is necessary to originate loans.[24]

By contrast, Yogesh Rane has always chosen to enroll in FASTMail and maintain a website because he believes that these programs are a "cheap form of marketing," that they pay for themselves, and his book of business is too large for him to "individually contact [his] clients on [his] own because it would be too time

---

20     Clark Dec. ¶ 10.
21     Clark Dec. ¶ 10 (participation has ranged from about 49% to 54%).
22     Declaration of Charles Kryski, Jr. ("Kryski Dec.") ¶¶ 3-4.
23     Declaration of James Perrinne ("Perrinne Dec.") ¶ 3.
24     Perrinne Dec. ¶ 3.

1  consuming."[25] Rane is aware of other HMCs who decided not to enroll in

2  FASTMail because their books of business were too small for the program to be

3  valuable to them.[26]

4       Furthermore, manager communications regarding these programs varied.

5  Plaintiff testified that his manager told him he had to enroll in the programs.[27] But

6  declarant Ken Sotelo testified that his manager told him that the programs were

7  voluntary and that "they were simply resources available to him" if he chose to use

8  them.[28] By contrast, Chad Smart's manager recommended that he enroll in these

9  programs because "they are good ways to keep in contact with clients and potential

10 clients, and they also bring in business in amount that covers the cost of the fees."[29]

11 Anna Lisa Truong Lopez testified that her manager sent a "very clear message"

12 that enrolling in FASTMail and having a website were voluntary and that she did

13 not have to participate in these programs if she did not want to do so.[30]

14       As the above sampling of declarations reflects, HMCs had differing

15 experiences with respect to marketing programs that could materially impact

16 liability. Accordingly, a trial in this case would necessarily require investigation of

17 each and every HMC's specific facts—essentially thousands of mini trials. Such

18 an exercise is flatly inconsistent with class litigation.

19       **3.    Plaintiff's Two Former Manager Declarants Only Raise
               Additional Individualized Issues**

20

21       With their moving papers, Plaintiff submitted the declarations of two former

     Wells Fargo branch managers who attested that (1) although Wells Fargo's policies

22

23       [25]    Declaration of Yogesh Rane ("Rane Dec.") ¶ 4.

24       [26]    Rane Dec. ¶ 4.

         [27]    Pltf. Dep. 119:17-120:9.

25       [28]    Declaration of Ken Sotelo ¶ 4.

26       [29]    Declaration of Chad Smart ¶ 4.

27       [30]    Declaration of Anna Lisa Truong Lopez ¶ 4.

28

1 say that FASTMail and HMC are voluntary, they are actually required; and
2 (2) they received instructions from higher managers to threaten to reallocate
3 HMCs' "book of business" to other HMCs if the HMC refused to enroll in
4 FASTMail. Neither of these claims withstood cross-examination, however.

5    Wells Fargo deposed Mike Thomas on May 16, 2017 and he effectively
6 abandoned the central premise of his declaration. He admitted that he never
7 worked for Wells Fargo outside San Bernardino County and did not know how
8 FASTMail and HMC websites were handled elsewhere, including the areas of
9 Northern California, Los Angeles, San Diego and Orange County.[31] Where his
10 declaration suggested that management "constantly" threatened HMCs to make
11 them enroll in FASTMail, on cross-examination he admitted he knew of no other
12 branch manager who made that threat, he never even discussed the issue with his
13 regional manager, and that he had merely had conversations with one area manager
14 about how to persuade HMCs to enroll in FASTMail.[32] He also testified contrary
15 to his declaration that, to the extent an HMC left Wells Fargo and his book of
16 business was reallocated to another HMC, the branch manager had discretion
17 where to allocate it, and could give it to someone not enrolled in FASTMail.[33]

18    The second former manager declarant, Pablo Ramirez, has actually retracted
19 his declaration entirely when he learned Wells Fargo wanted to depose him, stating
20 that he "do[es] not want [his] declaration to be considered by the Court" and seeks
21 to "retract the statements" and "do[es] not stand by the statements" within it.[34]
22 Thus, his declaration provides no support for Plaintiff's motion.

23

24    [31]    Deposition of Mike Thomas ("Thomas Dep.") 12:10-14:3, 14:19-
25 15:17.
     [32]    Thomas Dep. 35:13-18, 37:6-17, 50:14-51:18.
26    [33]    Thomas Dep. 39:17-41:12.
27    [34]    5/10/17 Declaration of Pablo Ramirez, ¶¶ 2-3.

28

SMRH:482868516.2    OPP TO PLTF'S MOT. FOR CLASS CERT.
Case No. 3:15-cv-5239

### C. Facts Relevant to Certification of Late Pay Claim

#### 1. The Primary Element of Incentive Compensation is Commission Credit Generated from Monthly Loan Volume

Typically, the largest credit in a HMC's incentive compensation formula is "commission credit" arising from monthly loan originations. Certain loans have a specific commission rates assigned to them, such as a flat rate where the HMC refinances an existing Wells Fargo loan.[35] The commission rate on most loans, however, is based on a "commission schedule" that derives the commission rate from *total monthly* loan activity.[36] As an HMC originates more loans during a month, the commission rate applicable to all the loans can increase on a tiered basis. For example, in 2015, an HMC who originated 3 loans in a month would receive commission credit of .45% on total loan volume, but the commission rate on all the loans would increase to .65% upon funding a fourth loan.[37]

#### 1. Steps Wells Fargo Takes Each Month to Calculate Pay

Although the incentive pay HMCs receive is based on the loan activity in a given calendar month, Wells Fargo does not have the information available to calculate the incentive pay instantaneously on the last day of the month. Before it can calculate any HMC's commission, Wells Fargo must undertake a complex process to verify the accuracy of the monthly loan data, and it must also pull data from separate company databases to determine the proper commission rate on different individual loans in an HMC's monthly loan volume.[38]

A key step in this process involves feedback from each HMC. Wells Fargo

---

[35] Declaration of Mark Faktor ("Faktor Dec.") ¶ 3; Stip. Fact Nos. 9-11 Ex. B, p. 3 (.43% on WFHM to WFHM refinance), Ex. C, p. 3 (.35% on WFHM to WFHM refinance), Ex. D, p. 3 (.40% rate on enterprise refinance loans); Pltf. Dep. 92:19-93:14, 107:22-108:2.

[36] Pltf. Dep. 93:10-22.

[37] Stip. Fact No. 11; Ex. D, p. 2 (commission schedule shown); Pltf. Dep. 93:15-94:24.

[38] Faktor Dec. ¶ 4.

SMRH:482868516.2

OPP TO PLTF'S MOT. FOR CLASS CERT.
Case No. 3:15-cv-5239

1 generates a commission report listing the loans its records reflect that the employee
2 closed and the commission rate Wells Fargo assigned to each loan, and HMCs
3 review this list to verify it and identify any errors.[39] HMCs routinely identify what
4 they believe to be errors, which must then be investigated. For example, a loan
5 may be listed as a referral loan with a lower commission rate than the standard
6 schedule, and the HMC might be able to show that this designation was improper.
7 Or it may be that the HMC had negotiated a special arrangement for a period of
8 time to receive a higher commission rate than the schedule which was not reflected
9 on the commission report.[40] The time required to validate any particular HMCs'
10 commissions in any month can vary based on individual circumstances.[41] For
11 example, James Perrinne testified that he has noticed errors on his commission
12 report and has contacted Wells Fargo's Bonus Commission Accounting
13 Department to resolve the issue through the reconciliation process.[42] Michael
14 Viktiuk testified that the "verification process can take a long time because there
15 are occasions when [he] need[ed] to have a dialogue with [his] manager regarding
16 the attribution of correct commission rates for certain loans."[43]

17      In addition, because a debit item in the monthly incentive pay formula is the
18 straight time hourly pay the employee received in the calendar month, Wells Fargo
19 cannot calculate the incentive pay for an HMC until the HMC has input into the
20 timekeeping system the number of hours the HMC worked during the calendar
21 month. HMCs must input and close their time only weekly, so it may be several
22 days after the end of the calendar month before Wells Fargo even possesses the

23

---

24     [39]     Faktor Dec. ¶ 5; Pltf. Dep. 150:8-17, Ex. F-35.
25     [40]     Faktor Dec. ¶ 5.
    [41]     Faktor Dec. ¶ 5.
26     [42]     Perrinne Dec. ¶ 8.
27     [43]     Declaration of Michael Viktiuk ("Viktiuk Dec.") ¶ 9.

28

1  hourly time data that would allow it to calculate the value of the straight time
2  hourly pay debit within the monthly incentive pay formula.[44]

3       Separate from items that require the HMCs' input to calculate, to code
4  certain loans for the proper commission rate requires Wells Fargo to pull data from
5  other databases that it receives only at set intervals. For example, only once per
6  month, Wells Fargo receives data that enables it to determine which loans resulted
7  from partner referrals or were refinances of Wells Fargo loans, which can impact
8  the commission rate attributable to those loans pursuant to the Comp Plan.[45]

9       Wells Fargo has at all relevant times allotted itself 15 days after the close of
10 a month to complete verifications and calculations, which is typically sufficient to
11 allow it to determine each HMCs' incentive pay for the previous month.[46]

12       **2.  Timing of Paychecks to HMCs**

13       HMCs receive a paycheck every 14 days, which means there are either 2 or
14 3 pay periods in any month. Each paycheck contains all of the hourly pay the
15 HMC generated during a two-week period.[47] In addition, incentive pay generated
16 during a particular month (over and above hourly pay already advanced) is paid out
17 in the last pay day of the following month. The last pay date can fall anytime
18 between the 16th and 31st of a particular month, depending which day of the
19 month is the first pay period and how many days in the month (28-31).
20 Accordingly, incentive pay for February loan funding is paid to HMCs sometime
21 between March 18 and 31, depending when the March pay dates occur that year.[48]

---

44  Faktor Dec. ¶ 6.
45  Faktor Dec. ¶ 6.
46  Faktor Dec. ¶ 7.
47  Stip. Fact No. 13; Faktor Dec. ¶ 8.
48  Stip. Fact No. 14; Faktor Dec. ¶ 8.

### 3. Changes to Compensation Plan That Went Into Effect January 1, 2017

In its September 2016 denial of Wells Fargo's motion for summary judgment, the Court identified ambiguities in the Comp Plan relevant to when inventive pay is earned. Thus, Wells Fargo's 2017 HMC Compensation plan was significantly revised to clarify that no incentive pay is earned until after a calculation period for the incentive pay that runs through and includes the 15th day of the following month. The new provisions include the following:

- In the "Definitions" section on page 2, a definition is set forth for "commission credit" that make clear that commission credit is just a running calculation and not an actual earned wage.

- Furthermore, a new definition is set for "earn, earned or earning." It states that monthly incentive pay is not earned until "Wells Fargo completes its processes to calculate the value of the incentive pay and verify the accuracy of its calculations" which "requires until the 16th of the following month."

- Section 5 C: Payment Schedule states that monthly incentive pay generally is earned only after the completion of the calculation and verification period (no sooner than the 16th date of the month following the month of loan funding at issue).[49]

## III. LEGAL ARGUMENT

### A. Class Certification Requires Sufficient Commonality to Allow Claims to be Proven Through Collective Proof

Certification is governed by Rule 23 of the Federal Rules of Civil Procedure. "Under Rule 23(a), the party seeking certification must demonstrate, first, that: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the

---

[49] Faktor Dec. ¶ 9, Ex. G, pp. 2 and 9.

1  representative parties will fairly and adequately protect the interests of the class."

2  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2548 (2011).

3      *Dukes* clarified that the "commonality" standard in Rule 23(a)(2) is not met

4  merely by identifying some issues that are common among the class. Rather,

5  commonality requires a plaintiff to demonstrate that class members claims "depend

6  upon a common contention" that is "of such a nature that it is capable of classwide

7  resolution — which means that determination of its truth or falsity will resolve an

8  issue that is central to the validity of each one of the claims in one stroke." *Id.* at

9  2551. As the Supreme Court further explained:

10          What matters to class certification . . . is not the raising of
11          common 'questions' – even in droves – but, rather the
            capacity of a class-wide proceeding to generate ***common***
12          ***answers*** apt to drive the resolution of the litigation.
13          Dissimilarities within the proposed class . . . have the
14          potential to impede the generation of common answers.

15  *Wal-Mart*, 131 S. Ct. at 2551 (emphasis added); *see also Ellis v. Costco Wholesale*

16  *Corp.*, 657 F. 3d 970, 981 (9th Cir. 2011) ("it is insufficient to merely allege any

17  common question"); *Aburto v. Verizon California, Inc.*, 2012 WL 10381, at *4-6

18  (C.D. Cal. Jan. 3, 2012) (relying on *Dukes* to deny certification in exemption case

19  stating, "the question of whether [class members] were improperly classified as

20  exempt will depend on answers unique to each potential plaintiff"); *Hughes v.*

21  *Winco Foods*, 2012 WL 34483, at *5 (C.D. Cal. Jan. 4, 2012) (per *Dukes*,

22  commonality "is satisfied only by common question 'of such a nature that it is

23  capable of classwide resolution").

24      Second, the proposed class must satisfy at least one of the three requirements

25  listed in Rule 23(b). *Dukes*, 131 S. Ct. at 2551. In this case, Plaintiff is seeking

26  certification only under Rule 23(b)(3), which applies when "the court finds that the

27  questions of law or fact common to class members predominate over any questions

28

-- 13 --

1  affecting only individual members, and that a class action is superior to other
2  available methods for fairly and efficiently adjudicating the controversy." FRCP
3  Rule 23(b)(3). When the plaintiff lacks collective proof that can resolve the
4  liability issue on a classwide basis, courts will deny certification under Rule
5  23(b)(3). *See Marlo v. United Parcel Service*, 639 F.3d. 942, 948-49 (9th Cir.
6  2011) (affirming decertification for lack of Rule 23(b)(3) predominance); *see also*
7  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3rd Cir. 2009)
8  (liability must be "capable of proof at trial through evidence that is common to the
9  class rather than individual to its members.").

10      As explained below, Plaintiff lacks proper grounds for certification here.

11  **B.  Plaintiff's Expense Reimbursement Claim Is Not Suitable for
         Class Treatment Because Individualized Issues Predominate**

12

13      Labor Code Section 2802(a) states that an employer "shall indemnify his or
14  her employee for all necessary expenditures or losses incurred by the employee in
     direct consequence of the discharge of his or her duties. . . ." Section 2802 is
15  designed to require employers to absorb the loss an employee incurs by paying for
16  a "necessary" expense, and what is necessary must take into account whether the
17  expense was reasonably necessary under the totality of circumstances. *Gattuso v.*
18  *Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 568 (2007).
19
20      The elements of a Section 2802 claim are the: (1) employee made
     expenditures or incurred losses; (2) expenditures or losses were incurred in direct
21  consequence of the employee's discharge of his or her duties; and (3) expenditures
22  or losses were **necessary**. *Cassady v. Morgan, Lewis & Bockius*, 145 Cal. App. 4th
23  220, 230 (2006) (emphasis added). "[A]scertaining what was a necessary
24  expenditure will require an inquiry into what was reasonable under the
25  circumstances." *Buchanan v. HomeServices Lending LLC,* 2013 WL 1788579, at
26  *7 (S.D. Cal. April 25, 2013).
27
28      The fact there is a reasonableness inquiry in deciding whether an expense

-- 14 --

1  must be reimbursed under Section 2802 does not mean that any expense that is
2  reasonable and work related must be reimbursed. Rather, where an employee's
3  expenditure is voluntary and optional and not ***reasonably deemed necessary to***
4  ***perform the employee's job duties***, the employer is not required to reimburse the
5  expense. *See Novak v. Boeing Co.*, 2011 WL 9160940, at *4 (C.D. Cal. July 20,
6  2011) (finding that failure to reimburse work-from-home employees for phone line
7  and internet costs did not violate Section 2802 because the work-from-home
8  program was optional and not required by the employer); *see also Takacs v. A.G.*
9  *Edwards & Sons*, 444 F. Supp. 2d 1100, 1124-25 (S.D. Cal. 2006) (factual disputes
10 as to whether "advertisement costs and bonuses to support staff" were "necessary"
11 precluded summary judgment).

### 1. Whether The Marketing Expenses Were Necessary to Any Given HMC Raises a Predominant Individualized Issue

The first predominant individualized liability issue the Court will need to
resolve is whether any particular HMC's use of FASTMail or an individualized
website was reasonably "necessary" to their jobs. Multiple analogous cases
explain why that issue cannot be decided on a class basis.

*Buchanan* is a closely analogous decision in that it addresses whether
certification was proper for a Section 2802 class seeking reimbursement of the
very same FASTMail and HMC website programs at issue here.[50] The *Buchanan*
plaintiffs produced evidence that an area manager in California had sent e-mails to
the HMCs he oversaw exhorting them to participate in FASTMail and have an
individualized website, including one stating that his goal was to have "100%
enrollment." The plaintiffs argued that, although the written materials describing

---

[50]  Home Services Lending ("HSL") was a Wells Fargo joint venture that used the same compensation plans as Wells Fargo and allowed its employees to elect to participate in Wells Fargo's FASTMail and HMC website programs. *See* Declaration of Thomas R. Kaufman ("Kaufman Dec.") ¶ 5.

-- 15 --

1 FASTMail and the websites (the same ones at issue here) stated that the programs
2 were optional and enrollees could cancel at any time, manager pressures rendered
3 the expenditures "necessary" under Section 2802. By contrast, the defendant
4 submitted ten declarations from HMCs describing their experiences, stating that
5 they were never instructed to enroll in the programs, and always understood them
6 to be optional. Furthermore, the evidence reflected that many HMCs either did not
7 participate in FASTMail, did not have an individual website, or both.[51]

8      On this record, the United States District Court for the Southern District of
9 California denied class certification. The court noted that where the company
10 policy at issue indicates purchase of an item is optional, and the plaintiffs instead
11 relied on coercive communications from managers that were heard by some but not
12 other members of the proposed class, individualized issues tend to predominate on
13 the "necessary" issue. Since that was exactly the record that the court faced, it
14 denied class certification for lack of commonality:

> Defendants' liability will rest on individualized inquiries into
> matters such as what each manager instructed, how each
> employee interpreted the instruction, and whether the employee
> then relied on the instructions and enrolled in the programs.
> Therefore, the commonality prong is not met because Plaintiffs
> fail to allege common claims capable of class-wide resolution.

20 *Buchanan,* 2013 WL 1788579, at *5 (internal citations omitted); *Howard v. Gap,*
21 *Inc.,* 2009 WL 3571984, at * 4-6 (N.D. Cal. Oct. 29, 2009) (cited by *Buchanan*
22 court in support); *Morgan v. Wet Seal, Inc.*, 210 Cal. App. 4th 1341,1353, 1356-57
23 (2012) (same); *see also Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 642-43
24 (N.D. Cal. 2010) (denying certification for lack of collective proof in a case where
25 employees allegedly subject to a common practice forcing them to buy T-shirts
26
27     [51]    Kaufman Dec. ¶ 5 (discussing record in *Buchanan*).
28

1 | contrary to company written policy).

2 | Similarly, the California Court of Appeal in *Morgan* denied certification of a
3 | claim seeking reimbursement for clothing purchases by retail store employees to
4 | comply with a dress code policy. Because the dress code policy did not, on its
5 | face, indicate that anyone had to purchase clothing, the plaintiffs argued that the
6 | policy as construed by their managers required the purchase of Wet Seal or other
7 | stylish clothing to meet the dress code for the job and that any variations in what
8 | clothing they bought was simply a damages question. The trial court rejected that
9 | argument entirely and the court of appeal affirmed, explaining that numerous
10 | individualized inquiries would be needed to determine if any purchase was
11 | "necessary" within the meaning of Section 2802:

> Answering the "central" liability question whether Wet Seal
> employees were required to wear Wet Seal clothing as a
> condition of employment or otherwise compelled to
> purchase Wet Seal merchandize would require several
> individualized inquiries including (1) what, if anything, the
> employee was told by his or her store manager regarding
> purchasing Wet Seal clothing or wearing Wet Seal clothing
> to work; (2) if such a discussion occurred, when and with
> whom the employee had that discussion; (3) how the
> employee interpreted that discussion;(4) whether the
> employee's interpretation was reasonable; and (5) whether
> the employee then purchased Wet Seal clothing to wear to
> work pursuant to that discussion.

22 | *Id.* at 1356.

23 | The same reasons the courts in *Buchanan* and *Morgan* denied class
24 | certification apply to this action as well. Examining the record here, all of the
25 | following evidence in the record suggests that, at least in many individual cases,
26 | participation in FASTMail or the HMC website program was not "necessary." The
27 | evidence to support that conclusion includes:

28 |

-- 17 --

- The competent Declaration of Jennifer Clark explaining that there has never been a company policy requiring HMCs to have a website or participate in any paid marketing program and there is no record of any HMC ever having been disciplined for refusing to participate.[52]

- The expense reimbursement policy expressly states that FASTMail and websites are "not mandatory or necessary," but "some HMCs might consider them helpful in promoting their business."[53]

- The 2014-15 Compensation Plans describes FASTMail and HMC websites as optional and not required.[54]

- Fifteen (15) HMCs have attested that they understood these programs to be optional, which includes three HMCs who worked without a website without adverse consequence and two HMCs either never participated in FASTMail or did so for only a portion of their employment.[55]

- The actual usage patterns of these two programs has not been universal over the years. Participation in FASTMail has never been significantly higher than 50% of the HMCs, participation in the HMC website program was never higher than 75%, and even once Wells Fargo made having a website free in 2016, 1,000 HMCs declined to set one up.[56]

- Copies of the instructions HMCs received when they enrolled for a website or marketing programs, which provide that the HMCs can cancel their participation at no cost—a concept inconsistent with participation being necessary.[57]

- Plaintiff's testimony that his belief these programs were necessary was based on alleged coercive statements from his manager.[58]

---

[52] Clark Dec. ¶¶ 1-17.
[53] Clark Dec. ¶ 17, Ex. K, p. 2.
[54] Stip. Facts 10-11, Ex. C, p. 4 and Ex. D, p. 4.
[55] Kryski Dec. ¶ 3; Perrinne Dec. ¶ 3; Viktiuk Dec. ¶ 4.
[56] Clark Dec. ¶¶ 6, 10.
[57] Clark Dec. ¶ 8, Exs. H and I.
[58] Pltf. Dep. 119:17-120:9.

-- 18 --

This evidence reveals that there is no common answer as to whether any particular HMC reasonably felt coerced to participate, but rather the answer will vary. Consider a number of situations where the answer to the "necessary" question would be completely different:

- One HMC works as part of a team supporting a high producing HMC, and has very few contacts of his own. That HMC chooses not to participate in FASTMail because the big producer is already doing so, and that is his source of the HMC's loan production.

- An HMC opted to participate in FASTMail for six months, found it did not generate additional loans, and then discontinued it. Could the program be deemed necessary if he incurred no benefit when he used it?

- Another HMC has had his own client contact program in place for many years and did not want to terminate it to instead use Wells Fargo's FASTMail program. How can FASTMail be necessary for him?

- An HMC has been participating at the lowest level of FASTMail for a year, but would increase to a higher level of mailings if he did not need to pay the cost of doing so. Which level of FASTMail subscription is the "necessary" level for this HMC?

The possible variations are endless, and in each case where an employee contends it was necessary for him to use FASTMail or an HMC Website, Wells Fargo will be entitled to cross-examine the HMC on the alleged grounds for this belief and to present evidence of its own that it was not necessary in that case. Given that there are literally thousands of HMCs in the putative class, resolving all those claims will prove to be truly unmanageable. *See Morgan*, 210 Cal. App. 4th at 1368 (affirming denial of certification because "individual factual inquiries would pose overwhelming case management difficulties"); *Weigele v. Fedex Ground*, 267 F.R.D. 614, 622 (S.D. Cal. 2010) (decertifying case when proving classwide liability would require calling at least 227 witnesses at trial).

SMRH:482868516.2
OPP TO PLTF'S MOT. FOR CLASS CERT.
Case No. 3:15-cv-5239

1　　　　The two declarations Plaintiff submitted with his motion for class

2　certification do not change this analysis at all. First of all, former manager Pablo

3　Ramirez refused to be cross-examined and instead simply withdrew his declaration

4　with a statement that he did not stand by any of the statements in it. Plainly, any

5　assertions he made about an alleged classwide management directive to force

6　HMCs to use FASTMail or websites should be given no weight at all.

7　　　　Plaintiff's other declarant, Michael Thomas, similarly retreated from

8　statements Plaintiff's counsel had him adopt in the declaration counsel drafted.

9　The declaration suggested that there was an order from higher management at

10　Wells Fargo that HMCs would be at risk of losing their book of business if they

11　did not sign up for FASTMail, and that HMCs without FASTMail could not

12　receive orphaned books of business from departing HMCs.

13　　　　At deposition, however, Thomas conceded that (1) he had no personal

14　knowledge of management practices outside San Bernardino; (2) he talked with

15　only one area manager in San Bernardino about encouraging HMCs to sign up for

16　FASTMail; (3) his regional manager never indicated people had to use FASTMail;

17　and (4) it was ultimately in his discretion as branch manager to decide who would

18　receive the book of business of an HMC who left Wells Fargo, regardless of

19　whether the recipient HMC had FASTMail.[59] Rather that support classwide

20　liability, Mr. Thomas's testimony raises the same individualized issues that

21　precluded certification in *Buchanan*. Accordingly, the Court should deny class

22　certification on Plaintiff's reimbursement claim.

23　　　　**2.　　Whether Employees Incurred a Loss From The Programs
　　　　　　　　Raises Another Individualized Issue**

24

25　　　　Labor Code section 2802 speaks of "indemnifying" employees, which

26　――――――――――

27　　　[59]　　Thomas Dep. 12:10-14:3, 14:19-15:17, 35:13-18. 37:6-17, 39:17-
　　　41:12, 50:14-51:18.

28　　　　　　　　　　　　　　　-- 20 --

1 Webster's dictionary defines as "to make compensation to for incurred hurt, loss,
2 or damage."[60] Implicit in this concept of indemnification is that the employee has
3 suffered some sort of ***economic loss*** or injury that the indemnifying party restores.
4 *See Zalkind v. Ceradyne, Inc.*, 194 Cal. App. 4th 1010, 1023-24 (2011) (explaining
5 that "indemnify" entails "reimbursement for losses").

6      An investment is distinct from a routine business expense case. An
7 employee who drives his car for work, which depreciates the car and requires
8 expenditures for gas, experiences a loss in using his car that the employer
9 compensates him for experiencing. With the marketing programs at issue, Wells
10 Fargo provides the HMC ***a service in return for the HMC's subscription fee*** that
11 may actually generate additional money for the employee. In other words,
12 investing $100 in FASTMail may generate more than $100 in resulting incentive
13 pay, causing the employee to earn a return on investment rather than a loss.

14      The value of the service obtained through a marketing program can vary
15 widely from one employee to another. For example, Plaintiff testified that, in his
16 case, FASTMail generated enough additional business that the additional
17 commissions he received fully offset the cost of the subscription.[61] By contrast,
18 HMC Lillia Sanchez attested in her declaration that she canceled FASTMail after
19 having enrolled in it for a year because she "did not think it was helping [her]
20 business as much as it should."[62] To determine whether any HMC experienced a
21 loss would require a close analysis of the HMCs record of generating business, and
22 the impact to that level of business after the employee either obtained an individual
23 website or enrolled in FASTMail. There is no feasible way to answer this question
24 classwide without studying each HMC's particular case.

25
---
[60]   http://www.merriam-webster.com/dictionary/indemnify
26 [61]   Pltf. Dep. 131:17-22.
27 [62]   Declaration of Lilia Sanchez ¶ 4.

28

SMRH:482868516.2                          OPP TO PLTF'S MOT. FOR CLASS CERT.
                                             Case No. 3:15-cv-5239

As the court in *Howard* discussed the individualized nature of this inquiry when discussing the value different employees obtained from purchasing discounted Gap clothing (assuming the purchases were mandatory):

> As to damages, whether there is a policy or not, plaintiff's claims would still require an inquiry into the variety of reasons each employee may have purchased Gap clothing. It could have been to wear it during non-working hours, as gifts for their family, and a host of other possibilities. Such purchases would not fall under the claims at issue and thus would not support damages. ***It would be very difficult, if not impossible to determine, on class-wide proof, whether all employees were harmed by some Gap managers' instructions.***

*Howard,* 2009 WL 3571984, at \*6 n. 2 (emphasis added).

In sum, because many employees received greater value in return than they expended on websites or FASTMail, and because there is no ready way to determine which employees obtained such benefits from the greater putative class without a detailed individualized analysis, individualized issues necessarily predominate and preclude class certification on the reimbursement claim.

### C. Certification is Also Inappropriate on Plaintiff's Claim for Alleged Late Payment of Incentive Pay

#### 1. Whether Any Given Incentive Payment Was Timely Will Turn on Individualized Issues as to When Payment Was Reasonably Calculable That Month For That HMC

The parties concur as to the timing that Wells Fargo pays incentive pay. Wells Fargo generally pays incentive pay for loan activity in one month on the last pay day of the month in the subsequent month. However, the question of whether that payment timetable is lawful or unlawful in any given case varies from HMC and HMC and month to month. *See Walsh v. IKON Office Solutions, Inc.*, 148 Cal. App. 4th 1440, 1461 (2007) (common exempt classification for putative class members did not support certification where record showed variation on whether exempt status was lawful).

-- 22 --

In its order denying Wells Fargo summary judgment on the late pay claim, the Court explained that, in its judgment, the law required Wells Fargo to pay the incentive pay when "reasonably calculable." *See Nguyen v. Wells Fargo Bank, N.A.*, 2016 WL 5390245, at * 12 (N.D. Cal. Sept. 26, 2016). But many individualized factors impact when Wells Fargo reasonably can calculate incentive pay any particular HMC is owed for a month and whether the pay day for that particular month came fast enough to satisfy Labor Code Section 204.

As a preliminary matter, Labor Code section 204 states that wages earned between the 1st and 15th of the month, must be paid by the 26th of the month, while wages earned between the 16th and 31st of the month may be paid as late as the 10th of the following month. Lab. Code § 204(a). Wells Fargo's incentive pay dates for a month can range from anywhere between the 16th and 31st of the following month because payday is every two weeks, and Wells Fargo pays on the last payday of the month. So, if wages in a particular case were first calculable between the 1st and the 15th of the month following the loan activity at issue, then Wells Fargo complied with Labor Code section 204 if the payday for the month fell on or before the 26th. In addition, if the wages in a particular case were not earned until the 16th of the month, Wells Fargo was entitled to pay as late as the last day of the month (or even to wait until the 10th of the month after that).

But individualized factors can delay when pay was calculable, including:

- Whether an HMC identified any errors in the commission report that Wells Fargo had to investigate and correct, and the reasonable amount of time required to complete the investigation into the alleged errors.

- How long an HMC waited after the end of the month to input his work hours for the latter part of the month, as necessary for Wells Fargo to calculate the debit in the payment formula for hourly straight time pay.

- Whether the HMC generated loans that required Wells Fargo to access information from other databases to calculate the commission rate and, if

-- 23 --

OPP TO PLTF'S MOT. FOR CLASS CERT.
Case No. 3:15-cv-5239

so, when Wells Fargo reasonably could have obtained the information necessary to perform the calculation.

Given that the thousands of putative class members had varying loan activity each month in a class period covering several years, answering the above questions will require extensive individualized inquiries and will prove unmanageable on a class basis. Accordingly, class certification of the late pay claim should be denied.

### 2. As a Result of Substantial Revision to The Compensation Plan, No Class Can Be Certified After December 31, 2016

At the very minimum, no late pay class can be certified beyond December 31, 2016. Plaintiff, who is the sole proposed class representative, last worked for Wells Fargo in 2015. Effective January 1, 2017, however, Wells Fargo thoroughly revamped its HMC compensation plan to better clarify that no incentive pay is earned until the 16th day of the month following the month of loan activity. While Plaintiff's counsel might argue that the new plan is still non-compliant with Section 204, the fact that Plaintiff never worked under the Plan should preclude him from representing a class challenging the 2017 Comp Plan. Accordingly, if the Court is inclined to certify any sort of late pay class, the cut-off date for that class should be no later than December 31, 2016.

## IV. THE MOTION SHOULD ALSO BE DENIED FOR PLAINTIFF'S FAILURE TO PRESENT A TRIAL PLAN

It is Plaintiff's burden at the certification stage to demonstrate what methods of common proof exist so that a class can be manageably tried. *Cervantez v. Celestica Corp.*, 253 F.R.D 562, 576 (C.D. Cal. 2008). "Class certification is appropriate only if these individual questions can be managed with ***an appropriate trial plan***." *Duran v. U.S. Bank Nat'l Ass'n,* 59 Cal. 4th 1, 21 (2014) (emphasis

added).[63] In cases where a party seeks class certification based on allegations that "the employer consistently imposed a uniform policy or de facto practice on class members, the party must still demonstrate that the illegal effects of this conduct can be proven efficiently and manageably within a class setting." *Id.* at 22.

Here, Plaintiff has not offered a trial plan. He has not even presented an expert to address how Plaintiff will manage the individualized issues Wells Fargo has detailed. The failure to address any of those important details provides a separate basis, in and of itself, to deny certification here.

## V.   **CONCLUSION**

For the foregoing reasons, Wells Fargo respectfully requests that the Court deny class certification as to all claims.

DATED:  June 1, 2017

SHEPPARD MULLIN RICHTER & HAMPTON LLP

By _____/s/ Thomas R. Kaufman_____
Thomas R. Kaufman
Attorney for Defendant
WELLS FARGO BANK, N.A.

---

[63]   Plaintiff's counsel here should be well familiar with the trial plan requirements, given that Mr. Wynne was lead counsel in *Duran* and argued the trial plan requirement issue in the California Supreme Court.