LEONARD CARDER, LLP
AARON KAUFMANN, SBN 148580
DAVID POGREL, SBN 203787
ELIZABETH GROPMAN, SBN 294156
1330 Broadway, Suite 1450
Oakland, CA 94612
Telephone: (510) 272-0174
Facsimile: (510) 272-0174
akaufmann@leonardcarder.com
dprogel@leonardcarder.com

WYNNE LAW FIRM
EDWARD J. WYNNE, SBN 165819
Wood Island
80 E. Sir Francis Drake Boulevard, Suite 3G
Larkspur, CA 94939
Telephone: (415) 461-6400
Facsimile: (415) 461-3900
ewynne@wynnelawfirm.com

*Attorneys for Plaintiff*
*HUY NGUYEN*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUY NGUYEN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, NATIONAL ASSOCIATION and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 3:15-cv-05239-JCS<br><br>Complaint Filed: August 25, 2015<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date: August 25, 2017<br>Time: 9:30 a.m.<br>Courtroom: G, 15th Floor |

# Table of Contents

I. INTRODUCTION ..................................................................................................................1

II. MATERIAL FACTS ............................................................................................................3

    A. Wells Fargo's Evidence Affirms Essential Facts for the Reimbursement Claim..................................................................................................................................3

    B. Wells Fargo's Uniform Policies for Payment of Commission-Based Earnings ...............................................................................................................................5

III. ARGUMENT .......................................................................................................................6

    A. Common Issues Predominate on the Expense Reimbursement Claim .......................6

        1. Common Facts Will Allow Classwide Determination as to Whether Subscribing to Wells Fargo's Individual HMC Websites and FASTMail Was Reasonable and Job-Related..........................................6

        2. HMCs need not prove a net "loss" to be entitled to reimbursement under California law. ..................................................................................9

    B. Whether Wells Fargo's Commission Payment Schedule Violates Labor Code § 204 Can Be Resolved for All HMCs In One Proceeding............................11

IV. CONCLUSION .................................................................................................................14

# Table of Authorities

**Federal Cases**

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir. 1975) .................................................................................................. 10

*Buchanan v. HomeServices Lending LLC*
  2013 WL 1788579 (S.D. Cal. 2013) ......................................................................................... 8

*Hopkins v. Stryker Sales Corp.*,
  2012 WL 1715091 (N.D. Cal. 2012) ....................................................................................... 10

*Howard v. Gap, Inc.*,
  2009 WL 3571984 (N.D. Cal. 2009) ..................................................................................... 8, 9

*Melgar v. CSK Auto, Inc.*,
  2015 WL 9303977 (N.D. Cal 2015) ........................................................................................ 10

*Nguyen v. Wells Fargo,*
  2016 WL 5390245 (N.D. Cal. Sept. 26, 2016) ................................................................. passim

*Stuart v. Radioshack Corp.*,
  2009 WL 281941 (N.D. Cal. 2009) ..................................................................................... 7, 10

*Takacs v. A.G. Edwards & Sons, Inc.,*
  444 F.Supp.2d 1100 (S.D. Cal. 2006) ........................................................................................ 7

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S.Ct. 2541 (2011) .............................................................................................................. 13

**State Cases**

*Morgan v. Wet Seal, Inc.*,
  210 Cal.App.4th 1341 (2012) .................................................................................................... 8

**Statutes, Rules & Regulations**

California Labor Code
  § 204 ................................................................................................................................. passim

California Labor Code
  § 2802 ............................................................................................................................... passim

## I. INTRODUCTION

Rather than show individual questions, Defendant's declarants confirm common questions of fact and law predominate. All of Defendant's declarants testify that they sought and obtained reimbursement for business-related expenses that were not related to the marketing programs at issue here. The declarants who were deposed testified that none of the business-related expenses for which they sought reimbursement under Defendant's uniform policy were mandatory. All of Defendant's declarants testified that they used at least one of the marketing programs at issue in this litigation (14 out of 15 used both) and found them beneficial to themselves and Wells Fargo, yet none sought reimbursement because all believed that the marketing expenses were not reimbursable under Defendant's policy.

Defendant miscasts Plaintiff's recovery theory to be that Wells Fargo required the class members to participate in the subject marketing programs. Plaintiff makes no such contention unlike the plaintiffs in the cases Defendant relies upon, which makes them easily distinguishable. This Court has already rejected Defendant's contention that for a business expense to be reimbursable under Labor Code § 2802 it must be mandated by the employer. *Nguyen v. Wells Fargo,* 2016 WL 5390245, *9 (N.D. Cal. Sept. 26, 2016). Indeed, Defendant's own declarants make clear that for a business expense to be reimbursable under its own policy, it need not be mandatory. Rather, Plaintiff's argument is that the question of whether the marketing expenses were reasonable job-related expenses for the HMC job is a predominant common question warranting class certification.

Defendant's only other argument against certifying the Section 2802 claim is premised on its novel theory that an employee must somehow show a "net loss" in order to be reimbursed. Defendant's argument finds no support in logic or law. It is undeniable that all HMCs who participated in the marketing plans had their wages deducted. Section 2802 does not require more. There is simply no support for Defendant's attempt to add a "profit & loss" element into Section 2802. It is hardly surprising that the only case Defendant relies upon contains no discussion whatsoever of Labor Code § 2802 as it arises out of New York law and is therefore completely irrelevant to this discussion. Regardless, Defendant's argument does not defeat class certification

1 because, even if it did exist, it would be an issue of damages which, of course, does not preclude
2 certification.

3      Defendant's half-hearted attempts to avoid certification of Plaintiff's Labor Code § 204
4 likewise merely buttress the inescapable conclusion that the predominant common question of
5 when commissions are earned is a classwide question warranting certification. Plaintiffs offer two
6 theories: either the commissions are earned when the loan funds or at the end of the month. Under
7 either scenario class certification is appropriate because the answer to the question will depend on
8 the interpretation of Defendant's HMC Compensation Plans and its corporate representative
9 testimony. Regardless of which theory prevails, the evidence is undisputed that Defendant did not
10 pay its HMCs until the final pay period of the month following when the loan funds because it set
11 up its payroll systems that way and HMCs have no further duties and responsibilities once a loan
12 funds. Defendant's argument that it is actually benefitting the HMCs by delaying their pay so they
13 have a chance to check for errors is a canard. Defendant's system is designed to accept adjustments
14 well-after its employees have been paid – in some cases up to six months later – and make those
15 adjustments in the following payroll cycle. Defendant has failed to offer any persuasive evidence
16 or argument why Plaintiff's Labor Code § 204 claim should not be certified.

17      Finally, as discussed below, Wells Fargo has amended both its expense reimbursement
18 program and commission compensation plan in ways that address issues raised in the subject
19 lawsuit. While not conceding those amendments have made those policies compliant with
20 California law, Plaintiff has not worked under these new policies. Accordingly, Plaintiff seeks to
21 modify the class definitions as follows to address these new developments:

> Class
> All persons who are or have been employed, at any time from August 25, 2011 through December 31, 2016, by Wells Fargo Bank, National Association in California under the job titles Home Mortgage Consultant, Home Mortgage Consultant Jr. and Private Mortgage Banker (collectively "HMCs")
>
> Expense Reimbursement Sub-Class
> All persons who are or have been employed as HMCs, at any time from August 25, 2011 through December 31, 2015, by Wells Fargo Bank, National Association in California and who participated in either Wells Fargo's individual HMC website program or FASTMail program.

Commission Pay Sub-Class
All persons who are or have been employed as HMCs, at any time from August 25, 2011 through December 31, 2016, by Wells Fargo Bank, National Association in California.

Waiting Time Penalties Sub-Class
All persons who have been employed as HMCs and separated from employment (either by involuntary termination or resignation), at any time from August 25, 2011 through December 31, 2016, by Wells Fargo Bank, National Association in California and who did not timely receive all of their wages at time of separation.

## II. MATERIAL FACTS

### A. Wells Fargo's Evidence Affirms Essential Facts for the Reimbursement Claim

The 15 HMC declarations Defendant submitted affirm that all class members share the same job duties; that their pay and job performance was measured by their production; and that they were subject to the same reimbursement policy.

All of the HMC declarants state that their main job is "originating" loans.[1] Under Wells Fargo's uniform compensation plan, the greater the loan production—both in terms of "units" sold and loan amounts—the more the HMC earns.[2] The three declarants that were deposed confirmed that they were evaluated based upon their loan production.[3] Under Wells Fargo's policy, HMCs could lose their jobs if they failed to meet minimum production levels.[4]

All of the HMC declarants have used the marketing programs at issue in this case[5] with just one only using FASTMail.[6] The three deposed testified that they believed the individual HMC website and FASTMail programs helped increase both their visibility and that of the company and

---
[1] Decl. of Beadnell, ¶ 2; Decl. of Chow, ¶ 2; Decl. of Decontreras, ¶ 2; Decl. of Kryski, ¶ 2; Decl. of Li, ¶ 2; Decl. of Perrinne, ¶ 2; Decl. of Rane, ¶ 2; Decl. of Sanchez, ¶ 2; Decl. of Smart, ¶ 2; Decl. of Sotelo, ¶ 2; Decl. of Stone, ¶ 2; Decl. of Lopez, ¶ 2; Decl. of Viktiuk, ¶ 2; Decl. of Wasserman, ¶ 2; Decl. of Wiley, ¶ 2.
[2] Stip. Fact No. 4 and Exs. B, C and D.
[3] Decontreras Depo., p. 37:19-38:4; Sotelo Depo., p. 29:7-13; Lopez Depo., p. 57:21-58:19.
[4] Decontreras Depo., p. 38:23-39:16; Lopez Depo., p. 61:6-17.
[5] Decl. of Beadnell, ¶ 3; Decl. of Chow, ¶ 3; Decl. of Decontreras, ¶ 3; Decl. of Kryski, ¶ 3; Decl. of Li, ¶ 3; Decl. of Perrinne, ¶ 3; Decl. of Rane, ¶ 3; Decl. of Sanchez, ¶ 3; Decl. of Smart, ¶ 3; Decl. of Sotelo, ¶ 3; Decl. of Stone, ¶ 3; Decl. of Lopez, ¶ 3; Decl. of Viktiuk, ¶ 3; Decl. of Wasserman, ¶ 3; Decl. of Wiley, ¶ 3.
[6] Decl. of Perrinne, ¶ 3.

facilitated communication with clients and prospective clients experience.[7] Wells Fargo's V.P of Business Services Janet Clark also testifies that the website "functionality" enabled the HMC "to gather some preliminary information from potential borrowers" and that leads that came in through the websites were directed to the particular HMC.[8] Each of the three deposed HMC declarants believed the marketing tools bolstered their loan originations, resulting in increased earnings personally *and* for Wells Fargo.[9] Thus the deponents' experiences bear out Wells Fargo's uniform representations about these marketing tools' usefulness for increasing loan originations.

Each of the 15 HMC declarants stated that, under Wells Fargo's uniform expense reimbursement policy, "I understand that I can receive reimbursement for any reasonable and necessary business expense that is related to the performance of my job . . . ."[10] All of them have accessed that policy to be reimbursed for a variety of items, including marketing efforts, such as meetings and other events with relators, CPAs, and prospective customers; business-related meals, mileage, parking and mobile phone expenses; trade association memberships; pamphlets and flyers; and advertisements.[11] The three deposed acknowledged that they chose these marketing activities on their own and the tools were in no way made mandatory by Wells Fargo; but nonetheless, they sought and obtained reimbursement for such items under Wells Fargo's uniform policy.[12]

Like the myriad of other marketing activities that the HMC declarants list as reimbursable

---

[7] Decontreras Depo., p. 29:22-30:8, 32:23-33:9; Sotelo Depo., p. 39:7-41:2; Lopez Depo., p. 37:8-22, 38:21-40:8.
[8] Clark Decl. ¶¶ 3, 5.
[9] Decontreras Depo., p. 33:10-12, 36:1-9; Sotelo Depo., p. 31:6-16, 56:4-25; Lopez Depo., p. 37:8-22, 38:21-40:8.
[10] Decl. of Beadnell, ¶ 7; Decl. of Chow, ¶ 7; Decl. of Decontreras, ¶ 7; Decl. of Kryski, ¶ 6; Decl. of Li, ¶ 7; Decl. of Perrinne, ¶ 7; Decl. of Rane, ¶ 7; Decl. of Sanchez, ¶ 7; Decl. of Smart, ¶ 7; Decl. of Sotelo, ¶ 7; Decl. of Stone, ¶ 7; Decl. of Lopez, ¶ 7; Decl. of Viktiuk, ¶ 7; Decl. of Wasserman, ¶ 7; Decl. of Wiley, ¶ 7.
[11] Decl. of Beadnell, ¶ 7; Decl. of Chow, ¶ 7; Decl. of Decontreras, ¶ 7; Decl. of Kryski, ¶ 6; Decl. of Li, ¶ 7; Decl. of Perrinne, ¶ 7; Decl. of Rane, ¶ 7; Decl. of Sanchez, ¶ 7; Decl. of Smart, ¶ 7; Decl. of Sotelo, ¶ 7; Decl. of Stone, ¶ 7; Decl. of Lopez, ¶ 7; Decl. of Viktiuk, ¶ 7; Decl. of Wasserman, ¶ 7; Decl. of Wiley, ¶ 7.
[12] Decontreras Depo., p. 21:3-13, 23:11-24:16, 29:5-15; Sotelo Depo., p. 45:14-46:3, 47:23-48:18, 49:10-14; 51:23-52:10; Lopez Depo., p. 41:14-25, 43:11-44:19.

under Wells Fargo's policy, all of Wells Fargo's declarants universally state that their expenditures on the website and FASTMail programs were voluntary.[13] However, unlike the other marketing items, all of the declarants stated that they could *not* be reimbursed for the websites and FASTMail under Wells Fargo's policy because they were told those items were not required by the company.[14]

While Wells Fargo's declarants may have understood the FASTMail and the website programs were optional, those deposed made clear they had virtually no input into how such marketing efforts were executed. The three deposed confirmed that the FASTMail went out according to Wells Fargo's pre-determined schedule, which is also explained in Wells Fargo's promotional literature.[15] The deponents also testified that they had *no* input as to the content of the mailings.[16] The contents of the websites are also controlled by Wells Fargo, with little or no variance among HMCs other than their name and contact information.[17]

Wells Fargo's VP Janet Clark confirms that, as of January 2016, the individual websites are offered to the HMCs for free.[18] At the same time, Wells Fargo began awarding points to higher-producing HMCs so that they could use FASTMail.[19]

B. Wells Fargo's Uniform Policies for Payment of Commission-Based Earnings

Wells Fargo's defense of the claims arising from alleged violation of Labor Code section 204 hinges on common evidence, as illustrated by the Court's description of Defendant's summary judgment argument: "Wells Fargo takes the positon that commissions are not 'earned' until the

---

[13] Decl. of Beadnell, ¶ 4; Decl. of Chow, ¶ 4; Decl. of Decontreras, ¶ 4; Decl. of Kryski, ¶ 4; Decl. of Li, ¶ 4; Decl. of Perrinne, ¶ 4; Decl. of Rane, ¶ 4; Decl. of Sanchez, ¶ 4; Decl. of Smart, ¶ 4; Decl. of Sotelo, ¶ 4; Decl. of Stone, ¶ 4; Decl. of Lopez, ¶ 4; Decl. of Viktiuk, ¶ 4; Decl. of Wasserman, ¶ 4; Decl. of Wiley, ¶ 4.
[14] Decl. of Beadnell, ¶ 8; Decl. of Chow, ¶ 8; Decl. of Decontreras, ¶ 8; Decl. of Li, ¶ 8; Decl. of Perrinne, ¶ 8; Decl. of Rane, ¶ 8; Decl. of Sanchez, ¶ 8; Decl. of Smart, ¶ 8; Decl. of Sotelo, ¶ 8; Decl. of Stone, ¶ 8; Decl. of Lopez, ¶ 8; Decl. of Viktiuk, ¶ 8; Decl. of Wasserman, ¶ 8; Decl. of Wiley, ¶ 8.
[15] Decontreras Depo., p. 35:4-14; Sotelo Depo., p. 52:22-8; Lopez Depo., p. 35:23-36:2.
[16] Decontreras Depo., p. 35:15-18; Sotelo Depo., p. 34:7-9; Lopez Depo., p. 36:3-5.
[17] Clark Decl., ¶ 3.
[18] Clark Decl., ¶ 4.
[19] *Id.*

calculation and verification process is complete, citing the testimony of Mark Factor and Section 5 of the Comp Plans." *Nguyen v. Wells Fargo,* 2016 WL 5390245, *11 (N.D. Cal. Sept. 26, 2016). Wells Fargo cites the same common evidence here – its universal comp plans and testimony from its corporate designee Mark Faktor.

Faktor's latest declaration confirms all HMCs are subject to the same "Comp Plans."[20] Incentive pay is largely determined by "'commission credit' arising from monthly loan originations."[21] The commission rates are "based on a set 'commission schedule' that derives the commission from total monthly loan activity," which increased on a "tiered basis."[22] Faktor describes a uniform calculation and verification process by which databases are culled, calculations are made, and HMCs are allowed to challenge the commission credits.[23] Wells Fargo has also adopted a classwide time keeping requirement that only requires HMCs to enter time weekly rather than daily.[24] Nonetheless, by its own choosing, Wells Fargo allows itself 15 days to complete this process.[25] And it also has chosen to wait up to 31 days to make payment on the commissions.[26]

### III. ARGUMENT

**A. Common Issues Predominate on the Expense Reimbursement Claim**

    **1. Common Facts Will Allow Classwide Determination as to Whether Subscribing to Wells Fargo's Individual HMC Websites and FASTMail Was Reasonable and Job-Related**

Rather than address Plaintiff's theory for expense reimbursement, Wells Fargo fashions its own liability theory from which it can argue individual issues predominate. Instead of addressing Plaintiff's theory and offer of common proof that class members' participation in Wells Fargo's marketing programs was reasonable and job-related, Wells Fargo re-frames the central issue to be whether such programs were "mandatory." As stated in the opening papers, this Court has already

---

[20] Faktor Decl., ¶ 2.
[21] Faktor Decl., ¶ 3.
[22] *Id.*
[23] Faktor Decl., ¶¶ 4-5.
[24] Faktor Decl., ¶ 6.
[25] Faktor Decl., ¶ 7.
[26] Faktor Decl., ¶ 8.

rejected Defendant's contention that expenditures must be mandated by the employer in order to be reimbursable under Labor Code section 2802. *See Nguyen*, 2016 WL 5390245, **8-10.

The Court dismissed Wells Fargo's authorities offered in support of summary judgment based on the fact that the analysis in those cases was premised on the assumption that the expenditures were mandatory. *Nguyen* at **9-10. Wells Fargo's opposition to class certification rests on many of the same authorities, and they are inapt here for the same reasons.

This Court at summary judgment rejected the premise for Wells Fargo's argument against class certification: "Wells Fargo['s] argument that there is a bright-line rule that only expenses that are officially required can be considered 'necessary' does not square with the case law." *Nguyen* at *9. The Court found the fact that "there was no express policy requiring employees to incur these expenses" did not preclude recovery for those expenses under Section 2802. *Id.* Rather the Court framed the liability analysis "as to whether the subscription fees paid by Plaintiff for the use of an individual HMC website and FASTMail were a 'reasonable cost'. . ." *Id.*

The language of Labor Code section 2802 and case law well-support Plaintiff's classwide liability theory that the subscribed marketing expenses are reasonable job-related expenses. As the Court noted, subsection (c) of 2802 provides that "'"necessary expenditures or losses" shall include all *reasonable* costs.'" *Nguyen* at *9 (emphasis added). The focus on what are reasonable, job-related expenditures tracks the purpose of Section 2802. "To be sure, § 2802 is a codification of California's 'strong public policy that favors the indemnification (and defense) of employees by their employers for claims and liabilities resulting from the employee's acts within the course and scope of their employment.'" *Stuart v. Radioshack Corp.*, 2009 WL 281941, *16. Thus, expenses incurred within the "course and scope" of the job are reimbursable under 2802, so long as the employee conduct is "not 'so unusual or startlingly that it would be unfair to include the loss as a cost of doing business.'" *Takacs v. A.G. Edwards & Sons, Inc.,* 444 F.Supp.2d 1100, 1123, fn. 13 (S.D. Cal. 2006).

Defendant's own authorities recognize two liability theories under Section 2802: "First, '[s]ection 2802 requires employers to indemnify employees for all necessary expenditures or loses by the employee in direct consequence of the discharge of his or her duties, *or* of his or her

7
REPLY MPA ISO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 3:15-cv-05239-JCS

obedience to the directions of the employer.'" *Buchanan*, 2013 WL 1788579, *3, (emphasis added), quoting *Morgan v. Wet Seal, Inc.*, 210 Cal.App.4th 1341, 1355 (2012). Wells Fargo's sole focus on whether the marketing tools are mandatory addresses only the second theory, which is not the basis for this action. Plaintiff's claim tracks the first theory, asserting that the use of Wells Fargo's marketing tools are reasonable, job-related expenditures because they are subscribed to in direct consequence of carrying out their sales duties.

Wells Fargo's reliance on *Buchanan, Morgan*, and *Howard v. Gap, Inc.*, 2009 WL 3571984 (N.D. Cal. 2009)[27] is misplaced principally because in each of those cases plaintiffs' class liability theory was that their respective employers *required* them to incur the expense at issue. Plaintiffs in *Buchanan* argued the marketing expenses were "required" and "mandatory," relying on a smattering of disparate emails in an attempt to show that the requirement was classwide. The Court rejected the meager showing of common evidence, ruling that "without a stated company policy *requiring* HMCs to enroll in the marketing programs as a condition of employment, the Court finds no common method to prove liability on a class-wide basis." 2013 WL 1788579, *5. Similarly, in *Morgan* and in *Howard*, plaintiffs' proposed liability theory was that retail store employees were *required* to purchase company-brand clothing as a condition for working in the stores. *Morgan*, 210 Cal.App.4th at 1345; *Howard*, at *3-5. Those courts denied class certification, finding that spotty anecdotal evidence of managers' instructions did not make up for the lack of a classwide written policy that company clothing was a job requirement. *Morgan,* at 1356-57; *Howard*, at *6. Here Plaintiff's theory is *not* that the expenses were *required,* but rather were reasonably incurred in the course and scope of the class members' sales duties for Wells Fargo. Thus, for the same reason this Court distinguished Wells Fargo's authorities on summary judgment—i.e., that they were premised on a theory that expenses were reimbursable because they were required by the employer (*Nguyen* at **9-10), Defendant's cases do not provide the proper

---

[27] *Howard* is also inapt, because the claims there were not for reimbursement under *California law*, but rather came under *New York law* that prohibits certain wage deductions and "kickbacks" to employers. *Id.* at *3. *Howard* offers no analysis to suggest the New York statutes there are analogous to California's reimbursement requirement under Labor Code section 2802.

analytical framework for determining whether Plaintiff's theory is suitable for class treatment.

Defendant's evidence reaffirms and provides additional evidence that Plaintiff's liability theory for expense reimbursement under Section 2802 can be adjudicated on a classwide basis. Defendant's declarants confirm that all HCMs share the same job duties focused on loan originations; that Wells Fargo presented them with the same promotional material regarding the individual HMC websites and FASTMail; and that they worked under and shared the same understanding of Wells Fargo's reimbursement policy. While the HMC declarants put forth by Defendant believed Wells Fargo would reimburse them for reasonable marketing expenses, they all understood that Wells Fargo's policy was to *not* reimburse for the individual websites and FASTMail. Those deposed also confirmed that Wells Fargo controlled the content and timing of these marketing tools. Lastly, they confirmed that these marketing tools increased their exposure as well as that of Wells Fargo, leading to more loans closed and thus greater earnings for them *and* Wells Fargo. With such common evidence, the trier-of-fact will readily determine whether subscriptions to these Wells Fargo-offered and managed services are reasonable, job-related expenses that are part of Wells Fargo's cost of doing business and cannot be passed onto its HMCs under Section 2802.

**2. HMCs need not prove a net "loss" to be entitled to reimbursement under California law.**

In a novel effort to block class certification, Wells Fargo conjures up a new requirement to recover expense reimbursement under California Labor Code section 2802: that an employee must prove that, separate and apart from paying out-of-pocket for the employer's business expense, they were also "damaged" by the expense. Wells Fargo goes on to explain that in the context here, HMCs must prove that whatever expense they incurred in subscribing to the company-provided websites and FASTMail was not made up for by the increase in commissions earned as a consequence of utilizing such marketing tools. Of course, this requirement finds no support in the language of Section 2802 or any case law interpreting that provision.

The only authority that Wells Fargo cites in support of its new requirement for reimbursement under Labor Code § 2802 is the decision in *Howard v. Gap, Inc.* But that case provides no support

here as the claims in *Howard* were not for California workers seeking reimbursement under California law, but rather for a putative class of New York employees asserting wrongful deduction and "kickback" claims under New York law. There the court, in *dicta,* observed that retail store workers may have to show that their purchase of Gap clothes was for work rather than non-work purposes, i.e., that the purchase was job related. *Id.* at *6, fn. 2. At best, it is a stretch to read *Howard* as requiring plaintiffs to show "more harm than good" from their expenditure under New York law, never mind that such a requirement is inherent in California's reimbursement law that shares little, if any, language found in New York's wrongful deduction and anti-"kickback" provisions.

Imposing some new "net harm" requirement for a Section 2802 claim would also run contrary to recognized public policy. It would be extremely difficult – if not impossible, absent expert analysis – for HMCs to prove their expenses on websites and FASTMail exceeded any resulting increase in loan originations and compensation therefrom. While it makes logical sense that greater exposure in the marketplace would lead to increase loan sales, as Defendant's declarants testified, it is unrealistic to think an HMC could prove a direct correlation between a particular loan transaction and a specific marketing effort. Imposing such a burden on employees would be an affront to "California's strong public policy that favors indemnification" of employee expenses. *Stuart,* 2009 WL 281941, * 16 (internal quotations omitted).

Finally, even if an employee was somehow required to show "damages" as a result of the expenditure, the individual issues that may arise from such a showing should not bar certification here. Following the well-established principal that differences in damages do not defeat class certification, Judge Lucy H. Koh court in *Hopkins v. Stryker Sales Corp.*, 2012 WL 1715091 (N.D. Cal. 2012) held that the fact that some may have received more expense reimbursement than others and variations in expenses incurred did not defeat class certification. *Id.* at *6, citing *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975). *See also Melgar v. CSK Auto, Inc.*, 2015 WL 9303977, *11 (N.D. Cal 2015) (individualized issues regarding damages on a Section 2802 claim did not warrant denial of class certification). The same would be true here in that any individual damages proof needed should not justify denial of class certification.

**B. Whether Wells Fargo's Commission Payment Schedule Violates Labor Code § 204 Can Be Resolved for All HMCs In One Proceeding**

As this Court noted in denying Wells Fargo summary judgment, the central liability question as to whether Wells Fargo's commissions payment schedule complies with Labor Code section 204 is: when are the commissions "earned" under Wells Fargo's compensation plans. *Nguyen*, 2016 WL 5390245, *12. This is a common question that can be answered through common evidence applicable to all HMCs.

As illustrated by the Court's analysis of Wells Fargo's summary judgment, determining when commissions are "earned" will turn on interpreting Wells Fargo's compensation plans.[28] Plaintiff asserts that the bulk of the commissions based on loan originations (the exception being home equity lines of credit, "HELOCS") are earned upon funding of the loan, or, at the latest, at the end of the month in which the loan is funded. As explained on summary judgment, Plaintiff's first theory, that loans are "earned" upon funding, is supported by: (1) the applicable compensation plans that show that Wells Fargo issues commission "credits" based on "funded" loans,[29] and, (2) Wells Fargo's designee admitted that the HMC has no more "duties or activities" once "a loan has funded."[30] Assuming Wells Fargo can delay through contract language the accrual of commissions past when all work is complete[31] (*see Nguyen* at *11, noting that the legal conditions precedent that determine when a commission is earned are a matter of contract, such terms cannot be unlawful or unconscionable), then, at the latest, commissions are earned at month's end as the compensation

---

[28] As Wells Fargo amended its compensation plan as of January 1, 2017 to address the Court's concern at summary judgment and Plaintiff has not worked under the current plan, Plaintiff agrees the class on the Section 204 claims should be closed as of January 2, 2017. This is not a concession that the amendments have addressed all issues under Section 204; rather, Plaintiff only concedes that the new language raises new issues that do not affect him since he left Wells Fargo's employ well-before the changes.

[29] Stipulated Facts, Ex. B, p. 2; Ex. C, p. 2; Ex. D, p. 2. (Consistent with the Court's order on summary judgment, Plaintiff refers to the original page numbers of the documents. See ECF 39, fn. 3.)

[30] Ex. 3, Decl. of Wynne, Faktor Depo., p. 31:16-19.

[31] Under a twice-a-month pay schedule, Wells Fargo can still employ a tiered-loan production analyses for awarding commissions. Wells Fargo could either adjust the tiers so that loan production is evaluated at least twice a month or tier payments based on a rolling average for monthly loan originations.

1 plans state "commission credits will be granted on the last day of the month in which the loan
2 actually funds (i.e. disbursement of funds to the closing/settlement agent)."[32] Under either Section
3 204 theory, liability can be proven classwide: (1) if commissions were earned upon funding, then
4 commission payments should have been made at least twice a month; (2) if commissions were
5 earned at month's end, then Wells Fargo had until the 10th of the next month to make payment.
6 Because Wells Fargo's universal schedule was to complete calculations 15 days after the month in
7 which the loans funded and then delay payment further until the last bi-weekly pay period of that
8 month, it meets neither schedule and liability can be proven classwide.

9 Wells Fargo's defense can also be addressed classwide. Wells Fargo argues that, under its
10 compensation plans, commissions are not earned until "the calculation and verification process is
11 complete." *Nguyen* at *11. Consequently, under the defense theory, Wells Fargo would have until
12 the 26th of the month following the funding of the subject loans to pay commissions. If that was
13 the case, there would be few months in which it was out of compliance with Section 204. While
14 the Court at summary judgment was skeptical at best whether the compensation plan supports such
15 a position, *see id.*, Wells Fargo's defense is the same for all HMCs and thus is amenable to class
16 treatment.

17 While Wells Fargo offers a variety of excuses for why it delays calculating the commission
18 payments for 15 days and then does not make payment until between the 16th and the 31st of the
19 month, none of them create individual issues that are material to the dispute over when the
20 commission earnings are due and payable. According to the opposition evidence, Wells Fargo
21 elects to wait until after the close of a calendar month for HMCs to challenge the commission
22 credits awarded in that subject month. Rather than requiring HMCs to submit their time daily to
23 meet the "timely" submission requirement in the compensation plans and Team Member
24 Handbook,[33] Wells Fargo uniformly permits the HMCs to submit their time weekly.[34] As a result,

---

[32] Stipulated Facts, Ex. B, p. 2; Ex. C, p. 2; Ex. D, p. 2; see also, Ex. 3, Decl. of Wynne, Faktor Depo., p. 65:9-17.
[33] See, e.g., Stipulated Facts, Ex. B, p. 1; Ex. 12, Suppl. Decl. of Wynne, Team Member Handbook, Jan. 2014, p. WFB001758.

Wells Fargo delays determining the hourly pay it has chosen to treat as a credit against the commission-based earnings before they are paid out. Defendant argues that it has adopted this process to ensure that the information is correct and to give the HMCs an opportunity to "verify it and identify any errors." (Opp., p. 10.) However, HMCs are also expected to check their pay *after* they have been paid and "report immediately to your manager any overpayment or any pay discrepancy…"[35] Indeed, Mark Faktor testified that he sees adjustments up to six months *after* employees have been paid.[36] Wells Fargo understands that adjustments are made after its employees have been paid and its procedure for dealing with such adjustments is to simply make the correction in the "next payroll cycle."[37] In fact and contrary to the impression Wells Fargo attempts to make that these adjustments are commonplace, the reality is that its own Retail Compensation Process Narrative states that, "These adjustments are minimal in comparison to the end of month payments."[38] Thus Wells Fargo's evidence neither withstands scrutiny nor distracts from the common issue of whether the uniform processing and pay schedule for commission earnings that it has elected to follow complies with the requirements of Section 204.

Regardless of who is correct, both sides assert uniform positions for the entire class based on compensation plans that are uniformly applicable to the putative class members. In other words, common evidence will drive a common answer as to when commissions are earned and, in turn, whether Wells Fargo's pay schedule complies with Section 204 consistent with the Supreme Court's directive in *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011) (class certification appropriate where "common answers [are] apt to drive the resolution of the litigation").

///

///

---

[34] Faktor Decl., ¶ 6.
[35] Ex. 12, Suppl. Decl. of Wynne, Team Member Handbook, Jan. 2014, p. WFB001761.
[36] Ex. 13, Suppl. Decl. of Wynne, Faktor Depo., p. 57:9-58:3.
[37] Ex. 14, Suppl. Decl. of Wynne, Retail Compensation Process Narrative, Wells Fargo Home Mortgage, p. WFB002202.
[38] *Ibid.*

## IV. CONCLUSION

In light of the foregoing, Plaintiff respectfully requests that his motion for class certification be granted.

DATED: June 9, 2017     WYNNE LAW FIRM

By: _____/s/ Edward J. Wynne_____
EDWARD J. WYNNE
*Attorneys for Plaintiff HUY NGUYEN*

DATED: June 9, 2017     LEONARD CARDER, LLP

By: _____/s/ Aaron Kaufmann_____
AARON KAUFMANN
DAVID POGREL
ELIZABETH GROPMAN
*Attorneys for Plaintiff HUY NGUYEN*