UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUY NGUYEN,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>WELLS FARGO BANK, NATIONAL ASSOCIATION,<br><br>　　　　Defendant. | Case No. 15-cv-05239-JCS<br><br>**ORDER GRANTING MOTION FOR CLASS CERTIFICATION**<br><br>Re: Dkt. No. 46 |

## I.  INTRODUCTION

Plaintiff Huy Nguyen asserts claims on behalf of a putative class of Home Mortgage Consultants ("HMCs")[1] who are or were employed by Defendant Wells Fargo Bank, National Association ("Wells Fargo"). Following summary judgment, the claims that remain in this case are based on two alleged substantive violations of the California Labor Code. First, Plaintiff claims that Wells Fargo's policy of not reimbursing HMCs for certain marketing programs, namely, the use of Wells Fargo's HMC websites and FASTMail program, violates California Labor Code section 2802. Second, Plaintiff contends Wells Fargo does not timely pay commissions to HMCs based on when the commissions are earned under California law, in violation of California Labor Code section 204. Presently before the Court is Plaintiff's Motion for Class Certification ("Motion").[2] A hearing on the Motion was held on September 8, 2017 at

---

[1] In the Stipulated Facts of the Parties for Use in Briefing Class Certification Issues ("Stipulated Facts"), Dkt. No. 46-5, the parties have stipulated that for the purposes of the instant motion, the term HMC is used to refer to "Wells Fargo employees working in the position of Home Mortgage Consultant, Private Mortgage Banker, Home Mortgage Consultant Jr., and Private Mortgage Banker, Jr.[,] [all of which] are all treated equivalently." Stipulated Facts, No. 2.

[2] Defendant also filed a motion styled as a Motion to Deny Class Certification ("Motion to Deny"). *See* Dkt. No. 47. The Court did not authorize such a motion. Although the parties raised the possibility that Wells Fargo might wish to file such a motion in their Joint Case Management

9:30 a.m. For the reasons stated below, the Motion is GRANTED.[3]

## II. BACKGROUND

### A. Factual Background

#### 1. Plaintiff's Employment as an HMC, Duties of HMCs, and the Compensation Plans

Nguyen was employed by Wells Fargo in various HMC positions between October 1, 2011 and August 17, 2015. Stipulated Facts, No. 5. The HMCs share as their primary job duty the origination of home loan products. Stipulated Facts, No. 3. This involves sales activities such as meeting with referral partners and finding leads, as well as receiving loan applications, assembling loan packages for submission to underwriting, and pushing the loan application forward in order to originate mortgage loans for Wells Fargo. Defendant's Appendix of Evidence, Ex. F (Nguyen Dep.) at 169-170.

When Nguyen began working for Wells Fargo in any HMC position, he received an offer letter that referenced a Compensation Plan for Home Mortgage Consultants ("HMC Comp Plan") setting forth Wells Fargo's compensation plan for HMCs. Stipulated Facts, Nos. 6-7. The HMC Comp Plan is updated every year, superseding the previous plan as to mortgage loans funded after a certain date. Stipulated Facts, No. 8.

---

Conference Statement, *see* Dkt. No. 38, the Court did not adopt that proposal in its Case Management Order. *See* Dkt. No. 40 ("The class certification motion shall be filed and served on or before February 21, 2017. The parties shall meet and confer and submit a stipulation and proposed order on the briefing schedule for the class certification motion with the reply brief to be due four (4) weeks before the scheduled hearing date."). While Defendant's proposed motion was vaguely referenced in a subsequent scheduling stipulation (which referred generally to "class certification related motions"), *see* Dkt. No. 44, the Court authorized only one such motion. Moreover, in contrast to summary judgment motions, where cross-motions are warranted because a denial of one party's request for summary judgment does not necessarily result in summary judgment for the other side, there is no such justification here for filing cross-motions. There are only two possible outcomes: the Court will either certify a class or it will not. There is no need for a cross-motion to deny class certification, which simply gives Wells Fargo a "second bite at the apple" as to opposing class certification. (Here, Wells Fargo filed its "Motion to Deny" one week after Plaintiff filed his Class Certification Motion and its Opposition brief a week after that). Finally, as a practical matter, the Motion to Deny raises essentially the same arguments that are made in Wells Fargo's opposition brief. Therefore, the Court STRIKES Wells Fargo's Motion to Deny under Rule 12(f) of the Federal Rules of Civil Procedure on the basis that it is redundant and was not authorized by the Court.

[3] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

2

Under the HMC Comp Plan, there are three components of HMC compensation: 1) hourly pay; 2) commissions, bonuses, incentives; and 3) premium pay for overtime hours worked. *See* Stipulated Facts, Ex. B (2013 HMC Comp Plan) at 2; Ex. C (2014 HMC Comp Plan) at 2; Ex. D (2015 HMC Comp Plan) at 2.

The HMC Comp Plans[4] provide that "commission credit will be granted on the last day [of][5] the month in which the loan actually funds (i.e. disbursement of funds to the closing/ settlement agent)." Stipulated Facts, Ex. B (2013 HMC Comp Plan) at 2; Ex. C (2014 HMC Comp Plan) at 2; Ex. D (2015 HMC Comp Plan) at 2. In order for commissions to be credited, however, the HMC must be "actively employed by Wells Fargo through the date commission credit is granted." Stipulated Facts, Ex. B (2013 HMC Comp Plan) at 9; Ex. C (2014 HMC Comp Plan) at 8; Ex. D (2015 HMC Comp Plan) at 8.[6] The "Standard Commission Schedule" contained in the HMC Comp Plans states that commission rates are determined based on "monthly funded" loans. *Id.* Gross commissions are "calculated according to the commission credit schedule and the loans funded in the month." Stipulated Facts, Ex. B (2013 HMC Comp Plan) at 8; Ex. C (2014 HMC Comp Plan) at 7; Ex. D (2015 HMC Comp Plan) at 7.

---

[4] The Court refers generally to the HMC Comp Plans for 2013, 2014 and 2015 as "The HMC Comp Plans." The 2016 HMC Comp Plan was not provided to the Court until after the September 8, 2017 motion hearing, *see* Dkt. No. 60 (Notice of Lodging), and the parties did not address the terms of the 2016 HMC Comp Plan in their briefs.

[5] While the 2015 Comp Plan uses the word "of" here, the 2013 and 2014 Comp Plans read, "commission credit will be granted on the last day *off for* the month in which the loan actually funds." The parties stipulated at oral argument that the use of "off for" instead of the word "of" was a clerical error and does not reflect any difference in the meaning of this language in these three versions of the HMC Comp Plan.

[6] The language of this section of the HMC Comp Plans varies slightly in the three relevant years. In the 2013 and 2014 HMC Comp Plans, this provision is entitled "When Incentive Payments are Credited." In the 2015 HMC Comp Plan, the provision is entitled "When Incentive Payments are Earned." *See* Stipulated Facts, Ex. B at 9, Ex. C at 8, Ex. D at 8. Further, the 2013 HMC Comp Plan uses the word "earn" in the body of the provision whereas the 2014 and 2015 HMC Comp Plans do not. Stipulated Facts, Ex. B (2013 HMC Comp Plan) at 9 ("To earn commissions, bonuses, or other incentives under this Plan, the Employee must be actively employed by Wells Fargo . . . ."); Ex. C (2014 HMC Comp Plan) ("Crediting of commissions, bonuses, or other incentives under this Plan: the Employee must be actively employed by Wells Fargo through the date commission credit is granted . . . ."); Ex. D (2015 HMC Comp Plan) ("The employee must be actively employed by Wells Fargo through the date commission credit is granted under the terms of this Plan . . . ."). In other words, while both the 2013 and 2015 HMC Comp Plans use the word "earn" in connection with when the commission is credited – either in the title of the provision or in the body of the provision – the 2014 HMC Comp Provision does not use the word "earn" in either.

Wells Fargo pays HMCs' hourly pay in bi-weekly paychecks. Stipulated Facts, Nos. 12-13. Hourly pay is fully vested when paid and cannot be recaptured by Wells Fargo, but is considered as an "advance on commissions" under the HMC Comp Plans. Wynne Decl., Ex. 3 (Faktor Dep.) at 18-19; Stipulated Facts, Ex. B-D at 2. Wells Fargo pays the HMCs incentive pay[7] once a month, based on loan fundings, on the last pay day of the month following the month in which the loans funded. Stipulated Facts, No. 14. Wells Fargo's monthly pay cycle for incentive pay has applied to all HMCs equally since at least 2012. Wynne Decl., Ex. 3 (Faktor Dep.) at 58-59.

The Wells Fargo payroll department calculates the amount of commissions owed based on three types of information: 1) time cards that come in weekly; 2) partner referrals that come in approximately 8-10 business days after the end of the month; and, 3) refinances (referred to as "Wells to Wells Refinances"), which come in 8-15 days after the end of the month. Wynne Decl., Ex. 3 (Faktor Dep.) at 12-17; *see also* Wynne Decl., Ex. 4 (April 5, 2016 email with the subject heading "Timing for Commission Processing – California Terms"). According to Wells Fargo, the commission is paid in the last pay period of the month following the month in which it was funded because the "verification process" used to calculate commissions takes on average 15 days. Wynne Decl., Ex. 3 (Faktor Dep.) at 37-38. Wells Fargo's Rule 30(b)(6) witness, Mark Faktor, testified at his deposition that he considers the commissions to be "earned" at the point when the calculation of the amount is complete. Wynne Decl., Ex. 3 (Faktor Dep.) at 52.

**2. Marketing Programs Used by HMCs**

The two Wells Fargo marketing programs that are the subject of Plaintiff's claims in this action are the individual HMC website program and FASTMail.

According to Jennifer Clark, who has been designated as Wells Fargo's "person most knowledgeable" as to these marketing programs, the HMC website program was created to "allow HMCs to have an individual website that would be mostly standardized content that Wells Fargo

---

[7] The parties agree that for the purposes of this action there is no meaningful legal distinction between commissions and incentive pay. Therefore, the Court, like the parties, uses these terms interchangeably.

4

would ensure remained current with the governing regulations." Defendant's Appendix of Evidence, Clark Decl. (Dkt. No. 51-1, hereinafter, "Clark Class Cert. Decl.") ¶3. HMCs could then customize a portion of the website with their contact information and "include other functionality to enable the HMC to gather some preliminary information from potential borrowers." *Id*. One of the advantages for an HMC of having an individual website was that "[t]o the extent leads came in through the HMC's website, the leads were directed to the particular HMC." *Id*. ¶ 5. On the other hand, "if leads came in through the branch website or the central home mortgage website, Wells Fargo decided who got the lead." *Id*. Until January 2016, Wells Fargo charged HMCs a $95 set-up fee and a $40 monthly subscription fee for their individual websites. *Id*. ¶¶ 4, 14.

FASTMail "allows HMCs to stay in contact with people in their 'book of business,' which includes both former customers and potential new customers." *Id*. ¶ 7. Clark describes the advantages of using FASTMail as follows:

> Similar to the websites, there is extensive regulation over mailing communications with potential customers (including no contact lists that preclude sending unsolicited mailers). Accordingly, while HMCs can set up their own mailers to their book of business, they need to be evaluated by Wells Fargo to ensure they comply with regulations, and their book of business needs to be "scrubbed" to eliminate anyone from the mailing on a "do not call list." To simplify things for HMCs, they can subscribe to FASTMail, which will cause a number of pieces of customized mailing to be sent to anyone they want within their personal book of business. The mailings have their name on them (in addition to Wells Fargo's), which allows the direct recipients to contact the HMC specifically.

*Id*. HMCs are charged a monthly fee for FASTMail, which is set at a "tiered level" based on the number of mailings the HMC sends out, ranging from $40 to $340, exclusive of postage. *Id*. ¶ 8.

Wells Fargo encourages HMCs to subscribe to these marketing programs, touting the advantages they offer HMCs in performing their jobs. The central portal for signing up for an HMC website, for example, states in bold that **"[a] WFHM HMC Website is a vital tool for your business."** Wynne Decl., Ex. 6 (HMC Online Advertising Toolkit – Branch/HMC Websites); *see also* Wynne Decl., Ex. 5 (Clark Dep.) at 60-61 (describing webpage as the "document that resides on the sales central portal that shows HMCs how to use and sign up for the

5

website"). The benefits of an HMC website are addressed in some detail on this page, which explains:

> The WFHM Branch/HMC Websites Program provides standard, compliant individual Websites for members of the Wells Fargo Home Mortgage Distributed Retail sales force. The websites offer a means to start the application process online, numerous lead generation tools, e-mail subscriptions and a wealth of Information that provide your customers the ability to begin their mortgage research from the comfort of their own homes.
>
> . . .
>
> In addition to the comprehensive Information a site provides, it is a valuable business tool. HMCs can direct customers to their website to begin the application process online. This provides greater business efficiency, significantly reducing data entry for an HMC.
>
> Your website can also be a valuable referral tool. You can list your referral sources directly on your Website – potentially sending customers to them. And, your referral sources can link back to you from their Websites.

Wynne Decl., Ex. 6.

Similarly, a Wells Fargo brochure entitled "FASTMail Works, FASTMail Works for You," states that the program FASTMail was created to "drive retention of existing customers and build referrals through continual personalized contact from the HMC," "leverage the HMC's prospecting and database efforts," "provide compliant, professional, branded materials personalized to the individual HMC," and "drive lead generation efforts back to the HMC through the Business Reply Cards (BRC) that are included in their mail pieces." Wynne Decl., Ex. 8 (brochure); *see* also Wynne Decl., Ex. 5 (Clark Dep.) at 93-94 (testifying that this document from 2009 has been updated since that time and continues to be used). The brochure goes on to describe results of a survey of HMCs, stating that "[a]lmost 90% of those surveyed rated FASTMail as a valuable/very valuable/extremely valuable program." Wynne Decl., Ex. 8 (brochure). It then provides "Success Stories Received From FASTMail Subscribers." *Id.* One states:

> FASTMail keeps my customers in touch with me. I don't have the time to contact all of them and the mailers help remind them to call me, and they do!
>
> I have been a loan originator for over twenty years now and never had a system in place like FASTMail to consistently and

> professionally stay in contact with my past customers. The key to marketing is those two components.
>
> I would not be as successful as I am without this marketing campaign, which is simple and easy to use. Great sales tool!

*Id*.

Notwithstanding the significant benefits Wells Fargo tells its HMCs these marketing tools offer them in conducting their business, however, use of these programs is officially optional. Defendant's Appendix of Evidence, Clark Class Cert. Decl. ¶ 10. The 2014 HMC Comp Plan was amended to include express language to this effect, stating that "Employee acknowledges and agrees that Employee's decision to participate in any or all of these programs is purely voluntary and that Employee is not obligated or otherwise required to participate in any of these programs." Stipulated Facts, Ex. C (2014 HMC Comp Plan) at 4. Thus, a small but not negligible minority of HMCs has chosen not to use one or both of these programs. In particular, Clark states in her declaration that between 2011 and 2015, 65 to 75% of HMCs had individual websites, and even when the charges were dropped for individual websites, in 2016, 15% of HMCs chose not to have one. Appendix of Evidence, Clark Class Cert. Decl. ¶ 6. Likewise, not all HMCs use FASTMail. *Id*. ¶ 10. In particular, between 50 and 55% of HMCs used FASTmail between 2011 and 2015 and in May 2016, the rate was about 60%. *Id*.[8]

### B. Procedural Background

The operative complaint in this action is the First Amended Complaint ("FAC"), which was filed in San Francisco Superior Court on September 28, 2015. Wells Fargo removed the action to this Court on November 16, 2015. Plaintiff asserted eight claims in his FAC, a number of which were dismissed on summary judgment. *See* Docket No. 37. The claims that remain in the case are as follows: 1) Claim Four for reimbursement of business expenses (Cal. Lab. Code § 2802); 2) Claim Five for failure to pay all wages at termination (Cal. Lab. Code §§ 201-03); 3) Claim Six for failure to provide lawful wage statements (Cal. Lab. Code § 226); 4) Claim Seven

---

[8] In its Opposition brief, Wells Fargo states that "[a]t present, only a bit more than half of eligible HMCs are enrolled in FASTMail." Opposition at 6 (citing Defendant's Appendix of Evidence, Clark Class Cert. Decl. ¶ 10). The Clark Declaration does not provide any statistics reflecting the current rate of enrollment, however.

7

for violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq*.), including failure to reimburse business expenses and to pay timely commissions (Cal. Lab. Code § 204.2); and 5) Claim Eight for penalties under the California Labor Code Private Attorney General Act ("PAGA") (Cal. Lab. Code § 2699).

Plaintiff asks the Court to certify the following class and subclasses as to Claims Four through Seven:

> Class
> All persons who are or have been employed, at any time from August 25, 2011 through December 31, 2016, by Wells Fargo Bank, National Association in California under the job titles Home Mortgage Consultant, Home Mortgage Consultant Jr. and Private Mortgage Banker (collectively "HMCs")
>
> Expense Reimbursement Sub-Class
> All persons who are or have been employed as HMCs, at any time from August 25, 2011 through December 31, 2015, by Wells Fargo Bank, National Association in California and who participated in either Wells Fargo's individual HMC website program or FASTMail program.
>
> Commission Pay Sub-Class
> All persons who are or have been employed as HMCs, at any time from August 25, 2011 through December 31, 2016, by Wells Fargo Bank, National Association in California.
>
> Waiting Time Penalties Sub-Class
> All persons who have been employed as HMCs and separated from employment (either by involuntary termination or resignation), at any time from August 25, 2011 through December 31, 2016, by Wells Fargo Bank, National Association in California and who did not timely receive all of their wages at time of separation.

Reply at 2-3.[9]

---

[9] In the Motion, Plaintiff proposed: 1) a Class of California HMCs employed by Wells Fargo from August 25, 2011 to the date of class certification; and 2) a waiting-time penalties sub-class of former HMCs who were employed by Wells Fargo during this period. Motion at 1. Plaintiff modified the proposed class definition in his Reply brief, however, to include a general class cut-off date of December 31, 2016 (instead of the date of the Court's class certification order). Reply at 2. In addition, Plaintiff proposed two sub-classes: 1) an Expense Reimbursement Sub-class; and 2) a Commission Pay Sub-class. *Id*. at 2-3. As to these sub-classes, Plaintiff proposes cut-off dates of December 31, 2015 and December 31, 2016, respectively. *Id*. Plaintiff changed the cut-off dates in recognition of the fact that "Wells Fargo has amended both its expense reimbursement program and commission compensation plan in ways that address issues raised in the subject lawsuit" and "Plaintiff has not worked under these new policies." *Id*. at 2; *see also* Opposition at 24 ("Effective January 1, 2017 . . . Wells Fargo thoroughly revamped it HMC compensation plan to better clarify that no incentive pay is earned until the 16th day of the month following the loan activity); Appendix of Evidence, Clark Class Cert. Decl. ¶ 14 (stating that in 2016 Wells Fargo "rolled out a marketing initiative that includes as a 'free' item for HMCs an individual website."). Because of these modifications to the proposed class definition, the Court need not address Wells

8

## III. ANALYIS

### A. Legal Standard

A class action may be maintained under Rule 23 of the Federal Rules of Civil Procedure if all of the requirements of Rule 23(a) are satisfied and the plaintiff demonstrates that one of the requirements of Rule 23(b) is met as well. Here, Plaintiff asks the Court to certify the proposed class under Rule 23(b)(3).

Rule 23(a) requires that a plaintiff seeking to assert claims on behalf of a class demonstrate: 1) numerosity; 2) commonality; 3) typicality; and 4) fair and adequate representation of the interests of the class. Fed. R. Civ. P. 23(a). Rule 23(b)(3) allows a class action to be maintained where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, classwide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, — U.S. —, 136 S. Ct. 1036, 1045 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196-197 (5th ed. 2012) (internal quotation marks omitted)).

"At class certification, a court does not accept at face value a plaintiff's theory of the case; the court must engage in a 'rigorous analysis . . . [into whether] . . . the prerequisites of Rule 23(a) have been satisfied,' and 'frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim.'" *Rodman v. Safeway, Inc.*, No. 11-cv-03003-JST, 2014 WL 988992, at *6 (N.D. Cal. Mar. 10, 2014) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982))). "While the trial court has broad discretion to certify a class, its discretion must be exercised within the framework of Rule 23." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.),

---

Fargo's argument that the proposed class cannot be certified after December 31, 2016 because of changes to the HMC Comp Plan that went into effect in 2017. *See* Opposition at 24.

9

*opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001) (citing *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977)).

### B. Numerosity

Rule 23(a)(1) requires that the size of the proposed class be "so numerous that joinder of all the class members is impracticable." Wells Fargo stated in its Notice of Removal that there are "2,015 putative class members who experienced some adjustment to their commissions as a result of participating in the marketing programs at issue" in this case. Notice of Removal ¶ 9. Therefore, the numerosity requirement is satisfied.

### C. Commonality and Predominance

The commonality requirement of Rule 23(a)(2) is met where "the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] with one stroke.'" *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal citation omitted) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Thus, plaintiffs seeking to certify a class must "demonstrate 'the capacity of classwide proceedings to generate common answers' to common questions of law or fact that are 'apt to drive the resolution of the litigation.'" *Id.* (quoting *Wal-Mart*, 564 U.S. at 350). "[C]ommonality only requires a single significant question of law or fact." *Id.* at 589 (citing *Wal-Mart*, 564 U.S. at 359).

"The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3)," requiring that common questions predominate over individual issues. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). In *Hanlon*, the Ninth Circuit explained that in contrast to the commonality requirement of Rule 23(a)(2), the predominance inquiry under Rule 23(b)(3) "focuses on the relationship between the common and individual issues." *Id.* at 1022. "'When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis.'" *Id.* (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1778 (2d ed.1986)); *see also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623

10

(1997) ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.").

To determine whether the commonality and predominance requirements are satisfied as to the classes Plaintiff seeks to certify, the Court looks to the legal requirements of Plaintiff's claims, the theories Plaintiff advances in support of his claims, and the factual record that has been developed thus far in this case. As set forth below, the Court concludes that the commonality and predominance requirements are satisfied as to both of Plaintiff's substantive claims.

### 1. Late Payment of Commissions Claim

Plaintiff's claim for late payment of commissions is based on California Labor Code section 204(a), which provides that "[a]ll wages . . . earned by any person in any employment are due and payable twice during each calendar month. . . ." Wages include "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." Cal. Labor Code § 200(a). "In other words, all earned wages, including commissions, must be paid no less frequently than semimonthly." *Peabody v. Time Warner Cable, Inc.*, 59 Cal. 4th 662, 668 (2014). The California Supreme Court recognized in *Peabody*, however, that "(1) commissions are not earned or owed until agreed-upon conditions have been satisfied, and (2) such satisfaction often may occur on a monthly or less frequent basis." *Id*.

As the Court explained on summary judgment, the question of when a commission is earned is typically a matter of contract. *See Koehl v. Verio, Inc.*, 142 Cal. App. 4th 1313, 1335 (2006). In this case, Plaintiff seeks to establish on behalf of the class that under Section V(C) of the HMC Comp Plans, HMC commissions are "earned" no later than the end of the month, which is when the loans fund and the commissions are credited. Under this theory, Wells Fargo would have to make commission payments by the 10th day of the following month. *See* Opposition at 23 (citing California Labor Code section 204(a) for the proposition that "wages earned between the 16th and 31st of the month may be paid as late as the 10th day of the following month"). It is undisputed, though, that HMCs are not paid commissions until after that date. Given that Plaintiff's claim turns on contractual language that applies to all HMCs and a common practice as

11

to when commissions are paid, the Court concludes that common issues predominate as to the proposed class.

The Court rejects Wells Fargo's assertion that there are individualized issues relating to the calculation of commissions that defeat commonality and predominance as to the late payment of commission claim. On summary judgment, the Court stated that if it "later determines that commissions for certain loans are earned at the end of the month in which they are funded, then the DLSE manual requires that they be paid when 'reasonably calculable.'" *Nguyen v. Wells Fargo Bank*, No. 15-CV-05239-JCS, 2016 WL 5390245, at *12 (N.D. Cal. Sept. 26, 2016) (quoting DLSE Manual § 5.2.5). As to the question of when commissions are "reasonably calculable," the Court found that there were factual disputes that precluded summary judgment. *Id*. Wells Fargo contends "individualized factors can delay when pay was calculable," pointing to variations such as "[w]hether an HMC identified any errors in the commission report that Wells Fargo had to investigate and correct," "[h]ow long an HMC waited after the end of the month to input his work hours for the latter part of the month," and "[w]hether the HMC generated loans that required Wells Fargo to access information from other databases to calculate the commission rate." Opposition at 23.

Wells Fargo's argument is based on the premise that the lawfulness of its policy as to when payment of commissions occurs varies from month to month and from HMC to HMC. The Court finds no authority to support such an approach, however, and finds that it is inconsistent with the standard articulated in the DLSE Manual. The DLSE Manual looks to when a commission is "*reasonably* calculable" (as opposed to when a commission was *actually* calculated). DLSE § 5.2.5. Section 5.2.5 addresses situations where "commission wages are not ascertainable at the time of a sale or transaction and must be calculated based on later developments (i.e., receipt of payment, shipping, etc.)." Most of the variations that Wells Fargo has identified, however, do not result from the sort of "later developments" described in this section but are simply the result of practices that Wells Fargo and/or some HMCs may have followed for reasons unrelated to such developments. In other words, these variations appear to have little or no relevance to the question of when commissions reasonably *could* be calculated. Therefore, the Court concludes that any

12

individualized inquiries that might arise as to when HMC commissions were reasonably calculable do not defeat commonality and predominance. [10]

### 2. Failure to Reimburse Claim

California law requires that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful." Cal. Labor Code § 2802(a). Section 2802(c) provides that "[f]or purposes of this section, the term 'necessary expenditures or losses' shall include all reasonable costs, including, but not limited to, attorney's fees incurred by the employee enforcing the rights granted by this section." As the Court recognized in its summary judgment order, under California law an expenditure need not be required by the employer to be "necessary" under section 2802. Dkt. No. 37 at 14-15. Rather, an expenditure may be necessary *either* because it was "'incurred by the employee'" or because it was incurred in direct consequence of the employee's "'obedience to the directions of the employer.'" *Buchanan*, 2013 WL 1788579, at *3 (quoting *Morgan v. Wet Seal, Inc.*, 210 Cal. App. 4th at 1355).

In the Motion, Plaintiff took a dual approach, arguing both that the marketing program expenses were incurred "in direct consequence of the discharge of" the HMCs' duties *and* that HMCS were often coerced into subscribing to these marketing programs. At oral argument, however, Plaintiff stipulated that he no longer seeks to assert a section 2802 claim based on the latter theory, leaving only the claim that these expenses were reasonably necessary to the

---

[10] At oral argument, Wells Fargo cited for the first time to DLSE Opinion Letter No. 12.09.02 (December 9, 2002) in support of its position. Wells Fargo offered no explanation for failing to cite to this opinion letter in its brief. Even assuming Wells Fargo did not waive its right to rely on this opinion letter by failing to cite it in its opposition brief, Wells Fargo's reliance on it is misplaced. In the opinion letter, the DLSE found that monthly payment of commissions to "sales employees engaged in origination of home mortgage loans" was not in violation of Labor Code section 204 "[s]o long as the agreement is clear and unambiguous" that commissions are "not 'earned' <u>within the meaning of Section 204</u>, until the agreed calculation becomes ascertainable." DLSE Opinion Letter No. 12.09.02 (December 9, 2002), p. 2. (emphasis in original). As the Court discussed on summary judgment, the HMC Comp Plans are *not* clear and unambiguous on this question.

13

discharge of the HMCs' duties. With this limitation, the Court finds that the commonality and predominance requirements are met as to this claim.

Wells Fargo relies heavily upon *Buchanan v. HomeServices Lending, LLC*, 2013 WL 1788579 (C.D. Cal. Apr. 25, 2013) and *Morgan v. Wet Seal*, 210 Cal. App. 4th 1341 (2012) in support of its assertion that the expense reimbursement claim should not be certified. In *Buchanan*, the plaintiffs were HMCs employed by a joint venture between Wells Fargo and Home Services of America. Like the plaintiff in this case, they asserted a section 2802 claim based on the employer's failure to reimburse them for the costs of websites, e-business cards, and mailer forms. 2013 WL 1788579, at *1, 4. The plaintiffs acknowledged that the company handbook and written policies did not expressly require these expenditures, but asserted that management used "strong arm tactics" to impose the expenses on all class members. *Id*. The plaintiffs offered in-person and email communications between employees and managers to establish that the expenditures were required, but the employer countered with "evidence showing that other HMCs interpreted the marketing programs to be merely optional including declarations of several HMCs . . . and evidence that many HMCs did not enroll" in the programs at issue. *Id*. at *5. The court concluded that the plaintiffs had not met the commonality requirement of Rule 23(a) because the "[d]efendants' liability will rest on individualized inquiries into matters such as what each manager instructed, how each employee interpreted the instruction, and whether the employee then relied on the instructions and enrolled in the programs." *Id*. In other words, the theory of the plaintiffs' expense reimbursement claim under section 2802 in *Buchanan* was the one that Plaintiff here has now abandoned, namely, that HMCs were forced to use these marketing tools by their managers. Because Plaintiff plans to rely on the common duties and requirements of HMCs that make these expenditures necessary and *not* on coercion of managers, *Buchanan* is distinguishable on the question of whether the commonality and predominance requirements are satisfied.

*Morgan* is distinguishable for the same reason. In that case, the plaintiffs alleged that their former employer, Wet Seal, violated California Labor Code section 2802 by requiring them to purchase Wet Seal clothing and merchandise as a condition of employment. *Morgan v. Wet Seal, Inc.*, 210 Cal. App. 4th 1341, 1344 (2012). The official policy of the employer, as stated in the

14

employee handbook, was that employees were expected to "dress in a manner that is both respectful of our Customers and consistent with the current fashion attire that is reflected in the stores" but that they were "not required to wear the Company's clothing." *Id*. at 1347. The plaintiffs, however, offered evidence that in fact their managers required them to wear all Wet Seal clothing and accessories and that they were not reimbursed for these expenses. *Id*. at 1350. The court found that a class could not be certified as to this claim because of the individualized issues that would have to be addressed under these circumstances, including "(1) what, if anything, the employee was told by his or her store manager regarding purchasing Wet Seal clothing or wearing Wet Seal clothing to work; (2) if such a discussion occurred, when and with whom the employee had that discussion; (3) how the employee interpreted that discussion; (4) whether the employee's interpretation was reasonable; and (5) whether the employee then purchased Wet Seal clothing to wear to work pursuant to that discussion." *Id*. at 1356. Again, Plaintiff in this case no longer asserts the expense reimbursement claim on the basis that HMCs are forced by their managers to use the marketing tools that are the subject of this claim. Consequently, the individualized issues that precluded certification in *Morgan* will not arise in this case.[11]

---

[11] In its Opposition brief, Wells Fargo also argues that the expense reimbursement claim will raise individualized issues because the expense associated with purchasing FASTMail and individual HMC websites may have been offset by the revenue generated by use of these programs and that amount is likely to vary widely between HMCs. Opposition at 21-22. The only authority it cites for this argument is a footnote in *Howard v. Gap, In*c., No. C 06-06773 WHA, 2009 WL 3571984, at *1 (N.D. Cal. Oct. 29, 2009). In that case, the plaintiff asserted a claim under New York law for unlawful deductions from wages by the retailer Gap, Inc. based on the allegation that her manager told her at orientation that she was required to purchase and wear Gap clothing at work. Because Gap's official policy encouraged but did require employees to purchase and wear its clothing, the court declined to certify a class as to this claim because there was no common method of proof. *Id*. at *4-5. The court noted that there was no common script used by managers to train employees and that even the declarations offered by plaintiff's declarants varied as to what they remembered being told by their managers during training. In the footnote cited by Wells Fargo, the Court noted that another reason for denying class certification on this claim was that some employees may have purchased Gap clothing to give to family members or wear outside of work. As these purchases would fall outside the ambit of the claim, the Court concluded that it would be "very difficult, if not impossible to determine, on class-wide proof, whether all employees were harmed by some Gap manager's instructions." Aside from the fact that this statement is dicta, it does *not* stand for the proposition that a reasonably necessary expense need not be reimbursed under section 2802 if the expense is outweighed by some benefit that allegedly results from the expense. Nor has the Court found any authority that supports such a conclusion.

Instead, Plaintiff's expense reimbursement claim turns on whether the marketing expenses at issue were reasonably necessary to the discharge of the HMCs' duties. Wells Fargo has stipulated that all HMCs perform the same primary duty (the origination of loans) and Wells Fargo's witnesses and promotional materials tout benefits of the marketing programs that apparently apply equally to all HMCs. Further, all HMCs are subject to the same policy with respect to reimbursement of these expenses. Conversely, Wells Fargo has pointed to no significant individualized issues regarding the ways in which HMCs use these programs or the types of benefits they obtain from them. Thus, the Court concludes that it will not need to engage in significant individualized inquiries to adjudicate this claim and that the commonality and predominance requirements are met.[12]

### D. Typicality

Rule 23(a)(3) requires that "the [legal] claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Here, Nguyen worked as an HMC and shared with the putative class members the primary obligation of originating loans on behalf of Wells Fargo. He also was subject to the same policies with respect to payment of commission and reimbursement of marketing expenses as the putative class members. Therefore, the Court finds that the typicality requirement is satisfied.[13]

### E. Adequacy

Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the interests of the class." "Determining whether the representative parties adequately represent a class involves two inquiries: (1) whether the named plaintiff and his or her counsel have any

---

[12] The Court also finds that because Plaintiff has limited the scope of his reimbursement claim, his failure to present a trial plan showing how the individualized issues can be managed does not present an obstacle to class certification. *See* Opposition at 24-25 (arguing that the Court should deny class certification because Plaintiff did not present a trial plan

[13] The Court's conclusion is based, in part, on the limitation in the scope of Plaintiff's section 2802 claim discussed above.

16

conflicts of interest with other class members and (2) whether the named plaintiff and his or her counsel will act vigorously on behalf of the class." *Calvert v. Red Robin Int'l, Inc*., No. C 11-03026 WHA, 2012 WL 1668980, at *2 (N.D. Cal. May 11, 2012) (citing *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)). There is no evidence of a conflict of interest on the part of Nguyen or his counsel. Further, Nguyen has actively served the class, including responding to discovery and sitting for his deposition. Wynne Decl. ¶ 11. Likewise, Nguyen's counsel has litigated many wage and hour class actions and is prosecuting this case vigorously. Wynne Decl. ¶ 5-8, Kaufmann Decl. ¶¶ 5, 15. Wells Fargo does not contend that either the plaintiff or his counsel will not adequately represent the putative class. The Court finds this requirement is satisfied.

### F. Superiority of Class Mechanism

The Court also finds that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The factors considered in making this determination include "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A) – (D). In addition, the Ninth Circuit has explained that "[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Wolin v. Jaguar Land Rover N. Am*., LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted). An overriding concern of the "superiority" inquiry is judicial economy which, in turn, is related to the question of commonality. *Id*.

Here, the Court finds that adjudication of Plaintiff's claims on a classwide basis is in the interest of judicial efficiency because the claims (as limited by Plaintiff) are relatively straightforward and do not appear to present any serious management problems. Moreover, the cost of litigating these claims will likely "dwarf" the relatively small amount of damages that might be recovered by each class member. Therefore, the Court concludes the class mechanism

17

meets the superiority requirement.

## IV. CONCLUSION

For the reasons stated above, the Motion is GRANTED. The Court certifies the following class and subclasses:

<u>Class</u>
All persons who are or have been employed, at any time from August 25, 2011 through December 31, 2016, by Wells Fargo Bank, National Association in California under the job titles Home Mortgage Consultant, Home Mortgage Consultant Jr. and Private Mortgage Banker (collectively "HMCs")

<u>Expense Reimbursement Sub-Class</u>
All persons who are or have been employed as HMCs, at any time from August 25, 2011 through December 31, 2015, by Wells Fargo Bank, National Association in California and who participated in either Wells Fargo's individual HMC website program or FASTMail program.

<u>Commission Pay Sub-Class</u>
All persons who are or have been employed as HMCs, at any time from August 25, 2011 through December 31, 2016, by Wells Fargo Bank, National Association in California.

<u>Waiting Time Penalties Sub-Class</u>
All persons who have been employed as HMCs and separated from employment (either by involuntary termination or resignation), at any time from August 25, 2011 through December 31, 2016, by Wells Fargo Bank, National Association in California and who did not timely receive all of their wages at time of separation.

A Further Case Management Conference is set for **November 3, 2017 at 2:00 p.m.** The parties are instructed to meet and confer and submit a joint Case Management Conference Statement that includes a proposed schedule for the remainder of the case by **October 27, 2017.**

**IT IS SO ORDERED.**

Dated: September 22, 2017

JOSEPH C. SPERO
Chief Magistrate Judge

18